1　　　　　　　　UNITED STATES DISTRICT COURT
　　　　　　　　NORTHERN DISTRICT OF MISSISSIPPI
2　　　　　　　　　　　OXFORD DIVISION

3
　　UNITED STATES OF AMERICA　　　　　　　　PLAINTIFF
4

5
　　VS.　　　　　　　　　　　　　　　　NO. 3:21CR107
6

7
　　JAMARR SMITH, THOMAS IROKO AYODELE,
8　　AND GILBERT McTHUNEL, II　　　　　　　DEFENDANTS

9

10
　　　　　　　　TESTIMONY OF STEPHEN MATHEWS
11　　　　　EXCERPT FROM MOTION TO SUPPRESS HEARING

12
　　　　　　BEFORE HONORABLE SHARION AYCOCK
13　　　　　　UNITED STATES DISTRICT JUDGE

14
　　　　　　　　　Oxford, Mississippi
15　　　　　　　　　January 31, 2023

16

17
　　　　　　　　APPEARANCES NOTED HEREIN
18

19

20

21

22

23　Court Reporter:　　PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
　　　　　　　　　　　Federal Official Court Reporter
24　　　　　　　　　　911 Jackson Avenue East
　　　　　　　　　　　Oxford, MS　38655
25

1  <u>APPEARANCES:</u>

2  For the Government:   ROBERT J. MIMS, Esquire
                          U.S. Attorney's Office
3                         900 Jefferson Avenue
                          Oxford, MS  38655
4
   For the Defendant
5   Smith:               GOODLOE T. LEWIS, Esquire
                          Hickman, Goza & Spragins, PLLC
6                         P.O. Drawer 668
                          Oxford, MS  38655-0668
7
   For the Defendant
8   Ayodele:             WILLIAM F. TRAVIS, Esquire
                          8619 Highway 51 North
9                         Southaven, MS  38671

10 For the Defendant
    McThunel:            PAUL A. CHINICHE, Esquire
11                        Chiniche Law Firm, PLLC
                          P.O. Box 1202
12                        Oxford, MS  38655-1202

13

14

15

16

17

18

19

20

21

22

23

24

25

1          * * * * *

2          **THE COURT:**  Who would the government call as its next

3 witness?

4          **MR. MIMS:**  Your Honor, I call Stephen Mathews.

5     (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

6          **THE COURT:**  Counselors, I see that one of the

7 defendants is missing.  May I proceed in his absence?

8          **MR. CHINICHE:**  You may, Your Honor.  It's my client,

9 Mr. McThunel.

10          **THE COURT:**  Thank you.

11 **STEPHEN MATHEWS, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN,**

12          **WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

13          **DIRECT EXAMINATION**

14 **BY MR. MIMS:**

15 **Q.**   Mr. Mathews, would you state and spell your name for the

16 record, please.

17 **A.**   Stephen, S-t-e-p-h-e-n, Mathews, M-a-t-h-e-w-s.

18 **Q.**   Mr. Mathews, who are you employed by these days?

19 **A.**   I'm employed by a company called Guidehouse.  It's a

20 contract company that does consulting work.

21 **Q.**   Okay.  So you're a civilian now; right?

22 **A.**   I am.

23 **Q.**   What did you do prior to that?

24 **A.**   29 years, I was in law enforcement; the last 19 as a

25 postal inspector.

1 **Q.** Okay. In 2018, were you with the U.S. Postal Inspection
2 Service?

3 **A.** Yes, sir, I was. I was a team leader, a supervisor,
4 stationed in the Mobile, Alabama, office.

5 **Q.** Okay. When you say a team leader or supervisor, what
6 area did you supervise?

7 **A.** I had offices -- my Mobile office that I covered had
8 inspectors there that covered about the lower third of Alabama.
9 Had an office in Jackson, Mississippi, that I supervised that
10 covered basically the Southern District of Mississippi. And
11 then we had an office in Oxford, Mississippi, which basically
12 covered the Northern District of Mississippi.

13 **Q.** And was Inspector Todd Matney one of the inspectors that
14 worked under your supervision at that time?

15 **A.** Yes, sir, he was.

16 **Q.** What did you do prior -- you said 19 years of postal
17 inspection service?

18 **A.** Yes, sir.

19 **Q.** What law enforcement experience did you have prior to
20 that?

21 **A.** Prior to that, six years with U.S. Probation here in the
22 Northern District of Mississippi, and then prior to that, four
23 years as a probation officer in Louisiana.

24 **Q.** Okay. So let's talk about the training you received as a
25 federal agent. What kind of training did you get initially

1    when you became a federal agent?

2    **A.**    It was in -- well, in 2001 when I became a postal

3    inspector, we had a 14-week academy in Potomac, Maryland, that

4    covered wide-range issues, you know, items including legal

5    aspects of the job.

6    **Q.**    What about search warrants?  Did you receive training on

7    search warrants at that time?

8    **A.**    Yes, sir, I did.  And we had continuing training, what

9    they call field legal training, every few years that would

10   cover search warrants or other developments that they thought

11   were appropriate.

12   **Q.**    Okay.  You had that -- that field training throughout

13   your career?

14   **A.**    Yes, sir, I did.

15   **Q.**    So, in regard to search warrants, what kind of training

16   did you receive?  In other words, based on your training, what

17   was your understanding as to what you needed to do to obtain a

18   search warrant?

19   **A.**    To obtain a search warrant, you just have to have --

20   establish probable cause -- that you believe that probable

21   cause has been established that a certain thing to be searched

22   will produce evidence of your crime.

23   **Q.**    All right.  As an agent, can you estimate how many search

24   warrants you were involved in?

25   **A.**    Hundreds.

1    **Q**.    And explain, if you would, just in general -- we're going

2    to talk about this one -- this case in a few minutes, but just

3    in general, what would you do when you decided you needed a

4    search warrant in an investigation?  How did that process work?

5    **A**.    Well, during the course of my career, I've written

6    hundreds of search warrants, various different things, from

7    whether it was drug packages, money laundering, fraud,

8    robberies.  It just kind of depends on -- it depended on what

9    you're exactly looking for.

10    The main basis of a search warrant is establishing what

11    happened and why you believe there's evidence that will be

12    recovered from the -- from that search that you're doing.  So

13    you're basically just going through trying to play out your

14    evidence as to why you believe there's probable cause that

15    you'll find evidence from that search.

16    **Q**.    In seeking search warrants, did you consult -- would you

17    consult with anybody as a general rule?

18    **A**.    Oh, yes, sir, with just about all of them.  You know, you

19    talk to other inspectors.  You talk to other law enforcement

20    agents, especially if it's something that you didn't -- was

21    maybe new to you that you hadn't done before, you know, for the

22    technical aspects.

23    The probable cause part in establishing what happened and

24    didn't happen, you know, is pretty general for all search

25    warrants.  But if there was a technical aspect, we would talk

1  to -- we had legal attorneys with the postal service.  They

2  were called inspector attorneys.  We'd talk with them.  We

3  would talk to other inspectors that had written search warrants

4  that might have been similar, other law enforcement agencies

5  that had written similar search warrants.

6  Then we would also, you know, consult -- obviously,

7  before we took it to a magistrate, we'd consult with the U.S.

8  Attorney's Office.

9  **Q.**  Okay.  So did you participate in the investigation of the

10  Lake Cormorant post office robbery that occurred February 5th,

11  2018?

12  **A.**  Yes, sir, I did.

13  **Q.**  How did you get involved?

14  **A.**  Initially, I was -- like I said, I was supervisor for the

15  Oxford office, and Oxford would cover Lake Cormorant.  I was

16  actually -- during the time that the robbery occurred, I was

17  out of town for a training.  I believe it was in Maryland.

18  But I was out of town for a few days, but I was notified

19  what happened.  I kind of coordinated who needed to show up

20  and, you know, what was going on.  They would brief me on what

21  was -- you know, different things that they found, what was

22  going on while I was away.  And within that first week, I was

23  back in Lake Cormorant helping organize and supervise what was

24  going on there.

25  **Q.**  I was going to ask you, what was your role?  You

1  mentioned organize and supervise.  Anything else as far as what

2  your role may have been in the investigation?

3  **A**.    Yeah.  I mean, I assisted with developing suspects, you

4  know, the reports.  And at some point -- at a later point after

5  Inspector Matney got injured, I kind of took over the lead

6  investigative agent in the case.

7  **Q**.    So, before the postal inspection service sought this

8  geofence warrant, what information did you have regarding the

9  crime?  And the Court's already heard the details of the crime.

10  I'm not trying to get into details.  I'm talking about more --

11  just in general, what -- what evidence did y'all have to go on?

12  **A**.    Before that, we had -- we had done a lot of stuff

13  regarding, you know, our investigate steps in the case.  You

14  know, the initial response started with interviews.  You're

15  looking for videos.  You're looking for witnesses.  You're

16  looking for all kinds of steps to kind of help you put together

17  what the case is.

18       And one of the initial things that we found was a video

19  from a farm that was adjacent to the post office that kind of

20  gave us -- or showed us the robbery in progress and gave us

21  some ideas of other things that we should be looking for.

22  **Q**.    Okay.  The victim in this case is Sylvester Cobbs; right?

23  **A**.    Yes, sir.

24  **Q**.    Did y'all interview Mr. Cobbs?

25  **A**.    Yes, sir, we did.

1 **Q.** And while he could describe what happened, he could not

2 identify the assailant; correct?

3 **A.** He could not.

4 **Q.** Why was that?

5 **A.** The individual was wearing a mask.

6 **Q.** Okay. Did you find any other potential witnesses on

7 scene?

8 **A.** Yes, sir, we did. There was a gentleman that lived

9 across the street from the post office that was initially

10 interviewed by the sheriff's office when they showed up and

11 then subsequently interviewed by inspectors.

12 **Q.** And what basically in a nutshell had he seen?

13 **A.** He'd seen a red, maroon car driving in the area that had

14 stopped. Said he walked up to the car to ask them, you know,

15 if they needed any help. He said it seemed kind of suspicious

16 to him. Asked if they needed any help. Said they were looking

17 for Highway 61. He gave them directions to Highway 61 and then

18 went back to his house.

19 **Q.** Okay. At that time, could that individual identify the

20 person he'd spoken to?

21 **A.** No, sir, he could not.

22 **Q.** And you mentioned you had the video; correct?

23 **A.** Yes, sir, we did.

24 **Q.** From the information you had at that time -- and I'm

25 talking the November 2018 time period now when -- because

1  that's when y'all got the geofence; right?

2  **A**.   Correct.   November 2018.

3  **Q**.   At that time, could you identify any suspects?

4  **A**.   No, sir.   No, sir.   We didn't have any particular names.

5  **Q**.   How many suspects did you have?

6  **A**.   We believed three because we had -- from the video, we

7  saw a white -- it's, like, a Yukon or a Suburban come -- drive

8  by the post office.   It turns around off camera.   You see it

9  coming back the other direction.   You see an individual get out

10  of that vehicle and come to the back of the post office, and

11  the white SUV leaves out of the -- you know, leaves the

12  opposite direction that it came from -- or it leaves in the

13  direction it came from on the video.

14        And then after we see the truck get there -- our mail

15  truck get there, we see another red, maroon type vehicle kind

16  of follow in the truck.   And it kind of turns around, and it

17  leaves the area, and it comes back.   And it sits there and --

18  just making all kinds of what we believe were suspicious

19  activities during -- during the time of the robbery.

20  **Q**.   And so the inspection service -- postal inspection

21  service eventually decided to seek a geofence warrant; right?

22  **A**.   Yes, sir, we did.

23  **Q**.   Now, we know that Inspector Matney is the one that signed

24  the affidavit and presented it to Judge Percy; correct?

25  **A**.   That's correct.

1 **Q.** Did you assist Inspector Matney in preparing the

2 affidavit in seeking the search warrant?

3 **A.** Yes, sir, I did.

4 **Q.** What did you do?

5 **A.** Basically, I -- during the course of the investigation, I

6 was speaking to another investigator with a local agency in

7 Alabama. He had called me for some assistance with a case he

8 was working on, and he explained to me about this geofence

9 search warrant that he had gotten from Google and kind of went

10 through the process of what it was and what it did and what it

11 could provide you. And so it was like, okay, this is an

12 interesting concept. Maybe it's something we could use -- use

13 in our -- our robbery.

14 So we also -- so then I also made contact with some other

15 people that had -- had maybe some more technical knowledge. We

16 had an inspector that assisted us with a robbery in

17 Porterville, Ala -- Porterville, Mississippi, that I knew had

18 some technical knowledge about some of this, you know, phones

19 and different things like that. I had spoken with her, some

20 other inspectors.

21 She got me in contact with some individuals in North

22 Carolina -- some law enforcement officers in North Carolina

23 that have written some of these and some other people that had

24 some knowledge of how these Google search warrants work,

25 because it was kind of -- at least, to me, it was a new -- a

1  new thing, a new type of search warrant.

2  **Q.**   This is the first time you'd ever actually applied for

3  one; correct?

4  **A.**   That is correct.

5  **Q.**   Okay.  But based on your conversations with other

6  inspectors, are you aware of other geofence warrants that have

7  been approved?

8  **A.**   Yes, sir.

9  **Q.**   So, besides you and Inspector Matney, did you work with

10  any other agents as far as preparing to seek the search

11  warrant?

12  **A.**   Well, in the preparation, you know, we talked to --

13  talked to other inspectors in my office, other inspectors that

14  were working on the case with us at the time, you know, to make

15  sure that we had all of our facts correct.

16        In reviewing the video, I had other inspectors look at

17  the video with me, you know, to get their take on what -- what

18  we were seeing, you know, what they -- you know, what their --

19  what their input was in it.  And I also did that, you know,

20  when we wrote the warrant.

21        You know, it was a collaborative effort.  Wrote the

22  warrant with Inspector Matney.  We reviewed the video together

23  to make sure that we were seeing the same things, that what we

24  saw, you know, matched up to what we were putting in the

25  warrant.

1   **Q**.   So we're going to play the video in a minute, but before

2   we play it, just tell the Court in your own words, what did you

3   see on the video that you thought was important pertaining to

4   probable cause?

5   **A**.   Well, first, obviously, we see the white car and identify

6   the vehicles involved and how many people we believe were

7   involved.  Obviously, a driver of the red vehicle, a driver of

8   the white vehicle, and the person on the back dock of the post

9   office.  So that was -- that was obviously important.

10       Once we see the person get out of the white vehicle and

11   they're coming to the back dock, we see some movement several

12   times during the course of the video that indicate that they're

13   moving their hand.  You can tell their -- that their elbow is

14   bent like their hand's up toward -- toward their head, like a

15   motion, like, using a phone or whatever.

16       But the elbow you could see.  To me, looked like it

17   was -- it was crooked.  It was bent.  Because at times you can

18   even see the right hand kind of dangling free.  And there was

19   several occasions like that where he moved back and forth on

20   the back dock that we -- that we noticed.

21       And then, also, after he left, after the robbery had

22   occurred -- this was prior to the robbery.  After the robbery

23   occurred, there's one particular instance when he comes back to

24   the back dock, and he's kind of bent down, and you see him --

25   it looks like he's looking down, and it looks like he's raising

1   his hand up as if he's looking at something in his hand.

2   **Q.**   Now, you can't see a phone in his hand, can you?

3   **A.**   No, sir, I cannot.

4   **Q.**   Do you know how far it is from the security camera to the

5   back dock of the post office?

6   **A.**   It's -- it's a good distance.  I'm not sure.  I mean, a

7   hundred yards maybe.  I'm not really positive.

8   **Q.**   Hard to see a little phone in there from that distance?

9   **A.**   Correct.  Yes.

10   **Q.**   But you were describing a minute ago after the robbery

11   had occurred before the assailant had left the view that he had

12   squatted down with his hands in front of him?

13   **A.**   Yes, sir.

14   **Q.**   Did that appear to you that he might be using a phone at

15   that time?

16   **A.**   Yes, it appeared possible.  Yes, sir.

17   **Q.**   And you described a minute ago that before -- before the

18   truck pulled up, did you see the assailant walking around with

19   his left hand up to his ear -- is that right? -- his elbow up?

20   **A.**   That's what it looked like.  Yes, sir.

21   **Q.**   What did that appear to you to be?

22   **A.**   To me, it appeared somebody was on the phone.

23           **MR. LEWIS:**   Excuse me, Your Honor.  This is cumulative

24   with the prior testimony.  The video speaks for itself.  This

25   witness did not sign the affidavit that obtained the search

1  warrant.  You know, the prosecution -- and I'm sure in good

2  faith, but this is just another bite at the apple.  They're

3  asking the witness to interpret what the video says.  I object

4  to it.  It's not necessary.  That's been done.

5  **THE COURT:**  Okay.  Thank you.  Move on.

6  **MR. MIMS:**  Your Honor, my intentions were at this

7  point to briefly review the video.

8  **MR. LEWIS:**  Excuse me, Your Honor.  I object to that.

9  **MR. MIMS:**  Can I respond to it, Your Honor?

10  **THE COURT:**  Sure.

11  **MR. MIMS:**  I think we've established this, but if I

12  need to go back through it with Mr. Mathews, I will.  What he's

13  testified to a minute ago is he and Inspector Matney worked

14  together collaborating to put the affidavit together.  They

15  reviewed the materials together.

16  They are complaining in their motion that -- basically

17  they said the government lied in its affidavit, that they

18  didn't see somebody using a phone.  And I'm trying to put the

19  people on the stand that put this affidavit together to say,

20  no, here's -- here's why we put in there appears they were

21  possibly using a phone.

22  It's the people that put that affidavit together I'm

23  putting on the stand, and I thought it would be important for

24  you to hear from him this is what he saw.  This is why he and

25  Inspector Matney, together, put this in the affidavit.

1          **THE COURT**:  Do you contend that he saw anything

2  different than what Matney did?

3          **MR. MIMS**:  I do not.  Your Honor, if I may -- if I may

4  proffer his testimony, he's going to -- if we walk through the

5  video, he would show you what Inspector Matney showed you

6  earlier.  We see the gentleman with his elbow up to his ear.

7  We see the person squatting and looking forward, and that

8  appears to be a phone.  And I can skip through that.  If the

9  Court has seen it, I understand.

10         **THE COURT**:  I have seen it, and, of course, I've

11  watched the video several times yesterday too.  So I think I'm

12  pretty familiar with the video.

13         **MR. MIMS**:  Okay.

14         **THE COURT**:  If he has additional testimony, if there's

15  parts of the video that he sees something different than the

16  other witness, I would want to hear that.  But I understand the

17  government's contention as to the positioning of the body that

18  could possibly be holding a phone.

19         **MR. MIMS**:  That's fair enough.  Thank you.  I just

20  wanted you to hear it from him that he saw that too.

21         **THE COURT**:  Yes.

22  **BY MR. MIMS**:

23  **Q**.  After -- so, Agent Matney -- or Inspector Matney, he's

24  here in Oxford; right?

25  **A**.  Yes, sir, he is.

1   **Q.**    You are in Mobile?

2   **A.**    Yes, sir.

3   **Q.**    And Agent Matney is the lead investigator in the case;
4   right?

5   **A.**    He is, yes, sir.

6   **Q.**    Okay. So it was Inspector Matney that signed the
7   affidavit and went to present it to Judge Percy; right?

8   **A.**    That's correct.

9   **Q.**    What occurred after the -- after Judge Percy signed the
10   warrant?

11   **A.**    Submitted it through -- Google has a process of a website
12   where you have to submit the application, and then they, I
13   guess, have their lawyers review it and then determine, you
14   know, what -- essentially look at it and find the relevant
15   information to send back to you.

16   **Q.**    Okay. Now, you're familiar with the whole file; right?

17   **A.**    Yes, sir.

18   **Q.**    In fact, at that time, up until Inspector Matney's
19   injury, you were working with him; right?

20   **A.**    Yes, sir.

21   **Q.**    After he was injured, which was summer of 2019 --

22   **A.**    Yes, sir. June of 2019.

23   **Q.**    -- you took over as the case agent -- the lead case agent
24   at that time; right?

25   **A.**    Yes, sir, I did.

1  **Q.** Okay. So it's fair to say you're familiar with what all

2  happened with Google and what you got back?

3  **A.** Yes, sir.

4  **Q.** All right. So what's the first thing y'all got back from

5  Google?

6  **A.** The first thing we got back was in April of 2019. It

7  was -- basically, it was three separate devices -- it showed

8  three separate devices within that geofence area during the

9  time frame between 5:00 and 6:00.

10 **Q.** And there's no identifiers for the devices. Fair to say?

11 **A.** Correct. It's just -- it's all numerical identifiers.

12         **MR. MIMS:** Your Honor, for ease, may I present this on

13 the presenter?

14         **THE COURT:** Yes.

15         **MR. MIMS:** We haven't identified it yet.

16 **BY MR. MIMS:**

17 **Q.** Mr. Mathews, do you recognize this document?

18 **A.** I do.

19 **Q.** What is this?

20 **A.** That's a document we received from Google in relation to

21 the search warrant, the initial.

22 **Q.** That's basically Step 1 of the process; correct?

23 **A.** Yes, sir.

24 **Q.** Okay. What's it -- what's -- it's showing you three

25 devices here; right?

1    **A.**    Yes, sir.  It's three separate devices.  The date was

2    February 5th, which was the time of our robbery, and then the

3    time frame was between 5:00 and 6:00 -- 5:00 and 6:00.

4    **Q.**    And to keep this simple, basically, the devices are

5    identified as 859, 479, and 768; correct?

6    **A.**    Yes, sir.  That's correct.

7    **Q.**    Some of them have more than one time when they actually,

8    for lack of a better word, I'm going to call it, hit.  Is that

9    fair?

10   **A.**    Yes, sir, that's fair.

11        **MR. MIMS:**  Your Honor, I would offer this into

12   evidence as Exhibit G-3.

13        **MR. LEWIS:**  No objection.

14        **THE COURT:**  It will be received.

15      (EXHIBIT NO. G-3 ADMITTED INTO EVIDENCE.)

16   **BY MR. MIMS:**

17   **Q.**    So, Mr. Mathews, what did you do after receiving this

18   information?

19   **A.**    After we received that information, you know, we looked

20   at the longitude and latitude, obviously, that was -- that was

21   showing on there and kind of saw they were, you know, within

22   that fence.  We then -- at that point, Inspector Matney, in

23   May -- I believe it was May of 2019 asked for that second part,

24   because, as you said, there was three parts.

25        The first one -- which I'm sure the judge knows, but the

1  first one was we get that information, and then we look at it.

2  And my understanding of the reason for that is, say, if we

3  were -- you know, had 500 hits, that they would want us to

4  narrow that down to a reasonable number instead of giving 500,

5  you know, identifiers on the -- for the Google owners.

6       So, at that point, we looked at it.  We said, hey, these

7  three -- two of them look like they're -- they could possibly

8  be our suspects because they're hitting, you know, real close

9  to our post office.  There's multiple hits on them.  The third

10  one is kind of an outlier.  We thought maybe could be a

11  witness.  You know, we need information on those.

12       So we submitted that information to Google for -- the

13  second step that we asked for was the hour before and the hour

14  after.  And Inspector Matney submitted that to Google around

15  the end of May.  And then --

16  **Q.**  And did Google -- did Google send back a response to

17  Step 2?

18  **A.**  Yes.  I believe it was May 30th they sent back a response

19  with -- with the hour before and the hour after to Inspector

20  Matney at that time.

21  **Q.**  It was shortly before Inspector Matney went to the

22  training where he ended up getting injured; right?

23  **A.**  That's correct.  That was around June -- the first part

24  of June is when he was going to the training.

25  **Q.**  And then did the inspection service -- postal inspection

1   service send off for Step 3 right before he went to training?

2   **A.**    Yes.  I believe it was on June the 7th he requested the

3   third step that would give the identifiers, and I believe it

4   was June the 10th -- because we were in contact that weekend

5   because he was -- when he was traveling to his training, there

6   was some issues with his flight, and he got there late, and

7   regardless to say, we're talking a lot that weekend.

8       He tells me -- I get this -- he got the information back

9   on the 10th, you know, when we're having this conversation.  So

10  he sends it to me to start doing the research --

11  **Q.**    Okay.

12  **A.**    -- on the information he gets back from June the 10th.

13  **Q.**    And we're talking about the Step 3 information?

14  **A.**    Yes.  The identifiers of the account owners.

15  **Q.**    And who -- what -- who was identified in Step 3?

16  **A.**    Step 3 there was, like I said, three different devices.

17  There was one for Jamarr Smith, and then there was one that

18  listed him as actually the account holder and a phone number

19  associated with him.

20      And then there was another one for -- it was a bleek -- I

21  don't remember the exact e-mail address -- and then a phone

22  number with it, which we were able to identify as related to

23  Mr. McThunel.

24      And then there was another one called

25  permanentwavesrecords.  It was an e-mail address and a phone

1  number associated with it.  It was at the 5:58 mark, the one we

2  thought could be a potential witness that we received

3  information on.

4  **Q.**  Is this the information you received back in regards to

5  Step 3?

6  **A.**  Yes, sir, it is.

7  **Q.**  So you've got the Jamarr Smith account; right?

8  **A.**  Yes, sir.

9  **Q.**  Are you able to take that information and determine who

10  Jamarr Smith was?

11  **A.**  Yes, sir, we were.

12  **Q.**  And then bleek2004, is that part of the information you

13  received?

14  **A.**  Yes, sir, it is.

15  **Q.**  And there's actually -- there's more --

16  **A.**  This is just a condensed version --

17  **Q.**  Yes.

18  **A.**  -- of what they sent that comes in the letter.  When you

19  get the letter back, there's also the attachment that actually

20  had Mr. McThunel's name associated with it.

21  **Q.**  So the attachment had more specifics on each of these --

22  each of these entities; right?

23  **A.**  Yes, sir.  That's correct.

24  **Q.**  All right.  And were you able to identify bleek2004 as

25  Gilbert McThunel?

1  **A.**    Yes, sir.

2  **Q.**    And then the third one that you got, did you run that

3  down and determine that one really had nothing to do with this?

4  **A.**    Yes, sir.  We couldn't find any relation to our case on

5  that one.

6  **Q.**    Okay.  So, after receiving this information and having

7  two people identified -- two potential suspects identified,

8  Smith and McThunel, what did you do?

9  **A.**    Then in -- well, did a lot of research.  And then middle

10  of July -- I think it was about July 17th -- I submitted

11  another search warrant to the magistrate judge for a broader

12  range of information related to Mr. McThunel and Mr. Smith's

13  account, which covered January 1, 2018, to April -- April 30th,

14  2018, for all Google information regarding them, including any

15  location information between those dates.

16  **Q.**    Okay.  So you were able to get location information on

17  Mr. Smith and Mr. McThunel specifically with a second search

18  warrant?

19  **A.**    Yes, sir, with a second search warrant.

20  **Q.**    And just very briefly, what did that information show

21  you?

22  **A.**    It showed travel between -- between Batesville,

23  Mississippi, and our target -- our -- you know, our post office

24  in Lake Cormorant and then travel back, you know, just

25  specifically during the time of the robbery.  It was travel up

1   there, the robbery occurred, and then travel back to

2   Batesville.

3   **Q.**   Okay.  Did you also seek phone records, what I call toll

4   records on these individuals?

5   **A.**   Yes, sir, we did.

6   **Q.**   Did you obtain those?

7   **A.**   Yes, sir.  We got -- we got phone records for -- for all

8   three accounts or for all three individuals, but the phone

9   records showed calls between all of the individuals during the

10  time of the robbery.

11  **Q.**   Now, you said all three.  The third person you're

12  referring to is Mr. Ayodele?

13  **A.**   Yes, sir.  That is correct.

14  **Q.**   How did you end up determining he was part of this?

15  **A.**   We had found a phone call -- and I believe it was from

16  the tower dump.  We had found a phone call between -- I'm

17  trying to remember correctly.  It was Mr. McThunel's phone and

18  Mr. Ayodele's phone.  I believe it was about a four-minute

19  phone call during the time period of the robbery.

20  **Q.**   Well, and you mentioned the time period of the robbery.

21  I should have asked you this earlier.  When did this robbery

22  occur?

23  **A.**   Between 5:15 and 5:35.

24  **Q.**   All right.  You've seen the video; right?

25  **A.**   Yes, sir.

1 **Q**. Of course, we have, like, an hour's worth of video, but
2 the part from where you first see the assailant dropped off
3 behind the post office until the last -- basically until the
4 robbery is over with, is that the 5:15 to 5:30 time period you
5 just referenced?
6 **A**. Yes, sir. Generally --
7 **Q**. Approximately.
8 **A**. -- in that time frame, yes, sir.
9 **Q**. Okay. Now, did you find any evidence as to who might
10 have a white SUV similar to what's in the video?
11 **A**. Yes, sir, we did.
12 **Q**. Who's that?
13 **A**. Mr. Ayodele.
14 **Q**. Okay. Did you find any evidence as to who might own a
15 red Hyundai similar to what you seen?
16 **A**. Yes, sir, Mr. McThunel.
17 **Q**. All right. Were you able to go back to the eyewitness
18 that spoke to the individual in the red car and present any
19 evidence to him to see if he could identify somebody?
20 **A**. Yes, sir, we did.
21 **Q**. How did you do that? What did you do?
22 **A**. Inspector Martin was out of our Jackson office. He
23 located Mr. Coffman, interviewed him, showed him three photo
24 lineups, one with each of our suspect's picture in -- in -- not
25 in -- one for Mr. McThunel, one for Mr. Ayodele, and one for

1   Mr. Smith. And he showed him three different -- different

2   lineups.

3       For the McThunel lineup and the Ayodele lineup, he didn't

4   recognize anybody in those pictures. But in the one we had

5   Mr. Smith's picture, he picked Mr. Smith as the individual that

6   he saw in the red vehicle during the time of the robbery.

7   **Q.** So, if Mr. Smith is driving the red vehicle and if

8   Mr. Ayodele is driving his own SUV, that leaves Mr. McThunel;

9   correct?

10   **A.** That's correct.

11   **Q.** Did you review Mr. McThunel's phone records from the time

12   from approximately 5:15 p.m. that evening?

13   **A.** Yes, sir, we did.

14   **Q.** What did you find?

15   **A.** We found a phone call between him and Mr. Ayodele.

16   **Q.** Okay. Do you recall how long that phone call lasted?

17   **A.** I believe it was a little over four minutes.

18   **Q.** Do you recall getting phone records from C Spire on

19   Mr. McThunel?

20   **A.** Yes, sir.

21   **Q.** Do you recall what Mr. McThunel's phone number was or at

22   least part of it?

23   **A.** I think it was -- I don't remember. I'm not positive. I

24   don't remember if it was 6029 or 7511. I remember both of

25   those numbers. I don't --

1  **Q.**   Let me ask you a question.  Would it be in some of the

2  reports you have in the back?

3  **A.**   Yes, sir, it would.

4  **Q.**   I could show you that and refresh your memory, but to cut

5  to the chase, if -- does 7511 as Mr. McThunel's number ring a

6  bell to you?

7  **A.**   Yes, sir.

8  **Q.**   And 6029 for Mr. Smith?

9  **A.**   Yes, sir.

10 **Q.**   Okay.  Do you see a phone call between those two?

11 **A.**   Yes, sir, I do.

12 **Q.**   Now, what time is that phone call?

13 **A.**   At 7 -- or 5:16.  1716.  5:16.

14 **Q.**   This is military time we're looking at here; right?

15 **A.**   Yes, sir.  That's correct.

16 **Q.**   And this is not UTC time.  Some phone records we get back

17 come in UTC time; correct?

18 **A.**   That's correct.

19 **Q.**   But that's not what is --

20 **A.**   That's not this, no.

21 **Q.**   Okay.  So, approximately 5:16 p.m., we have a phone call

22 between Smith and McThunel that lasted 350 seconds?

23 **A.**   Yes, sir.

24 **Q.**   Okay.  Is that consistent with what you saw in the video

25 when Mr. McThunel had his hand up to his ear?

1  **A.**   Yes, sir, it is.

2  **Q.**   Mr. Mathews, I understand that Inspector Matney is the

3  one who signed the affidavit; right?

4  **A.**   Yes, sir.

5  **Q.**   You worked with him close on that affidavit; right?

6  **A.**   Yes, sir.

7  **Q.**   To the best of your knowledge, was everything set forth

8  in that affidavit true and correct?

9  **A.**   Yes, sir, it was.

10  **Q.**   And, to the best of your knowledge, did you and your

11  coworkers follow the legal process as you understood it to be?

12  **A.**   Yes, sir, we did.

13          **MR. MIMS:**  No further questions, Your Honor.

14          **THE COURT:**  Thank you.

15          Cross-examination?

16          **MR. CHINICHE:**  Yes, Your Honor.

17                    **CROSS-EXAMINATION**

18  BY MR. CHINICHE:

19  **Q.**   Good afternoon, Mr. Mathews.

20  **A.**   Good afternoon.

21  **Q.**   I'm going to show you a document that's in this case.  We

22  have referred to it as Document 74-2.  Okay?  And it is the

23  Affidavit in Support of Search Warrant that Mr. -- Inspector

24  Matney signed.  Okay?

25  **A.**   Okay.

1   **Q**.   It is eight pages -- eight pages. If you'll -- let me

2   see if I can -- it's eight pages. It's got a Probable Cause

3   Statement; Evidence, Fruits, and Instrumentalities; Request for

4   Nondisclosure and Sealing. That's so that if there's anybody

5   that -- anybody's device that gets identified, law enforcement

6   doesn't want Google to notify that device holder; is that

7   right?

8   **A**.   Correct.

9   **Q**.   And then it's signed by Inspector Matney November 8th,

10   2018; right?

11   **A**.   Yes, sir.

12   **Q**.   Okay. And it had some attachments to it as well;

13   correct?

14   **A**.   Yes, sir.

15   **Q**.   In the -- you're familiar with getting a search warrant,

16   are you not?

17   **A**.   Yes, sir.

18   **Q**.   You have 19 years of federal law enforcement experience.

19   You've applied for search warrants all -- for all sorts of

20   things, haven't you?

21   **A**.   Yes, sir.

22   **Q**.   You've gotten search warrants on cars, houses, and cell

23   phones; right?

24   **A**.   Correct.

25   **Q**.   And in the Probable Cause Statement, you all indicate the

1  use of a cell phone; right?  And I believe it is right here,

2  Paragraph 16.

3  **A**.   What it states is "it appears robbery suspect is possibly

4  using a cellular device."

5  **Q**.   Right.  You've got to -- you've got to indicate in this

6  affidavit that the cell phone is possibly used, don't you?

7  Because if you don't indicate that a cell phone is believed by

8  you all to be used, you can't get the search warrant -- or you

9  might be able to get it, but it's not valid; right?

10  **A**.   I don't know that I necessarily agree with that, no.

11  **Q**.   Okay.  All right.  But the reason why -- this statement

12  in here in the probable cause where you outline where the crime

13  occurred, the date, what y'all believe the time to be, you

14  indicate to the magistrate judge that you've got a video, and

15  that based on looking at the video surveillance, it appears the

16  robbery suspect is possibly using a cellular device; right?

17  **A**.   Yes, that's what's stated in there.  Correct.

18  **Q**.   All right.  You're trying to get through this affidavit

19  and application cellular device information, are you not?

20  **A**.   We're trying to get Google device, whether it's a

21  cellular phone or -- it could have been an iPad or whatever,

22  but something that had Google services.

23  **Q**.   Right.  It's got to be a device with Google services on

24  it; correct?

25  **A**.   It's not necessarily cellular, but, yes.

1  **Q**.  Right.  But you indicate possibly using a cell device?

2  **A**.  That's correct.

3  **Q**.  So, if it were a land line being used in the crime, you

4  would put a land line in this affidavit, wouldn't you?

5  **A**.  That's too --

6  **Q**.  Maybe that's too speculative.

7  **A**.  That's too -- yeah --

8  **Q**.  Too speculative?

9  **A**.  -- too speculative for me to really say.

10  **Q**.  But my point is that this is an important statement --

11  paragraph.  Paragraph 16 is important in order to get -- in

12  order to get this search warrant; is it not?

13  **A**.  Whether it's more important than anything else, I don't

14  necessarily say that.  I mean, I think it's a fact for -- what

15  we believe is a fact that can be added to the search warrant,

16  but whether it's the key to the search warrant, I don't know

17  that I would necessarily say that.

18  **Q**.  Well, if I'm -- if I'm investigating the crime at a

19  house, I have to indicate a very detailed description of that

20  house.  I have to have the address, what the house looks like,

21  and I have to tell the magistrate judge, "Well, I believe that

22  house is involved in a crime or has a suspect" --

23  **A**.  Correct.

24  **Q**.  -- right?  But this affidavit and this application is

25  devoid of that information.  Has none of that identifying

1    information.  Do you understand?

2    **A.**   Not really, no.

3    **Q.**   Okay.  So to get -- to get around that problem or to fix

4    that problem, this affidavit says to the magistrate judge, "We

5    possibly observe the suspect using a cellular device."  Would

6    you agree with that?

7    **A.**   I don't know that I really understand your question.  I

8    don't know that we're getting around anything.

9    **Q.**   Okay.

10   **A.**   I don't know if I agree with that characterization.

11   **Q.**   Okay.  I understand.  Mr. Mims asked you a minute ago,

12   "Mr. Mathews, did you see a phone in his hand, or you can't see

13   a phone in his hand," meaning the suspect's hand.

14   **A.**   That's correct.

15   **Q.**   And how did you answer?

16   **A.**   I answered correctly.  I said no.

17   **Q.**   "No, I cannot"?

18   **A.**   That's correct.

19   **Q.**   So Agent Matney or Inspector Matney gets approval to

20   issue a warrant to Google, search warrant.  We call that a

21   geofence warrant; right?

22   **A.**   Yes.  It was based on the geofence, yes.

23   **Q.**   And this was your first time doing this; is that right?

24   **A.**   That's correct.

25   **Q.**   So y'all are borrowing language and consulting with

1  agents probably across the country, right --

2  **A.**   That's correct.

3  **Q.**   -- on how to do this?

4  **A.**   Correct.

5  **Q.**   And you're asking agents, "Hey, did y'all get it done?"

6  "Yes, we did.  No, we didn't," whatever.  Right?

7  **A.**   Right.

8  **Q.**   And this is a form -- because I've seen this form in

9  other cases now.  Okay?  This is not something that you

10 tailored yourself; right?

11 **A.**   Correct.  To a, you know, certain extent, yes.

12 **Q.**   Yeah.

13 **A.**   But, no.  Yeah.  I mean --

14 **Q.**   The facts --

15 **A.**   -- the majority of it we got information from different

16 people and put it together for our own individual search

17 warrant.  Correct.

18 **Q.**   So the facts portion is what you and Inspector Matney

19 wrote out, right, the facts, but the legal language and other

20 sections is borrowed from probably a template; right?

21 **A.**   Well, I don't know if it's necessarily a template.  It

22 was from several different ones.  So it wasn't just one

23 necessarily template.  It was from several different, what we

24 call, go-bys that we use to get the technical language in

25 there.

1  **Q.**   Okay.  And here we're on the same document in this
2  affidavit, Paragraph 21B.  In Paragraph 21, this is where we're
3  getting to the Step 1, Step 2, Step 3 process; right?
4  **A.**   Correct.
5  **Q.**   Okay.  And in this application, you all are indicating we
6  need "all location data, whether it's derived from GPS, cell
7  tower triangulation, Wi-Fi location, GPS coordinates, for this
8  estimated radius and the -- and for the target time period."
9  And in this case, y'all did 5:00 p.m. Central Time to 6:00 p.m.
10 Central Time; right?
11 **A.**   That's correct.
12 **Q.**   So you're going to Judge Percy asking him to give all
13 location data derived from whatever these sources are; right?
14 **A.**   Correct.  Within that geofence, correct.
15 **Q.**   And then you're going to get raw data.  You're going to
16 get devices which Mr. Mims showed you.  I think we have three
17 different devices.  We had the timestamp; right?
18 **A.**   Yes, sir.
19 **Q.**   After Step 1, you get what's depicted in Government G --
20 Exhibit G-3; right?
21 **A.**   Correct.
22 **Q.**   You get this after Step 1?
23 **A.**   Correct.
24 **Q.**   There's no -- there's no name associated.  There's no
25 e-mail account?

1   **A.**   Correct.

2   **Q.**   Okay.  And so there's Step 2, right, Step 2 and Step 3?

3   And would you agree that, in Step 3, that's when Google turns

4   over -- turns over the e-mail account, I think you said

5   bleek2004; right?

6   **A.**   Correct.

7   **Q.**   Step 3?

8   **A.**   I wouldn't necessarily characterize it as Step 2 and

9   Step 3, but they're steps you have to take in order.  The

10   Number 1 is a step that you have to take in order.  And if you

11   read the attachment, 2 and 3 state upon demand -- after review

12   and upon demand, they would provide that additional

13   information.  It doesn't necessarily say that you have to go to

14   Step 2 or Step 3 in any particular order, but you have to do

15   both of them.

16   **Q.**   Okay.

17   **A.**   It just says that this is available and this is

18   available.  And what we actually did was actually go in a step

19   process.  We went 1; then we went 2; then we went 3.  But it

20   didn't necessarily say after that first -- after we get that

21   first information that we had to follow some particular order,

22   but we had to review the information and then tell them what we

23   wanted.

24        And if we didn't want anything, we wouldn't go back to

25   them for anything.  If we wanted -- you know, this is what you

1 characterize as Step 2, we'd ask them for that, or 3 or both or

2 however.

3 **Q.** Okay. All right. So you and Mr. Matney are going to

4 Magistrate Percy. You're indicating you want all data,

5 location information. You're indicating "Each device

6 corresponding to the location to be provided by Google will be

7 identified only as a numerical identifier"; right?

8 **A.** That's correct.

9 **Q.** You agree with that? "Without any further content or

10 information identifying the user of a particular device." Now,

11 "Law enforcement" -- that's you; right? --

12 **A.** Correct.

13 **Q.** -- "will analyze this location data to identify users who

14 may have witnessed or participated in the subject offense and

15 will seek any additional information regarding those devices

16 through further legal process." Through further legal

17 process --

18 **A.** That's correct.

19 **Q.** -- right? So, once you get to this place in the

20 affidavit and application, you've got to -- you're telling

21 Judge Percy, "We will get additional information through

22 further legal process," but that wasn't done in this case, was

23 it?

24 **A.** It was done, yes, sir.

25 **Q.** It was --

1   **A.**    If we can flip to Attachment A, it defines what the

2   further legal process is.

3   **Q.**    Here's Attachment A.

4         **MR. MIMS:**  Your Honor, if I may, he's referencing

5   what's Government's Exhibit G-2.  It was left off the back of

6   Attachment A.

7   **BY MR. CHINICHE:**

8   **Q.**    Government Exhibit G-2.  Do you agree with me there?  You

9   see that?

10  **A.**    I don't see anything.  Oh, yeah, the number.  Yes.  I'm

11  sorry.

12  **Q.**    That's okay.  Is this G-2?

13  **A.**    Yes, sir.

14  **Q.**    Step 1, Step 2, "devices through further legal process."

15  **A.**    Correction.

16  **Q.**    Okay.

17  **A.**    You were saying Paragraph 1 is Step 1 and Paragraph 2 is

18  what you call Step 2, but, actually, if you look at -- 1 and 2

19  are basically -- one is saying what we want.  2 is saying what

20  they provide.

21  **Q.**    Right.

22  **A.**    So that's -- that's really, I guess what you call,

23  Step 1.

24  **Q.**    Okay.  So these are Step 1?

25  **A.**    Correct.  So Step 3 would -- or Step 2, as you call it,

1  would be Paragraph 3.  And the further legal process is

2  providing them -- we providing them a copy of the search

3  warrant and saying comply with Paragraph 3 or Paragraph 4 that

4  says you will give this information upon demand after we

5  reviewed this Step 1 process.

6  **Q.**   Right.

7  **A.**   And which we did.  We submitted to them and asked for all

8  three identifiers.

9  **Q.**   But you didn't -- you got the identifier information, but

10  you didn't go back to the federal court to request another

11  subpoena.  Instead -- am I right?  Because, instead, the

12  request went directly to Google for follow-up information?

13  **A.**   Correct.  This attachment was part of the search warrant,

14  and so what we did was we resubmitted it to Google and said,

15  "Comply with Paragraph 3 as directed in the original search

16  warrant, that you will provide this upon demand once -- or once

17  it's been -- once Part 1 is evaluated, you will provide this

18  upon demand."

19      So you have -- the legal process was going back into

20  the -- the Google geoportal, resubmitting it and saying,

21  "Comply with this because we've now reviewed the first part.

22  We need these three device informations," and resubmitted them.

23  So, yes, we did.  It was -- and correction.  It was a search

24  warrant, not a subpoena.

25  **Q.**   It was a search warrant.  All right.  This is another

1   document.  This is in the record at 74-4.  This is Step 1,

2   Items Number 1 and 2.  Step 2 is Item Number 3.  Step 3,

3   Paragraph 4; correct?

4   **A**.    Right.

5   **Q**.    All right.  But my point is, when this was attached to

6   the application for the search warrant, you all indicated we're

7   going to get location information.  Once we get it, we're not

8   going to know who it is, and there will be -- we will seek

9   additional information regarding those devices through further

10  legal process.

11          And then law enforcement submitted another request to

12  Google, and they got 2, they got 3, and they got 4 without

13  going back to a federal court to get another search warrant.

14  **A**.    That's because the judge had already signed off on -- on

15  these steps.

16  **Q**.    But you represented to the federal court that you were

17  going to get anonymous data and that we're then going to --

18  once we've got anonymous data and we get to look at it and we

19  get to narrow it down, we're going to come back and seek

20  additional information regarding those devices through further

21  legal process.

22          So you're representing to the magistrate judge what

23  you're going to do, but you're not doing it.  It's not

24  optional.

25  **A**.    I disagree with that.

1    **Q.**    I know you do.

2    **A.**    Because -- because we outlined what the further legal

3    process is.  If you'll read Paragraph 3 and 4, it clearly

4    states after "analysis of the provided records, and upon

5    demand."  To meet the upon demand, we demanded.  We sent a

6    request to them demanding the information.  They provide, you

7    know, the information in Paragraph 3 and the information in

8    Paragraph 4.

9         So, to me, it's clearly written out what the legal

10   process is, and we followed it that the judge signed off on.

11   **Q.**    And I'm submitting a new subpoena has to be issued and

12   approved when you go to Step 2, as well as a third subpoena for

13   Step 4.

14   **A.**    And I would -- I would, I guess, have to disagree.

15   That's not what the judge signed off on.  The judge signed

16   off --

17             **THE COURT:**   I understand -- excuse me.

18             **THE WITNESS:**   Go ahead.

19             **THE COURT:**   I understand each of your arguments.

20   **BY MR. CHINICHE:**

21   **Q.**    And in May of 2019, Google responds to Inspector Matney

22   providing Step 2 data --

23   **A.**    Correct.

24   **Q.**    -- right?

25   **A.**    That's correct.

1  **Q.**  And it's this information?

2  **A.**  Correct.

3  **Q.**  And we know that Google is responding only to the first

4  search warrant it received because it's referencing the

5  November 8, 2018, search warrant; right?

6  **A.**  Correct.  That's correct.

7  **Q.**  Then, Mr. Mathews, you all got June 2019 another response

8  from Google.  This is Step 3; right?

9  **A.**  Correct.  That's when we got the account identifiers.

10  **Q.**  You're still dealing with the very original search

11  warrant?

12  **A.**  That's correct.

13  **Q.**  And now -- now we've got how many account informations

14  here?

15  **A.**  Three.  The bleek2004, Jamarr Smith, and

16  permanentwavesrecords.

17  **Q.**  What's the name of the person that holds

18  permanentwavesrecords?

19  **A.**  That was not -- that was not in the information.

20  **Q.**  From Google?

21  **A.**  From Google.  Correct.

22  **Q.**  Is this the account y'all say that y'all have ruled out?

23  **A.**  Yes.  We couldn't find any -- any other relevant

24  information regarding that account.  And that account was the

25  one -- or the hit from Google was actually at 5:58.  It was

1    after the robbery occurred and after police officers and

2    everybody had shown up at the post office.

3    **Q.**    I would submit, Mr. Mathews, I'd like to know who has

4    that account.  Can you tell me?

5    **A.**    No, I can't tell you.  No.

6    **Q.**    What information do you have on permanentwavesrecords?

7    **A.**    I'd have to review my files.  I don't have that with me,

8    no.

9    **Q.**    That information has not been provided to my office, has

10   it?

11   **A.**    I don't know.  I don't know that we know the owner of

12   permanent wave because we never requested that information from

13   Google.

14   **Q.**    So it's possible that the person that owns that account

15   is also involved?

16   **A.**    I don't believe so, no.

17   **Q.**    Based upon these letters right here?

18   **A.**    Based on the time of the hit of the robbery.  The robbery

19   occurred, like I said, between 5:15 and 5:35.  That hit was at

20   5:58.  That's the only hit within the geofence at that time.

21   So, based on our review of the records, we didn't believe it

22   was involved, no.

23   **Q.**    What device is it?

24   **A.**    The one at 479, I believe.

25   **Q.**    479?

1   **A.**   5:58.

2   **Q.**   This one right here (indicating)?

3   **A.**   Correct.

4   **Q.**   859 is one of the defendants; 768 is another defendant?

5   **A.**   That's correct.

6   **Q.**   You're ruling that one out?

7   **A.**   That's correct.

8         **MR. CHINICHE:**  If I may just have a moment, Your

9   Honor.

10         **THE COURT:**  Yes.

11     (CONFERRING OFF THE RECORD.)

12         **MR. CHINICHE:**  I have no further questions.

13         **THE COURT:**  Mr. Lewis.

14                 **CROSS-EXAMINATION**

15   **BY MR. LEWIS:**

16   **Q.**   My name is Goodloe Lewis.

17   **A.**   How are you doing?

18   **Q.**   You requested information from 5:00 p.m. to 6:00 p.m. on

19   the day in question; correct?

20   **A.**   Yes, sir.  The original --

21   **Q.**   Because you thought that that would catch phones in the

22   geofence that were relevant to this case; right?

23   **A.**   That's correct.

24   **Q.**   And when you caught a phone that you thought was relevant

25   to the case, you would then investigate and figure out who --

1  who owned that phone; right?

2  **A.**  Correct.

3  **Q.**  And so you caught a phone that was within the thing but

4  at 5:58; right?

5  **A.**  Correct.

6  **Q.**  And you can't tell us -- so it's relevant.  It's

7  within the -- it's within the one-hour time frame.  It's

8  relevant.

9  **A.**  Possibly.  Possibly not.

10  **Q.**  Okay.  But you made the decision to not find out who that

11  person was and disclose it to us; correct?

12  **A.**  We determined that --

13      **MR. MIMS:**  Your Honor, I object to the part where he

14  says "disclose it to us."  We're going to clear that up in a

15  minute, but I want to object to that part.

16      **THE COURT:**  Objection noted.  You may proceed.

17  **A.**  We decided not to further investigate that.  Correct.

18      **MR. LEWIS:**  I have no further questions, Your Honor.

19      **THE COURT:**  Mr. Travis, any questions on cross?

20      **MR. TRAVIS:**  No cross.  Thank you, Your Honor.

21      **THE COURT:**  Thank you.  Mr. Mims.

22                **REDIRECT EXAMINATION**

23  BY MR. MIMS:

24  **Q.**  Mr. Mathews, after we indicted this case or maybe even

25  before that, did you provide me a copy of everything in your

1  file?

2  **A.**   Yes, sir, I did.

3  **Q.**   It is fair to say it's quite voluminous?

4  **A.**   It is.

5  **Q.**   In fact, you did it on a couple different occasions

6  as far as giving me a flash drive with volumes and volumes of

7  information; correct?

8  **A.**   That's correct.

9  **Q.**   Is that everything you have pertaining to this

10 investigation?

11 **A.**   Yes, sir.

12 **Q.**   Is that everything you have including anything pertaining

13 to permanentwavesrecords?

14 **A.**   Yes, sir, it is.

15 **Q.**   Okay.

16         **MR. MIMS:**  Your Honor, for the record, all of that

17 information has been provided to each of the defendants.

18 **BY MR. MIMS:**

19 **Q.**   Mr. Mathews, I want to ask another question.  You correct

20 me if I'm -- if I'm wrong.  Did we have a meeting at one time

21 with all three defendants to review discovery?

22 **A.**   Yes, sir, we did.

23 **Q.**   I don't remember if you were present in person or if you

24 were present by phone.

25 **A.**   I believe it was by phone.

1  **Q.**   By phone.  I was in my office with all three defendants;
2  right?

3  **A.**   Yes, sir.

4  **Q.**   Was that a -- well, just tell the Court, what was the
5  purpose of that meaning?

6  **A.**   To basically explain what the case was.  I had actually
7  developed the -- a PowerPoint that I believed we were going to
8  use in grand jury -- that was before I retired, but I believe
9  we went through the PowerPoint step by step to kind of show the
10  information that we had, kind of lay out the case in general
11  terms to the defense.

12  **Q.**   This was after we had provided discovery to them;
13  correct?

14  **A.**   Yes, sir, it was.

15  **Q.**   Did we give them the opportunity to ask you any questions
16  they wanted to ask you about what was in your file and your
17  investigation?

18  **A.**   Yes, sir.  You gave them free rein to ask anything.

19  **Q.**   Okay.  I'm putting G-3 up here for you to look at again.
20  Again, the permanentwavesrecords was the device that would be
21  479; correct?

22  **A.**   Yes, sir.

23  **Q.**   And that only hit at 5:58 p.m.; right?

24  **A.**   That is correct.

25  **Q.**   Based on your review of the video, we have -- people of

1   interest is the white SUV, the red car, and the assailant

2   behind the post office.  Were all three of those vehicles and

3   people long gone by 5:58 p.m.?

4   **A.**   Oh, yes, sir, they were.

5   **Q.**   Is that part of what led you to rule that person out as a

6   participant?

7   **A.**   Yes, sir, it is.

8   **Q.**   Did you still attempt to identify that person?

9   **A.**   We did attempt, yes, sir.

10  **Q.**   Were you able to do so?

11  **A.**   No, sir.

12  **Q.**   Okay.  One more thing.  If you recall, which -- I

13  understand that we -- they identified McThunel and Smith.  Do

14  you remember which one is device 859 and which one is 768?

15  **A.**   I have it in the record, but off the top of my head, I do

16  not.

17  **Q.**   Okay.

18        **MR. MIMS:**  I have no further questions, Your Honor.

19        **THE COURT:**  Okay.  Have you done -- have you done

20  geofence warrants since this one?

21        **THE WITNESS:**  No, ma'am.  I retired shortly after

22  that.  I retired in July of 2020.

23        **THE COURT:**  Mr. Mathews, I'm still kind of confused

24  about one thing.  So I understand that in Step 1 three numbers

25  were identified -- device numbers were identified.  In earlier

1  testimony, I understood that you narrowed it down to two, but
2  then you actually got information on three?

3  **THE WITNESS:**  We narrowed it down to two for the
4  second -- the second search warrant, for the search warrant
5  that I got in July.

6  **THE COURT:**  Say that to me again.

7  **THE WITNESS:**  For the -- I got a search warrant in
8  July 2019.  We had narrowed it down at that point to two.  That
9  was for Mr. McThunel and Mr. Smith's account.  That's what I
10  was talking about when we narrowed it down to two.  Does that
11  make sense?

12  **THE COURT:**  Huh-uh.

13  **THE WITNESS:**  Narrowed it down to two for the second
14  search warrant, not for the first search warrant.  The first
15  one we were looking at -- we looked at all three devices to see
16  if maybe we can identify the third one and see if maybe that
17  was a witness, that permanentwavesrecords.  We never could
18  identify who that was.

19  But we did -- were able to identify Mr. Smith's and
20  Mr. McThunel's and were able to use other information that gave
21  us probable cause for that second search warrant.  So the
22  second search warrant is when we narrowed it down to two people
23  and got a broader range of information.

24  **THE COURT:**  Your second search warrant was not a
25  geofence warrant?

1       **THE WITNESS:**  No, ma'am, it was not.  It was a Google

2   search warrant, but it was not a geofence.  That's correct.

3       **THE COURT:**  So, back to the first search warrant that

4   was a geofence, in Step 3, did you learn two sources of

5   information or three?

6       **THE WITNESS:**  Three, yes, ma'am.

7       **THE COURT:**  So, if you had narrowed it down to two,

8   how did you go about getting the third set of information?

9       **THE WITNESS:**  Well, at that point, we hadn't -- we

10  didn't narrow it down to two until after we got all of the

11  information.

12      **THE COURT:**  So when we talk about -- some of the

13  pleadings talk about narrowing it down to two.  You're

14  representing to me that in the first search warrant when you

15  did Steps 1 and 2, when you, upon demand, asked for the

16  information in Step 3, you got it on three devices?

17      **THE WITNESS:**  Yes, ma'am.  That is correct.

18      **THE COURT:**  Okay.

19      **THE WITNESS:**  If you would like, Your Honor, I can

20  kind of tell my -- what I understand about why Google likes you

21  to narrow it down.  I can -- I can give you that.

22      **THE COURT:**  Did anyone assist you in determining the

23  square meters to search in this case?

24      **THE WITNESS:**  No, ma'am.  No.  I -- well, I talked to

25  other inspectors about how -- you know, what mapping --

1           **THE COURT:** The perimeters?

2           **THE WITNESS:** -- program that you use where you could

3 put the pin in a certain location, and it will tell you the --

4 the coordinates per se. They kind of, you know, walked me

5 through that, you know, where to go to get that information,

6 how to pin that, but I actually did that myself.

7           **THE COURT:** Okay. In light of my questions, Mr. Mims?

8           **MR. MIMS:** No, Your Honor.

9           **THE COURT:** Counselors?

10           **MR. CHINICHE:** Yes, Your Honor.

11                   **RECROSS-EXAMINATION**

12 **BY MR. CHINICHE:**

13 **Q.** Mr. Mathews, I want to be -- I want to make sure we're

14 all clear. You got one geofence warrant -- search warrant in

15 this case; right?

16 **A.** Correct.

17 **Q.** And that was based upon an application dated

18 November 8th, 2019; right?

19 **A.** '18, I believe.

20 **Q.** '18; right?

21 **A.** Yes.

22 **Q.** And, in return, eventually, you all got three devices; is

23 that right?

24 **A.** That's correct.

25 **Q.** And it's these three devices here, bleek2004,

 1  jamarrsmith33, and permanentwavesrecords; right?

 2  **A.**    That's correct.

 3  **Q.**    All right.  And that -- once you had that, in -- you got

 4  this information in June of 2019; right?

 5  **A.**    Correct.

 6  **Q.**    After June 2019, June the 10th, you went and got a Google

 7  search warrant on bleek2004 and jamarrsmith33?

 8  **A.**    Correct.

 9  **Q.**    But you did not get a search warrant on

10  permanentwavesrecords?

11  **A.**    Correct.

12  **Q.**    And once you got that subsequent Google search warrant,

13  not a geofence, that's where you found identifiers for Gilbert

14  McThunel and Jamarr Smith?

15  **A.**    We had information -- no.

16  **Q.**    All right.  When you went and got the Google search

17  warrant, not the geofence, you confirmed the identity of these

18  two accounts?

19  **A.**    If we're talking about the first search warrant, the

20  November 2018 search warrant, we got --

21  **Q.**    You just got this; right?

22  **A.**    Well, no.  As I indicated, the -- we got that, but there

23  was also an attachment that came with it that has more

24  identifying information.  Like, bleek2004, it says Gilbert

25  McThunel.  Has a phone number associated with him.

 1  **Q.**    Right.

 2  **A.**    Jamarrsmith has a phone number associated with him.  So,

 3  yes, we had some more -- I'm not really sure of the question,

 4  but we had more identifying information than -- than what's

 5  particularly on this.  That's what I believe those hash -- what

 6  they call the hash values are on the Google.  It's that

 7  attachment that has more identifying information about bleek

 8  and jamarrsmith accounts.

 9       Then when we got -- from there, we developed more

10  probable cause on those two accounts to get the subsequent

11  search warrant that got broader information from January 1,

12  2018, to April 30th, 2018, which got all of their Google

13  information they had, including location from January 1 to

14  April 30th.

15  **Q.**    All right.  And it was the geofence that led you to that

16  layered Google search warrant; right?

17  **A.**    Yes, it was the information we got from that warrant.  We

18  used that and developed further those -- information about

19  those two accounts.

20  **Q.**    Right.

21            **MR. CHINICHE:**  Thank you.

22            **THE COURT:**  Can he be finally excused, or do you

23  anticipate needing to call him back?

24            **MR. MIMS:**  Your Honor, I do not anticipate recalling

25  him.  May he remain in the courtroom?

1      **THE COURT:**  Yes.  So you're finally excused.

2      **MR. MIMS:**  May Inspector Matney come back in the

3    courtroom if he wants to?  We kept him out in case -- the Court

4    had not excused him completely.  May he come back in?

5      **THE COURT:**  Yes.

6      **MR. MIMS:**  Okay.  Your Honor, I have no further

7    witnesses.

8                              *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I, Phyllis K. McLarty, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of Mississippi, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing 53 pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Witness my hand, this 16th day of February, 2023.

/s/ Phyllis K. McLarty
PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
Federal Official Court Reporter