1                      UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF MISSISSIPPI
2                          OXFORD DIVISION

3

   UNITED STATES OF AMERICA                  PLAINTIFF
4

5

   VS.                                NO. 3:21CR107
6

7

   JAMARR SMITH, THOMAS IROKO AYODELE,
8  AND GILBERT McTHUNEL, II               DEFENDANTS

9

10                  MOTION TO SUPPRESS HEARING

11

12          BEFORE HONORABLE SHARION AYCOCK
             UNITED STATES DISTRICT JUDGE
13

14                 Oxford, Mississippi
                 January 31, 2023
15

16

17            (APPEARANCES NOTED HEREIN)

18

19

20

21

22
   Court Reporter:      PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
23                  Federal Official Court Reporter
                   911 Jackson Avenue East
24                  Oxford, MS  38655

25

APPEARANCES:

For the Government:   ROBERT J. MIMS, Esquire
                     CLYDE McGEE, IV, Esquire
                     U.S. Attorney's Office
                     900 Jefferson Avenue
                     Oxford, MS  38655

For the Defendant
 Smith:              GOODLOE T. LEWIS, Esquire
                     Hickman, Goza & Spragins, PLLC
                     P.O. Drawer 668
                     Oxford, MS  38655-0668

For the Defendant
 Ayodele:            WILLIAM F. TRAVIS, Esquire
                     8619 Highway 51 North
                     Southaven, MS  38671

For the Defendant
 McThunel:           PAUL A. CHINICHE, Esquire
                     Chiniche Law Firm, PLLC
                     P.O. Box 1202
                     Oxford, MS  38655-1202

## TABLE OF CONTENTS

PAGE

GOVERNMENT'S WITNESSES

   TODD MATNEY

      Direct Examination by Mr. Mims ............ 6
      Cross-Examination by Mr. Chiniche ......... 42
      Cross-Examination by Mr. Lewis ............ 73
      Redirect Examination by Mr. Mims .......... 75

   STEPHEN MATHEWS

      Direct Examination by Mr. Mims ............ 86
      Cross-Examination by Mr. Chiniche ......... 111
      Cross-Examination by Mr. Lewis ............ 126
      Redirect Examination by Mr. Mims .......... 127
      Recross-Examination by Mr. Chiniche ....... 133

DEFENDANTS' WITNESSES

   SPENCER McINVAILLE

      Direct Examination by Mr. Lewis ........... 136
      Direct Examination by Mr. Chiniche ........ 152
      Cross-Examination by Mr. Mims ............. 154
      Redirect Examination by Mr. Lewis ......... 182
      Redirect Examination by Mr. Chiniche ...... 185
      Recross-Examination by Mr. Mims ........... 197

GOVERNMENT'S EXHIBITS       I.D.       ADMITTED

   G-1 ........... 20
   G-2 ........... 80
   G-3 ........... 102
   G-4A ........... 182
   G-4B ........... 182

1     (CALL TO ORDER OF THE COURT AT 10:05 A.M.)

2          **THE COURT:**  You may call the case.

3          **COURTROOM DEPUTY:**  The Court calls Case Number

4     3:21CR107, United States of America versus Jamarr Smith, et al.

5     This is a hearing on motion to suppress.

6          **THE COURT:**  Thank you.

7          So at the Government's table, I have Robert Mims, who

8     I think may be lead in this case.  I also have Clyde McGee.

9     Both are Assistant United States Attorneys.  I have Robin

10    Bailey, who we depend on for showing us videos from time to

11    time.  So I assume that's what you are doing here.

12          For the defense, I have Goodloe Lewis, who represents

13    Defendant Smith; William Travis, who represents Defendant

14    Ayodele, and Paul Chiniche, who represents Defendant McThunel.

15          So these are your clients that are in the courtroom.

16    Could you just identify them for me so I know who is who?

17          **MR. LEWIS:**  This is Jamarr Smith here in the pink

18    shirt.

19          **THE COURT:**  Thank you.

20          **MR. TRAVIS:**  Ayodele -- Mr. Ayodele in the blue suit,

21    Your Honor.

22          **THE COURT:**  Thank you.

23          **MR. CHINICHE:**  And Mr. McThunel in the brown jacket.

24          **THE COURT:**  Thank you.  Okay.

25          Let me say from the offset that I appreciate the work

Matney - Direct

1 that y'all have put into this case because I can tell that a
2 lot of research on both sides has gone into this case, and it
3 certainly is helpful to the Court.  So thank you for doing
4 that.

5      The defendants bear the burden of proving this to be
6 an invalid or unconstitutional search warrant; so I will start
7 with the defendants.

8      Mr. Mims.

9      **MR. MIMS**:  Your Honor, if I may, we've talked about it
10 beforehand, and while we're certainly ready to proceed any way
11 the Court wants to, we think it would probably make the most
12 sense and make this hearing run the smoothest if the Government
13 just went ahead and called the agents that were involved
14 preparing the search warrant and put that in front of you.

15      **THE COURT**:  Makes good sense.  Thank you.

16      Mr. Mims, you may call your first witness.

17      **MR. MIMS**:  Your Honor, I call Todd Matney.

18      And, Your Honor, for the record, our other witness
19 we're going to call is Stephen Mathews, and he has stepped out
20 of the courtroom now as we are beginning.  So he will not be in
21 here during Mr. Matney's testimony.

22      **THE COURT**:  Thank you.

23      (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

24      **TODD MATNEY, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN,**
25           **WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

Matney - Direct

**DIRECT EXAMINATION**

**BY MR. MIMS:**

**Q.**    Inspector Matney, would you state and spell your name for the record, please?

**A.**    Yes, sir.  It's Todd Matney.  T-o-d-d.  M-a-t-n-e-y.

**Q.**    And your title would be inspector as in postal inspector; correct?

**A.**    Yes, sir.

**Q.**    Okay.  Inspector Matney, who are you employed by?

**A.**    United States Postal Inspection Service.

**Q.**    How long have you been employed with the Postal Inspection Service?

**A.**    Since 2017.

**Q.**    All right.  Who were you with before Postal Inspection Service?

**A.**    Prior to Postal Inspection Service, I was working with the Office of Inspector General for the United States Postal Service.

**Q.**    Okay.  Fair to say that one side of the house -- the OIG investigates internal problems?

**A.**    Internal, yes, sir.

**Q.**    And the side of the house you work on now, the Postal Inspection Service, is external crime, such as the one we're dealing with today; right?

**A.**    Yes, sir.

Matney - Direct

1   **Q.**    Okay.  How long have you been a federal agent altogether?

2   **A.**    Nineteen years.

3   **Q.**    Prior to that, what kind of law enforcement experience do

4   you have?

5   **A.**    I was local law enforcement for about ten and a half

6   years prior to that.

7   **Q.**    Where at?

8   **A.**    Southaven Police Department.

9   **Q.**    Okay.  What was your position in 2018?

10   **A.**    2018, I was with the United States Postal Inspection

11   Service in Oxford, Mississippi.

12   **Q.**    What territory did you cover?

13   **A.**    The northern part of the state.

14   **Q.**    I'm sorry?

15   **A.**    Northern part of the state.

16   **Q.**    Okay.  So let's talk for a minute about your training.

17   Tell the Court, if you would, what training did you receive as

18   a federal agent?

19   **A.**    In 2004, I was hired with the United States Secret

20   Service.  I went through a Federal Law Enforcement Training

21   Center, which I think was approximately 11 weeks.  After that,

22   went through the United States Secret Service Academy in

23   Beltsville, Maryland.  That was approximately 17 weeks.  And

24   then with the OIG, I went through initial training with them,

25   which was approximately two weeks; and with the United States

1    Postal Inspection Service, another week of initial training,

2    basic investigations.

3    **Q.**    So, every step of the way, you've had some initial

4    training at the beginning to start with, more intensive, you

5    know, week-long or multi-week training; correct?

6    **A.**    Yes, sir.

7    **Q.**    What about annual training?  Do you also -- in your job,

8    your law enforcement career, have you had to do any kind of

9    annual refresher type training?

10   **A.**    Yes, sir.  With the inspection service, there's -- I want

11   to say there's approximately 18 hours of online training and

12   annual training that we are supposed to complete.

13   **Q.**    Okay.  What training or experience do you have with

14   search warrants?

15   **A.**    Extensive.  Just from local law enforcement, being a

16   local investigator, to becoming a federal agent, depending on

17   the type of nexus investigations that we had doing search

18   warrants for each case or whatever case is necessary.

19   **Q.**    You mentioned local law enforcement.  Did you do search

20   warrants back when you were with Southaven PD?

21   **A.**    Yes, sir.

22   **Q.**    Have you done them ever since you've been a federal agent

23   as well?

24   **A.**    Yes, sir.

25   **Q.**    Any idea how many search warrants you have obtained in

1  your career?

2  **A.**    No, sir.  A lot.

3  **Q.**    Would it be fair to say that some of the training that
4  you have had over the years has been on search warrants, of
5  what you have to do legally to obtain a search warrant?

6  **A.**    Yes, sir.  Not only that, but experience from doing the
7  search warrants as well as conferring with other, you know,
8  federal agents and supervisors.

9  **Q.**    So, when you do a search warrant, do you often, just all
10  by yourself, fill out an affidavit and go see a judge?

11  **A.**    No, sir.

12  **Q.**    Who all do you consult with?  How does that work usually?

13  **A.**    Usually what we'll do is we'll confer as a team, talk
14  about the information in the case, go to the supervisor, make
15  sure that we're including everything we're supposed to, and we
16  review everything prior to submitting it to the -- excuse me --
17  the Assistant U.S. Attorney that we're working with the case
18  on.

19  **Q.**    Okay.  So let's talk about this robbery that occurred at
20  the Lake Cormorant post office February 5th of 2018; is that
21  correct?

22  **A.**    Yes, sir.

23  **Q.**    Did you participate in that investigation?

24  **A.**    Yes, sir.

25  **Q.**    How did you get involved in it?

Matney - Direct

**A.**    We were called out after the robbery occurred by the
supervisor.

**Q.**    Okay.  What was your role in the investigation?

**A.**    Initially, it was to make the scene and assist whatever I
could, and then, within the week, my supervisor assigned me as
the lead for the case.

**Q.**    Okay.  Who was your supervisor?

**A.**    Stephen Mathews.

**Q.**    And where was Stephen assigned at that time?  Where was
his office?

**A.**    His office was in Mobile.

**Q.**    That's in Alabama; right?

**A.**    Yes, sir.

**Q.**    So just tell the Court, if you would, in general about
the robbery.  Just in simple terms, what happened that day?
We're going to get into the specifics here in a few minutes,
but what happened?

**A.**    Okay.  So we were called.  Apparently, there was a driver
that was making a delivery at a post office, and he was robbed
as he was making that delivery.  He -- fortunately, you know,
he wasn't hurt too bad.  Apparently, he was hit with a pistol
and then called the police and needed some medical attention.

**Q.**    Okay.  You say a driver.  Let me ask you, what hours
would the Lake Cormorant post office be open?  Is it open all
day long?

1  **A.**   No, sir.  It's, like, a half day post office.  It's a
2  small post office.

3  **Q.**   Okay.  And approximately what time did this robbery
4  occur?

5  **A.**   It was -- I don't know exactly what time it was.

6  **Q.**   Okay.  Let me ask you a question.  I'm going to get
7  sidetracked for a second here because of the answer to this
8  question.

9  **A.**   Okay.

10 **Q.**   In summer of 2018 -- is that right?  Have I got the year
11 correct? --

12 **A.**   Yes sir.

13 **Q.**   -- did you have an on-the-job injury?

14 **A.**   Summer of 2019.

15 **Q.**   Summer of 2019?

16 **A.**   Yes, sir.

17 **Q.**   Okay.  Just in brief -- we're not going to get into great
18 details on it, but it was a significant injury, wasn't it?

19 **A.**   Yes, sir.  I was in a -- I was in a firearms instructor
20 course in Maryland -- I mean -- excuse me -- Delaware, and an
21 inspector standing next to me shot me with a 12-gauge shotgun.

22 **Q.**   Okay.  Shot you in your foot?

23 **A.**   Yes, sir.

24 **Q.**   And it caused a pretty extensive injury?

25 **A.**   Yes, sir.

1  **Q.**   As a result of that, have you taken some medication --

2  are you on some medication or have you taken medication over

3  the years in relation to that?

4  **A.**   Yes, sir.  I had three -- three major surgeries and two

5  major infections due to it.

6  **Q.**   Okay.  Has that medication or anything else related to

7  that caused some memory difficulty?

8  **A.**   Somewhat, yes, sir.

9  **Q.**   Okay.  So, if I ask you details about what time this

10  robbery occurred, if you can't answer that, do you believe that

11  may be caused partly by your medication?

12  **A.**   Partly, yes, sir.

13  **Q.**   Okay.  It was something you would have known five years

14  ago; right?

15  **A.**   Yes, sir.

16  **Q.**   And it would be in your reports; correct?

17  **A.**   Yes, sir.

18  **Q.**   Okay.  So, at the time the robbery occurred, the post

19  office was closed.  Is that fair to stay?

20  **A.**   Yes, sir.

21  **Q.**   So who is it that's getting robbed?

22  **A.**   Mr. Cobbs.  He was the driver of the delivery truck.

23  **Q.**   And what's his job?  What is Mr. Cobbs doing?

24  **A.**   He drives the delivery truck from post office to post

25  office and does pick-ups and drop-offs of packages.

1  **Q.**   Okay.  Where does he deliver it to?

2  **A.**   To --

3  **Q.**   Where's he going ultimately?  Where's he taking all of

4  this mail?

5  **A.**   Ultimately back to the post office.

6  **Q.**   Which one?

7  **A.**   The main post office in Memphis.

8  **Q.**   In Memphis?

9  **A.**   Yes, sir.

10  **Q.**   That's where all the mail is collected and goes to;

11  correct?

12  **A.**   Yes, sir.

13  **Q.**   Okay.  So he has a route up there that includes Lake

14  Cormorant on his way to Memphis; right?

15  **A.**   Yes, sir.

16  **Q.**   At the end of the day picking up mail?

17  **A.**   Yes, sir.

18  **Q.**   Okay.  Do you remember how many stops he makes along that

19  route?

20  **A.**   No, sir.  There's several.

21  **Q.**   Okay.  Has he made some stops before he gets to Lake

22  Cormorant?

23  **A.**   Yes, sir.

24  **Q.**   All right.  So, when he gets to Lake Cormorant, he gets

25  robbed; correct?

1   **A.**   Correct.

2   **Q.**   And what do they take?  They're not taking his wallet,

3   are they?

4   **A.**   No, sir.

5   **Q.**   What is the robber taking?

6   **A.**   Registered mail.

7   **Q.**   Okay.  Why is the registered mail important?

8   **A.**   Because it contains money.

9   **Q.**   What kind of money does it contain?

10   **A.**   Cash.

11   **Q.**   Is that the receipts the post offices collect during the

12   day?

13   **A.**   Yes, sir.

14   **Q.**   Can that be a significant amount of money?

15   **A.**   Yes, sir.

16   **Q.**   In fact, do you happen to recall approximately -- if you

17   don't, it's fine, but do you happen to recall how much money

18   was taken in this case?

19   **A.**   Approximately, it was 67, 68,000.

20   **Q.**   Okay.  So, at the very beginning of your investigation,

21   when you and your colleagues go out there to start your

22   investigation, what information did you have at that time?

23   **A.**   Only what Mr. Cobbs had given us.

24   **Q.**   Okay.  Was he able to identify who assaulted him?

25   **A.**   No, sir.

1   **Q.**   Okay.  Were there any other eyewitnesses that you recall

2   in the area?

3   **A.**   At the time, we didn't know initially.  Apparently, there

4   was one person.

5   **Q.**   Okay.  What -- just in general, what do you remember that

6   one person seeing?

7   **A.**   Just -- just the -- the truck and the robbery occurring.

8   **Q.**   Okay.  So let me ask you this.  Did you also have a

9   video?

10   **A.**   Yes, sir, we did.  Later on, we discovered there was a

11   farm office, the gentleman that owned the land around the post

12   office, and he had extensive surveillance equipment/video

13   cameras around his building, and one of the cameras actually

14   had an entire view of the post office.

15   **Q.**   Okay.  You and I watched that video the other day in

16   preparing for this hearing, didn't we?

17   **A.**   Yes, sir.

18   **Q.**   Okay.  We're going to play that video in a minute.  I

19   want to talk a little bit about it before we do.  Before we get

20   into what you saw on the video, what did the post office

21   eventually do to further its investigation in November of 2018?

22   **A.**   We issued a search warrant.

23   **Q.**   Okay.  What kind of search warrant are we talking about?

24   **A.**   So what we did is -- we were having a problem identifying

25   the individuals.  Based on the video surveillance we saw, it

1    appeared that the gentleman that robbed Mr. Cobbs was using a

2    cell phone in the video.  We saw mannerisms and physical

3    movement that indicated that he probably had a cell phone on at

4    the time.

5    **Q.**    Okay.

6    **A.**    So we issued a search warrant to Google to determine,

7    based on the radius around the post office, if there was any

8    kind of information that could be extracted from Google to

9    determine that a cell phone was being used in that area at that

10    time of the robbery.

11    **Q.**    Is that what we call a geofence search warrant?

12    **A.**    Yes, sir.

13    **Q.**    And is the purpose of that to identify who might be

14    present at the scene of a robbery?

15    **A.**    Yes, sir.

16    **Q.**    Had you ever before this sought a geofence search warrant

17    before?

18    **A.**    No, sir.  Never.

19    **Q.**    Did you work with other agents in securing this geofence

20    search warrant?

21    **A.**    Yes, sir.

22    **Q.**    Who all did you work with?

23    **A.**    Stephen Mathews.

24    **Q.**    Okay.  Did y'all collaborate on the affidavit?

25    **A.**    Yes, sir.

1    **Q.**  But you're the one that signed the affidavit; correct?

2    **A.**  Correct.

3    **Q.**  Is that because you were here local, the one that's

4    closest to the judge?

5    **A.**  Yes, sir.

6    **Q.**  Plus, you were the lead agent; right?

7    **A.**  Yes, sir.

8    **Q.**  Let me ask you, did you -- did you consult with the U.S.

9    Attorney's Office before seeking this warrant?

10   **A.**  Yes, sir.

11   **Q.**  And that would be me that you consulted with; correct?

12   **A.**  Yes, sir.

13   **Q.**  So what do you typically have to show?  I'm just talking

14   search warrants in general.  What do you typically have to show

15   to be able to obtain a search warrant?

16   **A.**  Probable cause.

17   **Q.**  Okay.  And you put that probable cause in an affidavit;

18   correct?

19   **A.**  Correct.

20   **Q.**  In this situation, in this search warrant, did you and

21   Inspector Mathews put probable cause in your affidavit?

22   **A.**  Yes, sir.

23   **Q.**  Did you base part of that on the video?

24   **A.**  Yes, sir.

25   **Q.**  Now, I'm going to -- like I said, we're going to watch

1  the video here in just a second, but before we do, just off the
2  top of your head, what do you recall seeing on the video as you
3  watched it?

4  **A**.    There were several different points of the video.
5  Initially, it looked like, as he was walking up, he had his
6  hand to his left ear, his left hand up, his elbow pointed out.
7  Looked like he had a cell phone up to the side of his head.

8       There was another portion where he was squatted down
9  behind the building after the robbery.  And it looked like he
10  had pulled something out, and he was looking at his hand in
11  front of him as he was squatted down next to the building.

12      There was another portion where he was reaching in his
13  pockets like he was getting ready to pull something out.

14      Another portion, too, where he walked up to the building
15  prior to the robbery, and he moved to an open area in front of
16  bricks at the corner of the building, and it looked like he may
17  have been on his phone at that time as well.

18  **Q**.    When you say "he," are you talking about the assailant?
19  **A**.    The assailant, yes, sir.

20  **Q**.    Okay.  Did you see anybody else in the video that you
21  thought might have been involved in the robbery?

22  **A**.    Yes, sir.  We saw a white SUV that dropped him off.  You
23  can see that in the video at the beginning.  And then, also,
24  there was another car that seemed to be, like, a visual witness
25  or some kind of assistance, because they pulled up

1   simultaneously to Mr. Cobbs being out there at the post office,

2   parked across the road from it, making unusual moves with the

3   car and trips back and forth past the post office during the

4   robbery.

5   **Q.**   Can you describe this car?

6   **A.**   It was a red small -- looked like a Hyundai type vehicle.

7   **Q.**   Okay.  So, from your review of the video, it appears that

8   you have three participants; right?

9   **A.**   Yes, sir.

10  **Q.**   You've got the person driving the white SUV that drops

11  off the assailant?

12  **A.**   Correct.

13  **Q.**   You've got the assailant?

14  **A.**   Yes.

15  **Q.**   And you've got a lookout in a red car?

16  **A.**   Yes, sir.

17  **Q.**   Okay.

18          **MR. MIMS:**  Let's go ahead and pull up the video.

19          Your Honor, if we may, we're going to pull up the

20  video to play.

21          Your Honor, I will go ahead at this point, before we

22  get started, and offer the video into evidence as Government's

23  Exhibit G-1.

24          **THE COURT:**  Any objection?

25          **MR. CHINICHE:**  No objection, Your Honor.

Matney - Direct

1    **THE COURT:**  Very well.  It will be received.

2    (EXHIBIT NO. G-1 ADMITTED INTO EVIDENCE.)

3    **THE COURT:**  And I'm assuming -- how do counsel --

4  defense counsel wish to do this?  Are you going to designate

5  witnesses to where I ask all of you for cross-examination, or

6  just one of you, or do all of you consent to the introduction

7  of the video?

8    **MR. CHINICHE:**  Your Honor, I think we're in agreement

9  as to the evidence.  And we've already discussed with Mr. Mims

10  what we all anticipate.  I think -- I don't know that we all

11  need separate objections.  We all may have some questions.

12    **MR. LEWIS:**  Yes.

13    **THE COURT:**  If one of you stand up and answer my

14  question, I'm going to proceed unless somebody else stands up

15  and says, "Well, I disagree."

16    **MR. LEWIS:**  That is fine.

17    **MR. MIMS:**  Your Honor, for the record, what we're

18  putting into evidence -- we have a video that goes from, like,

19  5:00 to 6:00.  We may even have one on here that goes after

20  that.  It's really irrelevant to this.

21    For purposes of what we're playing here for the Court,

22  Ms. Bailey has kind of cut down the clip to right before the

23  white SUV first comes into view until the very end when the

24  white SUV leaves the view.  That's the key part here.  That's

25  what we're showing, but, actually, what we're putting into

 1  evidence will also include the entire video.

 2          **THE COURT:**  Okay.

 3          **MR. MIMS:**  Your Honor, I would also note that at the

 4  bottom of the screen, there's a time.  Right here (indicating)

 5  it says 6:38, and, of course, that's not the time of day.  That

 6  means it's 6 minutes 38 seconds into -- from the start of the

 7  video.  So, on the record, the time -- we're referencing that

 8  time from when the video started, if that makes sense.

 9          **THE COURT:**  Yes, sir.

10  **BY MR. MIMS:**

11  **Q.**   All right.  Before we play this, let me just ask you,

12  Inspector Matney, what are we looking at here?

13  **A.**   This is the post office in the upper left corner there.

14  **Q.**   You're talking about the brick -- the brick building we

15  see on the upper left part of the screen?

16  **A.**   Yes, sir.

17  **Q.**   Okay.  And this is there at Lake Cormorant; correct?

18  **A.**   Correct.

19  **Q.**   And this is coming from the -- from the farm shop right

20  across the street?

21  **A.**   Yes, sir.

22  **Q.**   Okay.

23          **MR. MIMS:**  Your Honor, there is a little audio.  We're

24  really not going to use it because the only thing you can

25  hear -- for our purposes, it's probably not relevant.  You do

1  hear a little bit of screaming during the assault, but it's

2  really not important. And you hear a train later on. So we

3  may not actually have the audio playing. The video is really

4  the more important part.

5          **THE COURT:** Is that acceptable to defense counsel?

6          **MR. LEWIS:** Yes, Your Honor.

7          **THE COURT:** Thank you.

8          **MR. MIMS:** All right. Ms. Bailey, if you would go

9  ahead and play the video.

10  **BY MR. MIMS:**

11  **Q.** Agent -- or, Inspector Matney, I'm just going to ask you

12  a few questions as we go along. We may just watch for a while,

13  and at times I may point out something and ask you a question.

14  **A.** Yes, sir.

15          (PLAYING VIDEO, EXHIBIT NO. G-1.)

16          **MR. MIMS:** All right. I tell you what, let's back up.

17  Before we start here, let's back up. Let's catch it where the

18  truck first comes into view, unless I missed it, you know,

19  coming from right to left. Let's go to about the five-minute

20  mark. All right. Let's start from there.

21          Your Honor, we backed it up to the five-minute mark.

22  **BY MR. MIMS:**

23  **Q.** All right. Inspector Matney, what do we see there?

24  **A.** The white SUV coming into the picture.

25  **Q.** Okay. That's the first time we see anybody suspected of

1  this robbery; is that correct?

2  **A.**   Correct.

3  **Q.**   And it drives on off to the left of the post office;

4  correct?

5  **A.**   Correct.

6       **MR. MIMS:**  All right.  Let it go just a few more

7  seconds.  All right.  Pause it right here.

8       (PAUSED VIDEO.)

9  **BY MR. MIMS:**

10  **Q.**   Inspector Matney, what are we seeing right here?

11  **A.**   You see the white SUV stop and the individual get out of

12  the white SUV and start walking towards the post office.

13  **Q.**   That's the assailant, though, we see get out?

14  **A.**   Yes, sir.

15  **Q.**   Now, what are fixing to see -- we're going to play it

16  here in a second.  Before we do, what are we fixing to see from

17  this assailant?

18  **A.**   As he walks up to the back of that building, you're going

19  to see his left arm go up.

20  **Q.**   Okay.  Describe for the Court -- show the Court what you

21  see in the video with your own arm.

22  **A.**   Sure.  From this -- from this video, it appears that he

23  has his hand up to his ear and elbow's out (demonstrating).

24  **Q.**   Okay.  Now, you can't see an actual cell phone in this

25  video, can you?

1   **A.**   No, you cannot.

2   **Q.**   But you see his hand up to his ear?

3   **A.**   Correct.

4   **Q.**   And that hand stays there for several minutes, doesn't

5   it?

6   **A.**   Correct.  For several seconds, yeah.

7   **Q.**   Well, more than several seconds.  I'm going to -- we're

8   at the -- we're at the 6:51 mark here.  Actually, if we watch

9   this video, in my notes, it looks like to the 9:50 mark.

10  **A.**   Oh, yes, sir.

11  **Q.**   But let's watch and see.  That's what we're looking for.

12       (PLAYING VIDEO.)

13  **BY MR. MIMS:**

14  **Q.**   He's going to walk behind the post office; right?

15  **A.**   Right.

16           **THE COURT:**  Can I stop you a minute?

17           **MR. MIMS:**  Yes, ma'am.

18           **THE COURT:**  Can you go back -- I know the affidavit

19  indicates that the affiant saw him get out of the truck, and I

20  just want to see if you can actually see that or just see him

21  walking.

22           **MR. MIMS:**  Let's back up a few seconds.  All right.

23  Let's pause it right there for a second.

24       (PAUSED VIDEO.)

25           **MR. MIMS:**  Your Honor, I would just note that, as you

Matney - Direct

1  saw it, you could see the door open and close right there in

2  the corner of that.  We can back it up if we need to.

3       **MR. LEWIS:**  Your Honor, excuse me.  I object to

4  counsel testifying.

5       **THE COURT:**  Yes.  Mr. Mims, back it up for me and let

6  me see it.

7       **MR. MIMS:**  Okay.

8       **THE COURT:**  That light pole is giving me trouble.

9       **MR. MIMS:**  All right.  Before we play it -- and I know

10  this is partly argument.  I'm not trying to testify.  I'm just

11  going ahead and skipping ahead to argument while we're here.

12  If -- what you're looking at is, you can see the door open and

13  close right before the truck pulls forward and the guy starts

14  walking.

15       **THE COURT:**  Okay.

16       **MR. MIMS:**  You can kind of see his mirror there.  Go

17  ahead.

18     (PLAYING VIDEO.)

19       **THE COURT:**  Proceed.

20  BY MR. MIMS:

21  **Q.**   All right.  Agent Matney, what do we see the white SUV

22  doing at this point?

23  **A.**   Driving off away from the post office.

24  **Q.**   All right.  Now, what do you see with the assailant?

25  **A.**   As he's walking to the back, you can see his arm up to

 1  his -- his hand up to his head, his left arm.  And, at this

 2  point, it seems that he still has his hand up to his head.

 3      **THE COURT:**  Y'all stop just a second.

 4      (PAUSED VIDEO.)

 5      **THE COURT:**  Would you prefer that I ask to rewind it

 6  as we go and look at it as we go --

 7      **MR. MIMS:**  Sure.

 8      **THE COURT:**  -- or keep my mouth shut and let y'all

 9  finish and then ask my questions?

10      **MR. MIMS:**  I'm good either way, Your Honor.  I'm fine

11  with stopping while we're here and let's talk about it.

12      **MR. CHINICHE:**  I would agree, Your Honor, what's

13  easiest for the Court.

14      **THE COURT:**  Okay.  Rewind it and let me see, then, as

15  he comes around the building.

16      **MR. MIMS:**  Your Honor, and, too, we can also zoom in.

17  The problem, when you zoom in, it doesn't get any clearer.

18  It's kind of blurry when you zoom in, but we can do that too.

19      **THE COURT:**  I wondered if you could.  I actually -- so

20  I'm clear, I looked at the video yesterday.  Okay?  So I'm

21  familiar with it.  I want to see what you point out, Mr. Mims.

22  Counsel, I want to see what you point out.  It obviously takes

23  an interpretation of the video to get to the facts stated in

24  the affidavit.  Okay?

25      **MR. MIMS:**  Your Honor, as far as pointing out, you

1    have to look closely, certainly.

2          **THE COURT**:  I get that.

3          **MR. MIMS**:  You can see the elbow better when he's not

4    right in front of the bricks.  When he's more off to the side,

5    you've got the lighter background.

6          **THE COURT**:  Yes, sir.

7          **MR. MIMS**:  But you can, if you look close, see it for

8    at least a three-minute period up until right before the truck

9    pulls up.  Then you see him go back behind the building, and

10   you don't see the hand up to the ear.

11         **THE COURT**:  And you're telling me -- because I was

12   hoping you were going to be able to zoom this in better today.

13   So zooming does not assist me?

14         **MR. MIMS**:  We'll do it and try.  I just -- when I try

15   to zoom in or even take still shots, it's blurry.  It doesn't

16   necessarily clear anything up.

17         **THE COURT**:  Okay.  If you would, rewind that a bit.

18        (PLAYING VIDEO.)

19         **THE COURT**:  Stop it, please.

20        (PAUSED VIDEO.)

21         **THE COURT**:  Mr. Mims, which arm do you contend --

22         **MR. MIMS**:  The left arm.

23         **THE COURT**:  -- that he's holding a cell phone?

24         **MR. MIMS**:  Your Honor, the left arm.

25         **THE COURT**:  Okay.

Matney - Direct

1    **MR. MIMS**:  He's walking towards us, but it's his --

2    it's his left arm.

3    **THE WITNESS**:  May I add, before he comes around that

4    corner, that's the best time that you can see that his elbow is

5    pointing towards the building.  Right before he comes around

6    this corner.

7    **MR. MIMS**:  Let's back up one more time.  Right there.

8    Let's start from right there.

9    (PLAYING VIDEO.)

10   **A.**   As he's approaching, you can now see the elbow up.  Right

11   there (indicating).

12   **BY MR. MIMS**:

13   **Q.**   By contrast, you can see his right arm down --

14   **A.**   Correct.  Swinging --

15   **Q.**   -- towards the ground?

16   **A.**   -- next to his body.

17   **THE COURT**:  Stop, please.

18   (PAUSED VIDEO.)

19   **THE COURT**:  Does the Government contend he's still on

20   his phone at this point?

21   **MR. MIMS**:  I do, Your Honor.

22   **THE COURT**:  Thank you.  Proceed.

23   (PLAYING VIDEO.)

24   **MR. MIMS**:  I don't know what happened.  We lost

25   something.

1        **THE COURT:** We did.

2     (PAUSE IN PROCEEDINGS.)

3     (PLAYING VIDEO.)

4        **MR. MIMS:** Let's pause it right there for a second.

5     (PAUSED VIDEO.)

6  **BY MR. MIMS:**

7  **Q.**   Inspector Matney, as you saw the -- and we can back it up

8  if we need to again -- as you see the assailant walk back

9  around behind the back edge, could you still see his left arm

10  to his ear?

11  **A.**   Can you back it up one more time?

12        **MR. MIMS:** Let's back it up just for a few seconds.

13  Keep going.  There we go.

14  **A.**   I was holding off commenting because I wasn't sure you

15  guys had video yet.

16  **BY MR. MIMS:**

17  **Q.**   Yeah.  Let's watch it.

18     (PLAYING VIDEO.)

19  **A.**   Yes, sir.  At this point, it does.  Now, it looks like,

20  once he gets around that corner, he makes a turn to the left.

21  He spins back around.

22     This is where Mr. Cobbs is driving his truck towards the

23  post office.

24        **THE COURT:** Can I ask you to stop just a moment?

25     (PAUSED VIDEO.)

1    **THE COURT:** Could the affiant explain to me the door

2    entrances at the back? I'm seeing the jutted out part of the

3    building that he's behind now.

4    **THE WITNESS:** Yes, ma'am.

5    **THE COURT:** Could you -- like, where are the entry

6    points to the back?

7    **THE WITNESS:** Yes, ma'am. Could you rewind it so the

8    truck is not in the way and I'll explain?

9    (PLAYING VIDEO.)

10   **THE WITNESS:** Right there is fine.

11   (PAUSED VIDEO.)

12   **THE WITNESS:** So that is a dock area right there.

13   It's a concrete area. It's covered. To the right is a door up

14   against the back of that building, and that's the entrance into

15   the post office.

16   **BY MR. MIMS:**

17   **Q.** Inspector Matney, you're talking about on the left side

18   at the very back of the building but on the right side --

19   **A.** Yes, sir. It's to the right side of the dock, the

20   covered area. There's a door.

21   **Q.** Okay. Because the front door of the post office for

22   customers is what we see at the very front --

23   **A.** Correct.

24   **Q.** -- that column there?

25   **A.** Correct.

1  **Q.**    But the back is where -- is where Mr. Cobbs would go in

2  and get the mail bag for the evening?

3  **A.**    Correct.  Yeah.  He has a key to the back for delivery

4  and pick-ups.

5  **Q.**    Okay.

6          **THE COURT:**   Thank you.

7      (PLAYING VIDEO.)

8  **A.**    At this point, Mr. Cobbs exits the truck.

9  **BY MR. MIMS:**

10 **Q.**    Now, we see the red car pulling in.  Is that the red car

11 you believe was involved?

12 **A.**    Yes, sir.

13 **Q.**    What do we see it doing right here?

14 **A.**    It slowed -- it slowed down as it approached the post

15 office -- as the truck was backed into the back of the post

16 office, and then it accelerated and went over the railroad

17 tracks.  And you can see it taking a slight right and then

18 taking a left, doing a U-turn, and then coming back across the

19 tracks.

20      Mr. Cobbs is walking to the front of the post office.  I

21 was told there's a deposit box in front that he checks when he

22 does his deliveries and pick-ups.  And the vehicle that was a

23 lookout comes past -- appears to be a lookout comes past.

24 **Q.**    Now, that red car comes back into view in a minute or

25 two, doesn't it?

1  **A.**   Yes sir.

2  **Q.**   Is this the red car we see coming back?

3  **A.**   Yes, it is.  You'll see it back up into the parking lot

4  across the street from the post office.

5  **Q.**   And meanwhile --

6  **A.**   At the same time the robbery is occurring, Mr. Cobbs is

7  getting into an altercation with the individual.  It looks like

8  at this point you can see where the individual sticks his hand

9  out towards Mr. Cobbs.  Looks like he may be holding a gun.

10       **MR. MIMS:**  Now, let's pause it for one second.  And we

11  may need to back up.

12    (PAUSED VIDEO.)

13  **BY MR. MIMS:**

14  **Q.**   There's a lot going on in this at one time, depending on

15  where you're looking.

16  **A.**   Correct.

17  **Q.**   Can you still see the rear of the red car in this screen?

18  **A.**   Yes.

19  **Q.**   Where is it at?

20  **A.**   It's in the front of the building to the right.

21  **Q.**   Okay.

22       **MR. MIMS:**  And, Your Honor, if we need to back it up,

23  because if you're watching the altercation, you may not see the

24  red car.  Do we need to back it up?

25       **THE COURT:**  Yes, sir.

1    **MR. MIMS**:  Let's back it up for just a second.

2         And, Your Honor, I would ask you just to watch the red

3    car.

4         Okay.  That's good.

5     (PLAYING VIDEO.)

6    **MR. MIMS**:  Let's just let it play for a minute, and

7    let's focus on the red car, and then we'll come back and

8    focus -- and back up and focus on the assault.

9    **BY MR. MIMS:**

10   **Q.**   Now, you can see -- what's the red car doing?

11   **A.**   It's slowly backing up.

12   **Q.**   Okay.  That little store there, is that store open, or

13   was it open in 2018?  Do you remember?

14   **A.**   I believe so.

15   **Q.**   And, now, as the truck pulls forward, what does the red

16   car do?

17   **A.**   Pulls off.

18   **Q.**   Okay.  That's the last time we see the red car, isn't it?

19   **A.**   Yes, sir.

20   **MR. MIMS**:  All right.  Let's back up for a minute to

21   the 12:50 mark.

22        Your Honor, we're going to back up and pick up

23   again -- that's good right there -- with the assault.

24   **BY MR. MIMS:**

25   **Q.**   Now, is that the assailant we still see at the back of

1   the --

2   **A.**   Yes, sir.

3           **MR. MIMS:**  Let's back up for one second.  Go back to

4   about the 13:30 mark, and I want you to pause it right at

5   13:34.  Right there (indicating).

6       (PAUSED VIDEO.)

7   **BY MR. MIMS:**

8   **Q.**   What do you see right there, Inspector Matney?

9   **A.**   You see the truck pulling off.  The back door of the

10  truck is open approximately two to three feet.

11  **Q.**   Okay.

12  **A.**   You see the assailant in the very back of the post

13  office, what appears to be either a white satchel or white box.

14  He's standing next to that -- that box.

15  **Q.**   What's the position of the assailant's hands and arms?

16  **A.**   At this point, it looks like he may be reaching in his

17  pockets.

18  **Q.**   Okay.  Can you tell anything at all as we watch it?

19  We're going to back up in a minute and roll through it again,

20  but I want you to watch his hand and watch his head, and just

21  tell me if you see anything as far as his hand and his head and

22  what he may be doing.

23          **MR. MIMS:**  Let's back up a couple of seconds and then

24  let it roll on through this.  Here we go.

25      (PLAYING VIDEO.)

1  **A.**   Right -- just prior to him bending over, you can see his
2  left hand go up to his ear.  When you rewind that, you'll see
3  it again.
4  **BY MR. MIMS:**
5  **Q.**   I'm looking more at his right hand.  I don't see his left
6  hand going up to his ear.
7  **A.**   Okay.
8  **Q.**   Now, let's let -- we're going to skip on through.  I'm
9  going to ask you something else.  In a second, we'll see him
10 walk out of the screen; is that right?
11 **A.**   There he goes, yes, sir.
12 **Q.**   All right.  And now do we see the assailant coming back
13 in the screen?
14 **A.**   Correct.  Now he squats down, and at this point is where
15 I saw his hand go out in front of him, and he looks down at it.
16 There it is.  Right there (indicating).
17 **Q.**   Okay.  What does that appear to you, in your opinion, as
18 you watch this that he's doing?
19 **A.**   It appears that he's looking at something in his hand.
20 Could be a cell phone.  Could be looking at a text message.  I
21 don't know.
22 **Q.**   And you don't know for certain what he's doing, do you?
23 **A.**   No.
24 **Q.**   Okay.  But it appears he may be using his cell phone?
25 **A.**   It's indicative of that type of movement that that's

1  probably what he's doing.

2  **Q.** When you were watching this video before preparing the

3  affidavit, did other inspectors in your agency watch this same

4  video?

5  **A.** Yes.

6  **Q.** Did y'all talk together about what y'all saw?

7  **A.** Yes.

8  **Q.** Was there a difference in opinion in what you're seeing?

9  **A.** No.

10  **Q.** Okay. Now we see the assailant walk --

11  **A.** Walked off.

12  **Q.** -- out of the screen; right?

13  **A.** Walked out of the screen.

14  **Q.** Okay. That's the last time we see the assailant, isn't

15  it?

16  **A.** Yes, sir.

17     (PAUSED VIDEO.)

18  **BY MR. MIMS:**

19  **Q.** So, while we're waiting on the last video with the part

20  with the white SUV, in your affidavit, you stated, "It appears

21  that the assailant was possibly using a cell phone."

22  **A.** Possibly, yes, sir.

23  **Q.** What did you base that on?

24  **A.** The movement of the individual, based on experience,

25  based on how normal people, including myself, hold the cell

Case: 3:21-cr-00107-SA-RP Doc #: 205 Filed: 09/04/23 37 of 244 PageID #: 1858

Matney - Direct

1 phone or look at a cell phone.

2 **Q.** And were there specific things you saw on this video that

3 you -- that you could point to and say, "It looks like here.

4 It looks like there"? What did you see?

5 **A.** Yes, sir. I mean, at different points, it looked like

6 his elbow was up. His hand was to the left side of his head.

7 **Q.** Okay.

8 **A.** The other portion is, as he's walking around the

9 building, he puts his hand up to his head really quick at the

10 back of the building. The other part is where he squatted down

11 after the robbery and he has his hand out, and you can visually

12 see his hand out in front of him.

13     (PLAYING VIDEO.)

14 **BY MR. MIMS:**

15 **Q.** Okay. Now, we've got the train coming across the tracks

16 right now; correct?

17 **A.** Correct.

18 **Q.** And the white SUV is actually on the other side of the

19 tracks, isn't it?

20 **A.** Yes.

21 **Q.** Inspector Matney, what do we see here?

22 **A.** The white SUV coming back in the picture.

23 **Q.** Which direction is he headed?

24 **A.** The same direction as the assailant was walking.

25 **Q.** Now, we don't see the assailant get in the SUV?

1    **A.**   Correct.

2    **Q.**   And if we kept watching this, in another minute or so, we

3    would see the white SUV coming back from left to right?

4    **A.**   Yes, sir.

5         **MR. MIMS**:  Ms. Bailey, let's go back to about the 6:50

6    mark, and I want to zoom in.  That's good.  Let's zoom before

7    we get to playing.  Or let's back up a little bit more if we

8    need to and let's watch this kind of zoomed in as best we can

9    on that upper left corner.

10        Your Honor, I thought we'd just watch a couple of key

11   parts kind of zoomed in where we can kind of compare them with

12   the zooming.  That's good.  Let's -- keep going.

13        Let's go ahead and skip ahead to about the 9:25, 9:30

14   mark.  Back it up just a little bit before he walks around the

15   corner.  There we go.  Let's go from right there.

16        All right.  Ms. Bailey, if you will, let's go ahead

17   and fast-forward to about the 13:55 mark.  Okay.  There we go.

18   That's good.

19        All right.  Thank you, Ms. Bailey.

20        Your Honor, anything else we need to look at on the

21   video right now while we're here?  Or, otherwise, I was going

22   to proceed.

23        **THE COURT**:  Would you take me back to 13:33?  Okay.

24   Thank you.

25        (STOPPED VIDEO.)

Matney - Direct

1  **BY MR. MIMS:**

2  **Q.**   Inspector Matney, did you present the affidavit to the

3  magistrate judge, Judge Percy?

4  **A.**   Yes, sir.

5  **Q.**   Okay.  He signed the warrant; correct?

6  **A.**   Yes, sir.

7  **Q.**   After he signed the warrant, what did you do?

8  **A.**   At that point, I submitted to Google.

9  **Q.**   How does that process work?

10  **A.**   It -- it's electronic.  You have to go through their

11  website -- or it's not really a website.  It's, like, a

12  portal -- and submit information that you are law enforcement.

13  You have to use a .gov e-mail address, and you submit the

14  documentation.  You scan it, send it to them, and then they

15  start working on it.

16  **Q.**   What information did you receive first -- from Google is

17  what I'm talking about -- after submitting it?

18  **A.**   First was to identify what devices, if any, were in that

19  area at the time of the robbery.

20  **Q.**   And do you recall how many devices hit?

21  **A.**   Three different devices hit, yes, sir.

22  **Q.**   And some of them had multiple hits; correct?

23  **A.**   Yes, sir.

24  **Q.**   Okay.  So that's step one of the process; right?

25  **A.**   Correct.

1    **Q.**    What did you do after that?

2    **A.**    After that --

3    **Q.**    I'm sorry.  Let me back up one second.  When Google first

4    sends you the devices that hit, they don't provide any

5    identifiers, do they?

6    **A.**    No, sir.

7    **Q.**    It's completely anonymous; right?

8    **A.**    Right.

9    **Q.**    Okay.  What do you do then after step one?  What did you

10   do here?

11   **A.**    It's to identify -- to see if we can identify the

12   device -- the -- excuse me -- the connection between the

13   devices and the --

14   **Q.**    Okay.

15   **A.**    -- people that own the phones.

16   **Q.**    So what did you do next as far as with Google after the

17   first step?

18   **A.**    After the first step, we reviewed the devices.  Then we

19   submitted step two.

20   **Q.**    How do you do that?  Do you again go through the Google

21   portal?

22   **A.**    Yes, sir.

23   **Q.**    Okay.  Did you get any information back in step two?

24   **A.**    Yes, sir, we did.

25   **Q.**    Okay.  And then what did you do after that?

1   **A.**   Then we proceeded with step three.

2   **Q.**   And in step three, what are you seeking?

3   **A.**   Step three indicated what the -- who the devices belonged

4   to.

5   **Q.**   Step three is where you get the actual information on

6   whose devices?

7   **A.**   Yes, sir.

8   **Q.**   Okay.  And did you submit the stuff -- or the request for

9   step three?

10   **A.**   Yes, sir.

11   **Q.**   You do that through the portal?

12   **A.**   Yes, sir.

13   **Q.**   Did that -- did that information then come back after you

14   had gotten hurt?

15   **A.**   It came back -- I left for training, I believe, on the

16   9th of June --

17   **Q.**   Okay.

18   **A.**   -- 2019.  It came back on the 10th while I was in

19   training.

20   **Q.**   Okay.

21   **A.**   And then on the 11th is when I was shot.

22   **Q.**   Okay.  So did Stephen Mathews then take that information

23   and continue with the case?

24   **A.**   Yes, sir.

25   **Q.**   All right.  Let me ask you this question.  Was --

1   everything that's set forth in that affidavit that you signed,

2   was it true and correct to the best of your knowledge?

3   **A.**    Yes, sir.

4   **Q.**    And did you follow the legal process as far as

5   interacting with Google as you understood it to be?

6   **A.**    Yes, sir.

7           **MR. MIMS:**   Inspector Matney, I have no further

8   questions.

9           **THE COURT:**   Mr. Chiniche, cross-examination.

10           **MR. CHINICHE:**   Yes, Your Honor.

11                          **CROSS-EXAMINATION**

12   BY MR. CHINICHE:

13   **Q.**    Good morning, Mr. Matney.

14   **A.**    Morning, sir.

15   **Q.**    Is it Inspector Matney?

16   **A.**    Yes, sir.

17   **Q.**    You mentioned to Mr. Mims that you had extensive

18   experience getting search warrants; is that right?

19   **A.**    Yes, sir.

20   **Q.**    And you've been in federal law enforcement for 19 years?

21   **A.**    Yes, sir.  Almost 19.

22   **Q.**    And so you have familiarity with this process?

23   **A.**    Yes, sir.

24   **Q.**    You have applied for search warrants and filled out

25   affidavits to obtain search warrants?

1   **A.**    Yes, sir.

2   **Q.**    What kinds of -- well, have you gotten search warrants on

3   houses?

4   **A.**    Yes, sir.

5   **Q.**    Have you gotten search warrants on cars?

6   **A.**    Yes, sir.

7   **Q.**    Have you gotten search warrants on cell phones?

8   **A.**    Yes, sir.

9   **Q.**    Have you gotten search warrants on cell towers?

10  **A.**    Anything that encompasses a cell phone, yes, sir.

11  **Q.**    Okay.  Have you searched -- have you gotten search

12  warrants on cell phones to search photographs?

13  **A.**    Yes, sir.

14  **Q.**    And you told Mr. Mims that the importance of going to a

15  magistrate judge is to establish probable cause.  That's the

16  one thing you've got to have; is that right?

17  **A.**    Yes, sir.

18  **Q.**    And, in fact, when you -- when you fill out an affidavit

19  or an application for a search warrant, you've got to indicate

20  to the judge -- and, in this case, a magistrate judge; right --

21  **A.**    Yes, sir.

22  **Q.**    -- that you've got -- you're telling him or her that

23  you've got probable cause?

24  **A.**    Right.

25  **Q.**    And you're establishing to that judge what the probable

Matney - Cross by Mr. Chiniche

1  cause is factually; right?

2  **A.**    Yes, sir.

3  **Q.**    And so if you've got to -- a search warrant has two

4  things.  Mr. Mims brought up one, which is you've got to have

5  probable cause?

6  **A.**    Yes, sir.

7  **Q.**    But the second thing is you've got to have particularity

8  with where that search warrant -- the target of that search

9  warrant or the asset that you're seeking to obtain; right?

10  **A.**    Particularity meaning?

11  **Q.**    With respect to that asset.  I'm just calling it an

12  asset.  So, if it's a house, you can't just say, "I want to go

13  search a house in Lake Cormorant."  You've got to give an

14  address; right?

15  **A.**    Correct.  An address and a description of the house, yes,

16  sir.

17  **Q.**    And in your affidavit, you have to put your source of

18  information, and sometimes that's -- am I right?

19  **A.**    Yes, sir.

20  **Q.**    Sometimes that source of information is an agent.  It can

21  be yourself.  It can be other agents.  Right?

22  **A.**    Yes, sir.

23  **Q.**    Sometimes that source of information has to be just an

24  eyewitness to something; right?

25  **A.**    (Nods head up and down.)

1  **Q.**   And sometimes that source of information is a
2  confidential informant; right?
3  **A.**   Yes, sir.
4  **Q.**   And if it's a confidential informant, you've got to
5  ensure to the judge that this informant is reliable and he or
6  she's been proven to be reliable in the past; isn't that right?
7  **A.**   Yes, sir.
8  **Q.**   Okay.  And so, when you get a search warrant on a home,
9  let's say in Lake Cormorant, you've got to describe the
10  address, don't you?
11  **A.**   Yes, sir.
12  **Q.**   You have to describe the color of the home?
13  **A.**   Yes, sir.
14  **Q.**   You have to describe, if you know, how many bedrooms are
15  in there; right?
16  **A.**   (Nods head up and down.)
17  **Q.**   And if you and other agents get a search warrant on a
18  home at, say, 123 Main Street and you arrive at that home and
19  you notice once you arrive that there is a building -- an
20  outbuilding, a shed in the back, you can't search that shed,
21  can you?  Not until you get another search warrant?
22  **A.**   Correct.
23  **Q.**   Okay.  And that's because that back shed wasn't known to
24  you at the time you applied for the search warrant; right?
25  **A.**   Yes, sir.

1  **Q.**    And so, legally, you've got to go get a second search
2  warrant or a subsequent search warrant to be able to search
3  that outbuilding?

4  **A.**    Yes, sir.

5  **Q.**    And then, at that point, you've got to have probable
6  cause, and you've got to state with particularity the building
7  you want to search or seize; isn't that right?

8  **A.**    Yes, sir, but there's some exceptions to that.  I mean,
9  if we say on the property -- any buildings on the property
10  within -- located within the range of that house, you know,
11  that may be included in the search warrant, but it's not -- not
12  necessarily the case all of the time.

13  **Q.**    Yes.  Yes.  I agree.

14  **A.**    Yes, sir.

15  **Q.**    And so, when you are seeking a search warrant on a phone,
16  you've got to be particular about that phone.  You've got to --
17  if you're going to the magistrate and you want to search
18  Mr. Smith's iPhone 14, you've got to put that in the search
19  warrant application, don't you?

20  **A.**    Yes, sir.

21  **Q.**    And you've got to indicate to the magistrate judge that
22  there's a reason why you want to get into that iPhone 14.  In
23  other words, you've seen it as part of the crime or you have a
24  confidential informant that is indicating to you Mr. Smith,
25  every time he orders drugs from California, he uses his iPhone

1  14, right?

2  **A.**    Yes, sir.  And we're -- so I'm clear, we're speaking

3  about having possession of the phone and wanting to get inside

4  of it; correct?

5  **Q.**    Well, even if you don't have possession of that phone.

6  If you want to -- if you want to seize a phone or if you know

7  that there was a phone that was used by a particular suspect,

8  you've got to be specific; right?

9  **A.**    Yes, sir.

10  **Q.**    Okay.  And you name that phone.  You give as many

11  particular aspects of the asset you're going after to search;

12  right?

13  **A.**    Yes, sir.

14  **Q.**    Okay.  And so this burglary at the Lake Cormorant post

15  office occurred February 5th, 2018?

16  **A.**    Yes, sir, I believe.

17  **Q.**    On or about.  And, at that time, you and other agents

18  really had no suspects other than --

19  **A.**    Yes, sir.

20  **Q.**    Is that right?  You had what Mr. Cobbs, the victim, was

21  telling you --

22  **A.**    Yes, sir.

23  **Q.**    -- right?  And then later you all learn that there may

24  have been an eyewitness; is that right?

25  **A.**    Yes, sir.

1  **Q.**   Is that how the timeline goes?  You talked to Mr. Cobbs.

2  The next break in the case was you learned that there was an

3  eyewitness or --

4  **A.**   I think that was after we discovered the video.

5  **Q.**   The video?

6  **A.**   Yes, sir.

7  **Q.**   Can you give me a timeline on when you discovered the

8  video?

9  **A.**   I think it was within a day or two after the robbery.

10  **Q.**   Okay.

11  **A.**   It may have been sooner.  I'm sorry.

12  **Q.**   Okay.  So after you had the video -- and you obtained the

13  video from a nearby business --

14  **A.**   Yes, sir.

15  **Q.**   -- is that right?

16  **A.**   The farm -- it's a farm office.

17  **Q.**   Farm office?

18  **A.**   Yes, sir.

19  **Q.**   And then when did you obtain or learn about a potential

20  eyewitness?

21  **A.**   Oh, we learned about that from -- well, I believe it was

22  after the video -- we viewed the video.

23  **Q.**   Okay.  And so was the -- was learning about the

24  eyewitness before or after the geofence warrant?

25  **A.**   Before.

1  **Q.**    Okay.  All right.  And then you went and got a geofence
2  warrant; is that right?
3  **A.**    Yes, sir.
4  **Q.**    We're going to talk about that in a minute.
5  **A.**    That was on down the road, though.  That was a little
6  ways past the initial investigation.
7  **Q.**    That was in November --
8  **A.**    Correct.
9  **Q.**    -- 2018 --
10 **A.**    Right.
11 **Q.**    -- right?  And so, after you got the geofence warrant and
12 you told Mr. Mims it came back, it identified two devices or
13 three devices?
14 **A.**    Three devices.
15 **Q.**    You got a response from Google that identified three
16 devices?
17 **A.**    Right.
18 **Q.**    And of those three, I believe the file says you and other
19 agents narrowed it down to two; is that right?
20 **A.**    Yes, sir.
21 **Q.**    And then, once you had identifiers, once those two
22 devices were identified with account users, you later went and
23 got other Google warrants; right?
24 **A.**    Yes, sir.  I -- Stephen Mathews did.  He did the second
25 search warrant.

1   **Q.**   Right.  And so Stephen Mathews got subsequent Google

2   search warrants that eventually, in the Government's position,

3   identified Defendant Smith and Defendant McThunel; is that

4   right?

5   **A.**   Yes, sir.

6   **Q.**   Is that the timeline that I've got?  Okay.  All right.

7   But we're here for the purposes of today of the Google -- of

8   the geofence warrant.  You understand?

9   **A.**   Yes, sir.

10   **Q.**   Okay.  All right.

11          **MR. CHINICHE:**  Your Honor, if I may use the ELMO.

12   **BY MR. CHINICHE:**

13   **Q.**   Well, Mr. Matney, let me ask you this.  You filled out an

14   affidavit -- Application for a Search Warrant in this case

15   November 8th, 2018.  Do you agree with that?

16   **A.**   Yes, sir.

17          **MR. CHINICHE:**  Your Honor, may I approach the witness?

18          **THE COURT:**  You may.

19   **BY MR. CHINICHE:**

20   **Q.**   Mr. Matney, will you take a look at this document.  It is

21   part of the record at Document 74-2.

22          **THE WITNESS:**  Your Honor, may I request to get my

23   glasses?  I left them over there.  I'm sorry.

24          **THE COURT:**  Yes, sir.

25          **THE WITNESS:**  Thank you.  Okay.  I'm sorry.

Matney - Cross by Mr. Chiniche

1  **BY MR. CHINICHE:**

2  **Q.**   Mr. Matney, do you see that document, and do you

3  recognize that document?

4  **A.**   Yes, sir.

5  **Q.**   And what is it, please, for the Court?

6  **A.**   It's the Affidavit in Support of the Search Warrant

7  Application.

8       **MR. CHINICHE:**  Your Honor, at this time, may I publish

9  this to the witness and to the Court?

10      **THE COURT:**  Yes.  To be clear, this is the affidavit

11  for the geofence warrant?

12      **MR. CHINICHE:**  Yes, Your Honor.

13      **THE COURT:**  Okay.  Yes.  Thank you.

14  **BY MR. CHINICHE:**

15  **Q.**   Mr. Matney, this is your Affidavit in Support of the

16  Search Warrant; is that right?

17  **A.**   Yes, sir.

18  **Q.**   Okay.  And it is -- it contains an Exhibit B, I believe,

19  but this is an eight-page document with your signature down at

20  the bottom November 8th, 2018; is that right?

21  **A.**   Yes, sir.

22  **Q.**   And you signed that in front of Judge Percy --

23  **A.**   Yes, sir.

24  **Q.**   -- is that right?  Okay.  And then you attached what's

25  called -- or Attachment A indicating the subject accounts and

Matney - Cross by Mr. Chiniche

1  the execution of the warrant; is that right?

2  **A.**   Yes, sir.

3  **Q.**   And you give the geographical box of your geofence

4  location?

5  **A.**   Yes, sir.  Longitude and latitude.

6  **Q.**   Okay.  And you used this affidavit to get the geofence

7  warrant in question; is that right?

8  **A.**   Yes, sir.

9  **Q.**   All right.  And so, in this warrant, you indicate what

10  your experience is; right?

11  **A.**   Yes, sir.

12  **Q.**   The jurisdiction that you -- and the authority you have

13  to issue that warrant; is that right?

14  **A.**   Yes, sir.

15  **Q.**   And this was your first geofence warrant?

16  **A.**   Correct.

17  **Q.**   And you and Stephen Mathews worked on this, the language

18  that's in here; is that right?

19  **A.**   Yes, sir.

20  **Q.**   Okay.  And so, in the background section, you indicate to

21  Judge -- to Judge Percy that you seek information regarding a

22  cellular telephone, mobile telephone, and you explain that's a

23  handheld device; is that right?

24  **A.**   Yes, sir.

25  **Q.**   Then you include in Paragraph 7 that Google is a company

Matney - Cross by Mr. Chiniche

1   with which -- that provides electronic communications to its

2   subscribers; is that right?

3   **A.**   Correct.

4   **Q.**   Including e-mail services. You indicate in here that

5   "Google allows subscribers to obtain e-mail accounts at the

6   domain name gmail.com or google.com. Subscribers obtain an

7   account by registering that with Google." Is that right?

8   **A.**   Yes, sir.

9   **Q.**   "A subscriber using the provider's service can access his

10   or her e-mail account from any computer connected to the

11   Internet"?

12   **A.**   Yes, sir.

13   **Q.**   You indicate in Paragraph 8 that Google has developed a

14   system for collecting location data, not only for Android users

15   but non-Android devices, "if the device is registered to a

16   Google account and the user has location services enabled." Is

17   that right?

18   **A.**   Yes, sir.

19   **Q.**   So I take it that this is language that you all are

20   getting from -- probably from other agents in the field. I

21   mean, you didn't come up with this language. This is something

22   you're borrowing from the Government at large; is that right?

23   **A.**   Yes, sir. We're conferring with other people.

24   **Q.**   Right. And this is a fairly new technology that you all

25   are employing in November of 2018; is that right?

1 **A.** Correct.

2 **Q.** Is it fair to say, Inspector, that at the time you went

3 to get this search warrant that you weren't real familiar with

4 the technology or the science behind how this information is

5 obtained?

6 **A.** Yes, sir. That's correct.

7 **Q.** Okay. It's kind of learning as you go; is that right?

8 **A.** Yes, sir.

9 **Q.** You indicate that "Location data can assist investigators

10 in understanding a fuller geographic picture and timeline and

11 may tend to identify potential witnesses as possibly

12 inculpating or exculpating account owners." Right? That's all

13 in there; is that right?

14 **A.** Correct.

15 **Q.** And so you're asking -- you've drawn in the exhibit a

16 geographic location. You're asking -- you're sending some GPS

17 coordinates, and you're asking for devices that are within that

18 geographical area; is that right?

19 **A.** Yes, sir.

20 **Q.** Okay. That's -- you do have an understanding of that;

21 right?

22 **A.** Yes, sir.

23 **Q.** You understand that that's what you're hoping to obtain?

24 **A.** Right. That's the area that we put in there when we

25 requested from Google the information.

1  **Q.**  Right.  So here comes the probable cause statement.

2  We've got to establish probable cause; right?  And so you put

3  in the facts and circumstances that you want Judge Percy to

4  rely on before he issues this geofence warrant; is that right?

5  **A.**  Yes, sir.

6  **Q.**  And in the Probable Cause Statement, you talk about the

7  date of the crime, February 5th.  It happened around 5:25.

8  You're including information from the victim, right, victim

9  Cobbs, which you've seen on video; is that right?

10  **A.**  Yes, sir.

11  **Q.**  You identify -- you identify a maroon Hyundai Elantra and

12  you identify a large white SUV, a GMC Yukon; is that right?

13  **A.**  Yes, sir.

14  **Q.**  And then here in Paragraph 16, "Postal inspectors

15  conducted a detailed review of the video surveillance, and it

16  appears the robbery suspect is possibly using a cellular device

17  both before and after the robbery occurs."

18  **A.**  Yes, sir.

19  **Q.**  Now, that is -- Paragraph 16, that is typed by you or by

20  you and Stephen Mathews; is that right?

21  **A.**  Correct.

22  **Q.**  That's not form language; right?

23  **A.**  Correct.

24  **Q.**  Okay.  Couple of questions.  Did you show Judge Percy the

25  video that you were relying on when you went to him to get this

Matney - Cross by Mr. Chiniche

1  application signed?

2  **A.**  No, sir.

3  **Q.**  Okay.  So Judge Percy relied just on what I've got here

4  in front of me; is that right?

5  **A.**  Yes, sir.

6  **Q.**  Okay.  The -- and I want to make sure that the victim,

7  Mr. Cobbs, he doesn't indicate to you at all that there's a

8  cell phone involved by the assailant, does he?

9  **A.**  No, sir.

10  **Q.**  Okay.  And it's nowhere in -- it's nowhere in a statement

11  that he gave or a report that you all have for Mr. Cobbs that

12  the assailant used a cell phone?

13  **A.**  Correct.

14  **Q.**  Okay.

15  **A.**  But it was indicative during the video, too, that he was

16  nowhere near when we saw the assailant using -- when we

17  possibly thought the assailant was using a cell phone.

18  **Q.**  To be clear, the only suggestion that the assailant used

19  a cell phone is what you saw or you perceived to observe in the

20  video?

21  **A.**  Yes, sir.

22  **Q.**  Okay.  So there's no other source.  It's just what we saw

23  and what the Court has seen this morning?

24  **A.**  Correct.

25  **Q.**  And then in -- here in Paragraph 21, you indicate -- and

1   this is from the Evidence, Fruits, and Instrumentalities.  I

2   realize this is a form, but you indicate, "The information

3   sought from Google regarding the subject accounts, specified in

4   Section II of Attachment A to the proposed warrant."

5       All right.  So let me stop there.  What you're saying is

6   the information sought from Google is in Section II of

7   Attachment A.  So, if I flip to Attachment A, I've got

8   Attachment A, Section I.  It's this -- this is the subject of

9   your warrant or application; is that right?

10  **A.**   Yes, sir.

11  **Q.**   Okay.  "To the proposed warrant, will identify which

12  cellular devices were near the location where the robbery took

13  place and may assist law enforcement in determining which

14  persons were present or involved with the robbery under

15  investigation.  The requested information includes:  Location

16  information.  All location data, whether derived from GPS data,

17  cell site/cell tower triangulation, and precision measurement

18  information, such as timing advance or per call measurement

19  data and Wi-Fi location, including the GPS coordinates."

20      So, in here, you're asking Google to provide location

21  information, all location data; is that right?

22  **A.**   Yes, sir.

23  **Q.**   All location.  You're not limiting it in any way; is that

24  right?

25  **A.**   I think it's related back to the Attachment A in the

1   previous Paragraph 21 that says within the parameters that we

2   set forth.

3   **Q.**   Sure.

4   **A.**   Yes, sir.

5   **Q.**   I understand.  It's within that parameters?

6   **A.**   Yes, sir.

7   **Q.**   And we can proceed under that understanding.  But you're

8   asking for all location data, all location data that Google has

9   in its system that it has obtained, whether derived from GPS,

10  cell tower triangulation, Wi-Fi location, or what's called

11  precision measurement information; is that right?

12  **A.**   Yes, sir.  Within the parameters that we set forth, yes,

13  sir.

14  **Q.**   Within the parameters, right.  And then you indicate,

15  "Each device corresponding to the location data to be provided

16  by Google will be identified only as a numerical identifier,

17  without any further content or information identifying the user

18  of a particular device.  Law enforcement will analyze this

19  location data to identify users who may have witnessed or

20  participated in the subject offenses and will seek any

21  additional information regarding those devices through further

22  legal process."  Is that right?

23  **A.**   Yes, sir.  That's correct.

24  **Q.**   So you're telling Judge Percy in this application,

25  "Judge, I need all location data."  Now, it's -- it's with

1 | respect to the four corners of this geofence that I, Inspector
2 | Matney, has drawn?
3 | **A.** Yes, sir.
4 | **Q.** And it's for a time frame, 5:00 p.m. Central to 6:00 p.m.
5 | Central, on February 5th; right?
6 | **A.** Yes, sir.
7 | **Q.** And you're indicating to him that, once I get the
8 | location information of all of this data that is going to
9 | include every device that fits this criteria, once I get that
10 | information, I'm not going to know who owns the account. I'm
11 | not going to be able to identify suspects; right?
12 | **A.** Correct.
13 | **Q.** But we're going to take that data, and we will come back
14 | to the Court, and we will get, through further legal process --
15 | **MR. MIMS:** Your Honor, I object. He's added into the
16 | question "come back to the Court." That's not what it says.
17 | **THE COURT:** It is not what it says, but you are free
18 | to cross-examine.
19 | **BY MR. CHINICHE:**
20 | **Q.** Okay. You indicate "Law enforcement will analyze this
21 | location to identify users who have witnessed or participated
22 | in the subject and will seek any additional information
23 | regarding those devices through further legal process."
24 | All right. What did you mean by that sentence?
25 | **A.** Basically whatever process we have to go through,

1   whatever Google requests for us to do in order to obtain

2   additional information.

3   **Q.**   But did you under -- didn't you understand that you were

4   going to get more data than the number of suspects?

5   **A.**   That was our hope, yes, sir.

6   **Q.**   And you understood that the -- or maybe you didn't.  I

7   don't know.  You tell me -- that the initial data that you were

8   going to get wasn't going to be anonymous?

9   **A.**   I'm not aware of their process and how they reveal the

10  information that we're requesting --

11  **Q.**   Okay.

12  **A.**   -- until -- until I get it.

13  **Q.**   Okay.  But you understood that -- in this application to

14  Judge Percy that you were -- you wanted a certain amount of

15  data; that it was going to be anonymous; and that through

16  further legal process, you would narrow it down.  Right?

17  **A.**   I didn't indicate how much information we were

18  requesting.  Just requesting information that fit within those

19  parameters.

20  **Q.**   Okay.  And so we get to the conclusion.  And this

21  application or affidavit was approved on November the 8th,

22  2018; is that right?

23  **A.**   Yes, sir.

24  **Q.**   There's another document that we have used in the motion

25  to suppress.

Matney - Cross by Mr. Chiniche

1    **MR. CHINICHE:**  Mr. Mims.

2       (CONFERRING OFF THE RECORD.)

3    **BY MR. CHINICHE:**

4    **Q.**    Inspector Matney --

5    **A.**    Yes, sir.

6    **Q.**    -- we've got Paragraph 21 here, and then this is -- this

7    is Document 74-4.  This is part of an exhibit, Mr. McInvaille's

8    report.  And this is Information, Number II.  And I realize you

9    didn't draw this, but have you seen this?  Do you understand --

10   **A.**    Yes, sir, I have.

11   **Q.**    Do you understand what's indicated here?  Step 1, Step 2,

12   and Step 3; is that right?

13   **A.**    Yes, sir.

14   **Q.**    Is that right?

15   **A.**    Yes, sir.

16       **MR. MIMS:**  Excuse me one second.  If I might just

17   clarify just to make sure that everybody's on the same page.

18   What Mr. Chiniche is putting up there actually comes from the

19   search warrant.  It's part of their expert report, but that II,

20   Information to be Provided by the Provider, is part of the

21   search warrant.  Yes, ma'am.  I just wanted to make sure we

22   were all looking at the same thing.

23       **MR. CHINICHE:**  Thank you, Mr. Mims.

24   **BY MR. CHINICHE:**

25   **Q.**    And so, Inspector Matney, 74-4 here and this portion

Matney - Cross by Mr. Chiniche

1  underneath Figure 1, that is -- that is a copy of the search

2  warrant that you actually issued to Google for the geofence; is

3  that right?

4  **A.**  Correct.

5  **Q.**  So this is language that you typed up because you put in

6  the parameters between 5:00 p.m. Central Time and 6:00 p.m.

7  Central Time; right?

8  **A.**  I did not type it up, but, yes, sir, that is correct

9  information.

10 **Q.**  Okay.  You sent it to Google through the portal; right?

11 **A.**  Yes, sir.

12 **Q.**  And is there a reason why there's -- there's more

13 language in the actual search warrant than you applied for when

14 you went to Magistrate Percy?

15 **A.**  I think, as an investigation goes, you're trying to

16 narrow down the information that you're looking for, and that's

17 why it got more detailed as we went.

18 **Q.**  Okay.  But you agree that these are two different -- two

19 different written documents; is that right?

20 **A.**  Yes, sir.

21 **Q.**  Okay.  All right.  So, in 74-4, we see the location

22 information you're asking Google to provide, and then also in

23 Step 1, "Any user and each device corresponding to the location

24 data to be provided."

25      All right.  We've got Step 2 and Step 3.  And I realize

1  this is -- this is delineated for our purposes.  It's what

2  we've been talking about.  But, Inspector Matney, I want to

3  know if you agree that you all skipped Step 2 and went to --

4  straight to Step 3; is that right?

5  **A.**   No, sir.  We did Step 2.

6  **Q.**   You did Step 2?  So Step 1 is, in essence, getting the

7  raw data.  Would you agree with that?

8  **A.**   Yes, sir.

9  **Q.**   Okay.  Step 2 says, "For those accounts identified as

10 relevant to the ongoing investigation."  So that means for

11 accounts identified as relevant.  That means that you identify

12 as relevant or law enforcement identifies as relevant; right?

13 **A.**   Through the analysis of the provided records that we

14 received, yes, sir.

15 **Q.**   "And upon demand, the provider shall provide additional

16 location history outside of the predefined area -- shall

17 provide additional location history outside of the predefined

18 area for those relevant accounts to determine the path of

19 travel.  This additional location history shall not exceed

20 60 minutes plus or minus the first and last timestamp

21 associated with the account in the initial data set.  The

22 purpose of path of travel contextual location points is to

23 eliminate outlier points where, from the surrounding data, it

24 becomes clear the reported points are not indicative of the

25 device actually being within the scope of the warrant."

1    That's Step 2; right?

2  **A.**  Yes, sir, that's Step 2.

3  **Q.**  All right.  So "for those accounts identified as relevant

4  to the ongoing investigation through an analysis of provided

5  records."  That means you or your agents determined that are

6  relevant through the provided records in Step 1 that are

7  anonymous?

8  **A.**  They're identified as device numbers.  They're not -- so,

9  yeah, we don't have the information to back up the cell phone,

10  but they are identified as a number.

11  **Q.**  They're identified as a number?

12  **A.**  Yes, sir.

13  **Q.**  The date and the time is provided --

14  **A.**  Yes, sir.

15  **Q.**  -- by Google?  And they draw a radius.  We'll explain

16  later; right?

17  **A.**  Yes, sir.

18  **Q.**  And they indicate whether they're within the geofence or

19  without the -- or outside of the geofence, don't they?

20  **A.**  Yes, sir.

21  **Q.**  Okay.  So you're obtaining data that -- from Google

22  that's outside of the geofence; isn't that right?

23      **MR. MIMS:**  Your Honor, I object to the question.

24  That's not accurate as to what Google does.  That's something

25  more to get into with the expert later, but that's -- Google

1 does not provide them information that's outside the geofence.

2     **MR. CHINICHE:**  Your Honor, I would --

3     **THE COURT:**  It's overruled.  You may ask your

4 question.

5 **BY MR. CHINICHE:**

6 **Q.**    What is your understanding, Agent Matney?

7 **A.**    My understanding is that, when we request the

8 information, we request it within the parameters, and also, as

9 you see in that portion, it says to determine path of travel.

10 So, at that point, we -- it's a possibility that it could be

11 outside of those parameters at that time.

12 **Q.**    Exactly.  Thank you.  Thank you.  And so you, as agents,

13 once you get this raw data and the path of travel, assists you

14 in figuring out who was at that location; right?

15 **A.**    Indicated by what was within the parameters at the time,

16 yes, sir.

17 **Q.**    Right.  But there's a -- but you recognize the

18 possibility that some of the data is outside the geofence.

19 Step Number 3, "For those accounts identified as relevant to

20 the ongoing investigation through an analysis of provided

21 records, and upon demand, the provider shall provide the

22 subscriber's information for those relevant accounts to include

23 the subscriber's name" --

24 **A.**    Sir, can you move the sheet?  I'm sorry.

25 **Q.**    I'm sorry.

1  **A.**    Thank you.

2  **Q.**    Step 3 is the money step.  That's where you get, right,

3  the subscriber's name, e-mail address, the services subscribed

4  to -- so if it's an AT&T, C Spire; right? -- the last six

5  months of IP history and the SMS account number and the

6  registered IP address; right?  Step 3 is the money -- that's

7  where you get the identifiers, the account holder for that

8  particular device?

9  **A.**    Related to the device ID, yes, sir.

10 **Q.**    Right.  Okay.  So my question is if -- you indicate to

11 Judge Percy that "Law enforcement" -- that's you -- "will

12 analyze the location data to identify users who may have

13 witnessed or participated in the subject offense and will seek

14 additional information regarding those devices through further

15 legal process."

16        So what I'm telling you is, we all know that you -- you

17 obtained anonymous data in Step 1, and then you obtained the

18 account e-mail address, the subscriber's name in Step 3; right?

19 **A.**    Yes, sir.

20 **Q.**    You obtained Step 3 information, and you did so without

21 further legal process?

22        **MR. MIMS:**  Your Honor, again, I'm going to object.

23 That goes to a legal conclusion of what this says.  It's to

24 further the process.  That's part of our issues.  It's really

25 not the agent's factual issue.  It's a legal argument between

1   the Government and the defense.

2        **MR. CHINICHE:**  Okay.  I'm not going to concede that

3   point but --

4   **BY MR. CHINICHE:**

5   **Q.**   Inspector Matney, you received a letter from Google,

6   right, dated May 30th, 2019?

7   **A.**   Yes, sir.

8   **Q.**   And this -- this is Google's response; right?  And this

9   is -- this is -- is this the Step 2 --

10  **A.**   Yes, sir.

11  **Q.**   -- that you obtained that was on your computer right

12  before you got injured?

13  **A.**   Correct.

14  **Q.**   Okay.  All right.  This letter from Google indicates that

15  they are responding to the search warrant dated November 8th,

16  2018; isn't that correct?

17  **A.**   Yes, sir.

18  **Q.**   So you only got one geofence warrant; isn't that correct?

19  **A.**   Yes, sir.

20  **Q.**   And you did so on November 8th, 2018 --

21  **A.**   Correct.

22  **Q.**   -- is that right?  So you got a response from Google

23  without further legal process; right?  Because you only got one

24  geofence warrant November 8th, 2018; isn't that correct, Agent?

25  **A.**   Yes, sir.  The warrant was on November 8th.

1      **THE COURT:** I'm sorry. I didn't hear your response.

2      **THE WITNESS:** Yes, ma'am. The warrant was on

3   November 8th.

4      **THE COURT:** Okay. I might ask you to speak a little

5   closer to the microphone too.

6      **THE WITNESS:** Yes, ma'am.

7   **BY MR. CHINICHE:**

8   **Q.** Okay. So, although this is a rural area, there are other

9   businesses in the -- at this intersection; right?

10  **A.** Yes, sir.

11  **Q.** We've got a farm business where you obtained a video;

12  right?

13  **A.** Yes, sir.

14  **Q.** We saw -- in addition to the white SUV and the red

15  Hyundai Sonata --

16  **A.** Elantra.

17  **Q.** We're not conceding that's what it is, but if you say

18  that's what it is. So, in addition to those two cars, we see

19  other vehicles passing through; right?

20  **A.** Correct.

21  **Q.** On the video, I saw a gentleman walking around the

22  building.

23  **A.** At the very beginning?

24  **Q.** At the very beginning.

25  **A.** Yes, sir.

1   **Q.**   He was a white gentleman; right?  The victim, Mr. Cobbs,

2   he had a cell phone based on his own admission to you, didn't

3   he?

4   **A.**   Yes, sir.

5   **Q.**   And he indicated that, right after the assault, he called

6   his wife, and then he called U.S. Postal Service?

7   **A.**   Yes, sir.

8   **Q.**   But none of those individuals that I just mentioned came

9   back as a hit on your geofence warrant, did it?

10   **A.**   No, sir.

11   **Q.**   And we've got businesses nearby.  None of those came

12   back, did they?

13   **A.**   Yes, sir.  But I'm not aware if anybody was in those

14   businesses at the time.

15   **Q.**   Okay.  So do you understand -- and if you don't, that's

16   fine -- that the geofence warrant is very -- I'm sorry -- the

17   geofence warrant for Google to return back data, we're talking

18   about a population of people; right?  We're talking about

19   people that, number one, have cell phones; right?

20   **A.**   (Nods head up and down.)

21   **Q.**   They've got to have a cell phone.  If they don't have a

22   cell phone, the geofence doesn't work; is that right?

23   **A.**   Correct.

24   **Q.**   Not only do they have to have a cell phone, but they have

25   to have a Google account that's accessed or utilized on that

Matney - Cross by Mr. Chiniche

1  cell phone; right?

2  **A.**    Correct.

3  **Q.**    Now, once they have a Google account, they have to have

4  the ability for location services; right?

5  **A.**    Selected on your phone, yes, sir, from what I understand.

6  **Q.**    It has to be accessible; right?

7  **A.**    Yes, sir.

8  **Q.**    But you didn't put any of that in your application to

9  Judge Percy, did you?

10 **A.**    No, sir.

11 **Q.**    And that's because y'all didn't know who it was.  You

12 didn't have account names.  You didn't have account numbers.

13 Right?

14 **A.**    That's incorrect.  It wasn't because I didn't know who it

15 was.  It was simply because that was the process that we

16 determined we needed to request information via the search

17 warrant.

18 **Q.**    I know.  But if you're going to Judge Percy and you're

19 telling him that you need a geofence warrant, you're not being

20 particular.  Because what you could say is -- what you have to

21 say, the defense argues, is you have got to be particular about

22 that warrant.

23        You've got to tell Judge Percy that we -- the suspect

24 we're identifying, he's got a cell phone, he's got Google on

25 that cell phone, he's got location services enabled on that

 1  cell phone, and we believe it was part of the crime.  Not just
 2  that he used his cell phone.

 3      Because you knew in the video -- you knew before you got
 4  the video that Agent -- that the victim, Cobbs, he had a cell
 5  phone.  So your warrant is vague, was it not?
 6  **A.**    It was particular in how we requested the information
 7  based on the lat and long of the area that we were looking at.
 8  **Q.**    Right.  You knew where a crime had been committed?
 9  **A.**    Yes, sir.
10  **Q.**    And you could draw a box around that?
11  **A.**    Correct.
12  **Q.**    But that's all you had.  Unlike in the situation when
13  you're going to get a cell phone, you get -- you get the make,
14  the model, the serial number.  I've seen serial numbers in
15  search warrants.  I've seen the telephone number.  You know,
16  we've got all kinds of information.

17      But in this warrant, your application to Judge Percy was,
18  I need all data that returns a hit within this four corners of
19  a geofence, and then, once I get that data, I'll come back --
20  well, that's a dispute -- but through further legal process, we
21  will narrow it down.

22      Because, in some cases, you can go to -- can you not --
23  you can go to the magistrate and say, "Jamarr Smith was
24  involved in this crime or Gilbert McThunel was involved in this
25  crime, we believe, and here's his account number.  We need all

1  of the data from his e-mail address.  And his e-mail address is

2  such and such at gmail.com."  Right?

3  **A.**    Only if we indicate probable cause with that information.

4  **Q.**    Exactly.  But you didn't have probable cause with respect

5  to the geofence other than a crime was committed within the

6  four area corners of this geofence; right?

7  **A.**    Right.  We didn't have a specific phone at a certain

8  time.  We were -- we were basing it on the video that we saw.

9  **Q.**    But there's no way you could tell by looking at the video

10  that the suspect had a Google account, location services turned

11  on, et cetera, that would give you an indication of why you

12  need this information from Google?

13  **A.**    It was probable cause, yes, sir.

14  **Q.**    Well, yeah.  I mean, you've got to have a crime that's

15  been committed.  Otherwise, you can't get a warrant.  I get

16  that.

17  **A.**    Yes, sir.

18  **Q.**    Yeah.  The geofence -- let's just be clear, too, for the

19  Court.  The geofence only returns devices.  It doesn't indicate

20  communication, does it?  It doesn't record phone calls, does

21  it?

22  **A.**    Correct.

23  **Q.**    You can't tell whether that phone was making phone calls

24  or texts or anything; right?

25  **A.**    Correct.

Matney - Cross by Mr. Lewis

1  **Q.**   It's just a device location?

2  **A.**   Based on the geofence request, yes, sir.

3  **Q.**   Right.

4          **MR. CHINICHE:**  Your Honor, if I may have just a

5  moment.

6          **THE COURT:**  Yes, sir.

7      (CONFERRING OFF THE RECORD.)

8          **MR. CHINICHE:**  I have no further questions.  Thank

9  you.

10         **THE COURT:**  Any questions, Mr. Lewis?

11         **MR. LEWIS:**  I'm just going to ask a couple, Your

12  Honor, if I may.

13                      **CROSS-EXAMINATION**

14  **BY MR. LEWIS:**

15 **Q.**   Hi, Inspector Matney.  Goodloe Lewis.  Let me make sure I

16  understand.  You did use some sort of form for this affidavit

17  that you gave to the judge; correct?

18 **A.**   I'm sorry.  What do you mean, sir?

19 **Q.**   Like a go-by?

20 **A.**   Yes, sir.

21 **Q.**   Okay.  So somebody else had done one.  You took that,

22  pulled out what you needed, and put into your affidavit;

23  correct?

24 **A.**   Well, Stephen Mathews did.

25 **Q.**   Okay.  He prepared the affidavit?

1  **A.**    Yes, sir.  We reviewed it together prior to taking it to

2  the judge.

3  **Q.**    Had you been told that you needed to have in the

4  affidavit for a geofence warrant that a suspect was using a

5  phone at the time?

6  **A.**    I believe we reached out to people for assistance, other

7  inspectors, other law enforcement agencies, to determine the

8  best tool to use to find information.

9  **Q.**    And they told you it was important to have in that

10  affidavit that somebody was using a phone at the time of the

11  crime?

12  **A.**    Yes, sir.  That was part of the requirement for the

13  search warrant.

14  **Q.**    Just a few more questions just to make sure I'm clear.

15  As Mr. Chiniche asked you, what Google would send back to you

16  would not tell you if somebody was using the phone or texting,

17  in other words, making a phone call or texting at the time;

18  correct?

19  **A.**    Correct.

20  **Q.**    All it would tell you is whether they had location

21  services activated; correct?

22  **A.**    It would indicate a device, yes, sir.

23  **Q.**    Had location services?

24  **A.**    Had location services.

25  **Q.**    You had no idea whether any of these suspects had

1    location services activated at anytime; correct?

2    **A.**    No, sir.

3    **Q.**    Okay.  Do you remember the names of these other

4    inspectors who you watched the video with?

5    **A.**    The video was -- it was viewed in different locations and

6    discussed over the phone as well, but, I mean, initially, it

7    was Inspector Dwayne Martin and I that went and recovered --

8    excuse me -- the video.

9    **Q.**    Well, you said that you had some assistance in

10   interpreting the video.  I just want to know the names of who

11   assisted you in interpreting the video.

12   **A.**    No, I had no assistance in interpreting the video.  That

13   was my own interpretation.

14   **Q.**    Okay.

15               **MR. LEWIS:**  Thank you, Your Honor.

16               **THE COURT:**  Mr. Travis?

17               **MR. TRAVIS:**  No questions.  Thank you, Your Honor.

18               **THE COURT:**  Thank you.

19               Mr. Mims, redirect?

20               **MR. MIMS:**  Yes, ma'am.

21                         **REDIRECT EXAMINATION**

22   **BY MR. MIMS:**

23   **Q.**    Inspector Matney, I just have a few follow-up questions.

24   Let's go back to the topic of particularity for a second.  I'm

25   going to use -- I'm going to use my copy here because I've

1    drawn some lines on it, but this, again, is the Affidavit in

2    Support of Search Warrant that you submitted; correct?

3    **A.**    Correct.

4    **Q.**    Okay.  And in that affidavit, in Introduction, does it

5    say you were seeking Application for a Search Warrant for

6    information maintained on servers controlled by Google?

7    **A.**    Correct.

8    **Q.**    Okay.  And it says for location data associated with a

9    particular location at a particular time as set forth in

10   Section I, Attachment A; correct?

11   **A.**    Correct.

12   **Q.**    And then in Section I, Attachment A, that's where, again,

13   it says the warrant is directed to Google; right?

14   **A.**    Correct.

15   **Q.**    And it applies to content and other information within

16   the provider's possession, control, and custody; right?

17   **A.**    Yes, sir.

18   **Q.**    Within the geographical region.  And that's this box that

19   you've drawn around the post office; right?

20   **A.**    Yes, sir.

21   **Q.**    Okay.  So that's what you're searching.  You're searching

22   what -- does Google have information within this box?

23   **A.**    Correct.

24   **Q.**    Now, the search warrant -- this is a copy of the Search

25   and Seizure Warrant signed by Judge Percy; right?

Matney - Redirect

1   **A.**   Yes, sir.

2   **Q.**   Okay.  And as part of it was this Document 74-2 that was

3   part of the record here, which is your affidavit with the

4   Attachment A at the back; right?

5   **A.**   Yes, sir.

6   **Q.**   Okay.  There's also -- as we see in Attachment A, there

7   is paragraph Roman Numeral I.  There's also in it -- I think it

8   was just maybe inadvertently left off of the document attached

9   to the court file in this motion, but this Roman Numeral II,

10  was that not part of the same affidavit?

11  **A.**   Yes, sir.

12  **Q.**   Okay.  And that's what actually sets forth the three-step

13  process that you were asked about earlier; correct?

14  **A.**   Yes, sir.

15  **Q.**   So, all of this, this that includes Roman Numeral II,

16  that was all part of the affidavit --

17  **A.**   Yes, sir.

18  **Q.**   -- that was presented to Judge Percy; correct?

19  **A.**   Correct.

20  **Q.**   That he signed off on the warrant?

21  **A.**   Correct.

22  **Q.**   Okay.  Was this information submitted to Google as part

23  of the portal?  What do you send to Google?

24  **A.**   The search warrant.

25  **Q.**   Okay.  Do you do just the search warrant, or do you also

Matney - Redirect

1  send them the part of Attachment A?

2  **A.**   Part of Attachment A as well.

3  **Q.**   Because they have to have Attachment A to see the box;

4  right?

5  **A.**   Yes sir.  The parameters of longitude and latitude.

6  **Q.**   And Attachment A also includes this Roman Numeral II;

7  correct?

8  **A.**   Yes, sir.

9  **Q.**   And in response to that, you got back over time three

10  responses; right?

11  **A.**   Yes, sir.

12  **Q.**   Now, the first response -- and I don't -- I can't find

13  the actual letter.  It's back at the office.  Apparently, I

14  didn't clip it to this.  But the first response you get from

15  Google has the initial hits; right?

16  **A.**   Yes, sir.

17  **Q.**   But they're anonymous; right?

18  **A.**   I'm sorry.  They're --

19  **Q.**   They're anonymous?

20  **A.**   Yes, sir.

21  **Q.**   No identifiers?

22  **A.**   Correct.

23  **Q.**   Okay.  And then, in Step 2, you get the letter that was

24  referred to earlier.  This is dated May 30th; is that right?

25  **A.**   Yes, sir.

1  **Q.**   And then in Step 3 is the letter dated June 10th.  And

2  that's where you get the actual information of whose devices

3  these belong to; right?

4  **A.**   Yes, sir.

5  **Q.**   And that is all based on one search warrant; right?

6  **A.**   Correct.

7  **Q.**   That you presented to Google?

8  **A.**   (Nods head up and down.)

9  **Q.**   Yes?

10  **A.**   Based on the information, yes, sir, that they supplied

11  me.

12  **Q.**   And that was signed off on by Judge Percy?

13  **A.**   Yes, sir.

14        **MR. MIMS:**  Your Honor, may I have one second to confer

15  with co-counsel -- or opposing counsel over here?

16        **THE COURT:**  Yes.

17     (CONFERRING OFF THE RECORD.)

18        **MR. MIMS:**  Your Honor, this page here that I have on

19  the screen that's marked Roman Numeral II, that's actually part

20  of the affidavit.  It's part of Attachment A.  I think it was

21  just inadvertently left off of the Exhibit 70 -- what number

22  was it?  70 -- Document Number 74-2, part of the motion.

23        And, Your Honor, because that's part of that same

24  affidavit and part of that same Attachment A, I would like to

25  include this as Government's Exhibit G-2.

1     **MR. CHINICHE:**  No objection.

2     **THE COURT:**  Thank you.  That's quite important.

3     So, in the affidavit in Paragraph 21, I think for the

4  first time I see reference to Section II of Attachment A.  And

5  it's your contention that the document that I, frankly, have

6  attached to the search warrant is, in fact, supposed to be

7  attached to the affidavit?

8     **MR. MIMS:**  Yes, Your Honor.

9     (CONFERRING OFF THE RECORD.)

10     **MR. MIMS:**  Your Honor, I'm going to put the exhibit

11  sticker on the back so that we can copy the front.

12     Is that what you were asking?

13     **MR. CHINICHE:**  Yes.

14     (EXHIBIT NO. G-2 ADMITTED INTO EVIDENCE.)

15     **MR. MIMS:**  Okay.  Your Honor, I have no further

16  questions of Inspector Matney.

17     **THE COURT:**  So the affidavit has been admitted.  The

18  search warrant has not; is that correct?

19     **MR. MIMS:**  Your Honor, the search warrant is already

20  in the record as an attachment to their motion.

21     **THE COURT:**  Their motion.

22     **MR. MIMS:**  And that was Document 74-2.

23     **THE COURT:**  For clarification, is the search warrant a

24  one-page document with no attachments to it?

25     **MR. MIMS:**  Well, actually, Your Honor, I misspoke a

1  minute ago.  It's the affidavit that is Document 74-2.  The

2  search warrant -- I'm not certain if it's --

3  **MR. LEWIS:**  Your Honor, I believe what -- yes, the

4  search warrant is a one-page document.  The search warrant

5  references the application as an attachment, and so it did get

6  kind of jumbled up in the record.  But I believe that's

7  correct, what I just said, and, therefore, that page that

8  didn't make it into the -- that actually should have been on

9  the back of the application which is attached to the search

10 warrant, if that helps.

11 **THE COURT:**  Thank you.  Okay.

12 **MR. MIMS:**  And, Your Honor, we also, of course, have

13 the G-1, but since we're probably going to use it again, I'm

14 just going to let Ms. Bailey continue to maintain it for now.

15 **COURTROOM DEPUTY:**  So G-2 is just this one page?

16 **MR. MIMS:**  Yeah, just one page is G-2.

17 And, Your Honor, we have no further questions of

18 Inspector Matney.

19 **THE COURT:**  Counselors, if you will give me just a

20 second, I want to review some of my notes.

21 Let me ask you about the availability of our witnesses

22 this afternoon.  Obviously going to take this afternoon.  Is

23 this witness available this afternoon?

24 **MR. MIMS:**  Yes, Your Honor.

25 **THE COURT:**  And your expert is available this

1   afternoon?

2   **MR. CHINICHE**:  Yes, Your Honor.

3   **MR. MIMS**:  And, Your Honor, I have one more witness

4   too, and he's available as well.

5   **THE COURT**:  Okay.  Good.

6   Counselors, I want to ask him some questions, but I

7   will give you both an opportunity to follow up.

8   Mr. Matney, I can't place my hands on it right now,

9   but somewhere in the documentation I see notes that refer to

10  perhaps you had some phone conversations with Google after you

11  received the list of device numbers; is that correct?

12  **THE WITNESS**: Yes, ma'am.  That's correct.

13  **THE COURT**:  Can you explain those phone conversations

14  and the questions and what, if anything, that -- in those

15  conversations, what did that lead to?

16  **THE WITNESS**: Yes, ma'am, I remember.  It was a -- it

17  was a phone conversation I had with them after I received the

18  initial information of the device IDs to determine what they

19  needed next and how I needed to proceed with the information

20  that I was requesting.

21  **THE COURT**:  None of that's in writing?

22  **THE WITNESS**:  No, ma'am.

23  **THE COURT**:  Okay.

24  **THE WITNESS**:  Other than the e-mails that I sent to

25  Stephen Mathews advising him that I received the information

1 and was proceeding.

2 **THE COURT:** Is it my understanding that you received

3 information back on three devices? You narrowed it to two, but

4 when you -- when Step 3 was performed by Google, did you

5 actually get information on all three devices?

6 **THE WITNESS:** Yes, ma'am. That was my understanding,

7 but at that point, that was when I was in training. So that

8 was something that Stephen Mathews received.

9 **THE COURT:** Do you know why they sent you three pieces

10 of information on three identified device numbers versus the

11 two that it had been narrowed to in Step 2?

12 **THE WITNESS:** Yes, ma'am. Because there were three

13 device IDs that were indicated within the parameters of the

14 initial step.

15 **THE COURT:** And why did you narrow to two?

16 **THE WITNESS:** That's going to be Stephen Mathews. I

17 know the answer to that, but it was him that received that

18 information. I was told that one of them indicated it was not

19 an individual. It belonged to a company.

20 **THE COURT:** From your perspective, can you tell me why

21 this case took from 2018 until 2023?

22 **THE WITNESS:** I think the longest part was the

23 investigation -- initial investigation. We -- we did searches

24 of video within businesses within the area. We conferred with

25 local law enforcement. We -- we talked to witnesses. We did

1    surveillance, up until the point where we finally -- it was
2    determined that this was a route that we could take to find
3    additional information.  It wasn't until nine months later
4    after the initial investigation that we determined that
5    information.

6         Also, as that information was coming the second and
7    third phase, that's when I left for training, and that's when I
8    was shot.  So when I was pulled out, I think it took time for
9    everybody to gather the information from my case to proceed.

10        **THE COURT:**  The affidavit indicates that you're
11   seeking -- under Paragraph 21A, that you're seeking "all
12   location data, whether derived from GPS, cell site/cell tower
13   triangulation, or precision measurement."  Do you know the
14   source of where the information of the three devices actually
15   came from?

16        **THE WITNESS:**  No, ma'am, I don't know how Google came
17   up with that information.

18        **THE COURT:**  Okay.  In light of my questions, do you
19   have any questions of him, Mr. Mims?

20        **MR. MIMS:**  Your Honor, I do not.  I would state that
21   you asked him a question as to why did this take from 2018 to
22   2023.  Certainly, as to the length of the investigation, Agent
23   Matney -- or Inspector Matney can answer that if he can.  Part
24   of the delay was based on charging decision in the U.S.
25   Attorney's Office.  That might be a better question for me if

1    the Court wants to hear it at the appropriate time.

2          **THE COURT:**  Okay.  Any questions from any three of you

3    in light of my questions?

4          **MR. CHINICHE:**  No, Your Honor.

5          **THE COURT:**  Thank you.

6          **MR. TRAVIS:**  No thank you, Your Honor.

7          **THE COURT:**  Okay.  So I'm not going to finally

8    discharge you in case you need to return to the witness stand.

9    So I don't want you to have any conversations with anybody

10   about your testimony.

11         **THE WITNESS:**  Yes, ma'am.

12         **THE COURT:**  Okay.  But you're released.  You may step

13   down.  Thank you.

14         **THE WITNESS:**  Thank you.

15         **THE COURT:**  Okay.  We've hit it at -- right at 12:00.

16   Are your witnesses available now?

17         **MR. MIMS:**  Yes.

18         **THE COURT:**  What would be your best guess about the

19   length of their testimony?

20         **MR. MIMS:**  I would expect Inspector Matney to be

21   fairly lengthy.  A lot of it would duplicate -- I'm sorry --

22   Inspector Mathews.  A lot of it would duplicate Inspector

23   Matney.  And so I will cut out and shorten it to some extent,

24   but I still look for it to be probably, between all of us, an

25   hour.

Mathews - Direct

1   **THE COURT:**  Okay.  Let's take a lunch break then.

2   Okay?  So we'll be in recess and back in session at 1:30.

3       (LUNCH RECESS TAKEN.)

4       **THE COURT:**  Who would the Government call as its next

5   witness?

6       **MR. MIMS:**  Your Honor, I call Stephen Mathews.

7       (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

8       **THE COURT:**  Counselors, I see that one of the

9   defendants is missing.  May I proceed in his absence?

10      **MR. CHINICHE:**  You may, Your Honor.  It's my client,

11  Mr. McThunel.

12      **THE COURT:**  Thank you.

13  **STEPHEN MATHEWS, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN,**

14              **WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

15                      **DIRECT EXAMINATION**

16  **BY MR. MIMS:**

17  **Q.**   Mr. Mathews, would you state and spell your name for the

18  record, please.

19  **A.**   Stephen, S-t-e-p-h-e-n, Mathews, M-a-t-h-e-w-s.

20  **Q.**   Mr. Mathews, who are you employed by these days?

21  **A.**   I'm employed by a company called Guidehouse.  It's a

22  contract company that does consulting work.

23  **Q.**   Okay.  So you're a civilian now; right?

24  **A.**   I am.

25  **Q.**   What did you do prior to that?

Mathews - Direct

1  **A.** 29 years, I was in law enforcement; the last 19 as a

2  postal inspector.

3  **Q.** Okay. In 2018, were you with the U.S. Postal Inspection

4  Service?

5  **A.** Yes, sir, I was. I was a team leader, a supervisor,

6  stationed in the Mobile, Alabama, office.

7  **Q.** Okay. When you say a team leader or supervisor, what

8  area did you supervise?

9  **A.** I had offices -- my Mobile office that I covered had

10  inspectors there that covered about the lower third of Alabama.

11  Had an office in Jackson, Mississippi, that I supervised that

12  covered basically the Southern District of Mississippi. And

13  then we had an office in Oxford, Mississippi, which basically

14  covered the Northern District of Mississippi.

15  **Q.** And was Inspector Todd Matney one of the inspectors that

16  worked under your supervision at that time?

17  **A.** Yes, sir, he was.

18  **Q.** What did you do prior -- you said 19 years of Postal

19  Inspection Service?

20  **A.** Yes, sir.

21  **Q.** What law enforcement experience did you have prior to

22  that?

23  **A.** Prior to that, six years with U.S. Probation here in the

24  Northern District of Mississippi, and then prior to that, four

25  years as a probation officer in Louisiana.

1   **Q.**   Okay.  So let's talk about the training you received as a

2   federal agent.  What kind of training did you get initially

3   when you became a federal agent?

4   **A.**   It was in -- well, in 2001 when I became a postal

5   inspector, we had a 14-week academy in Potomac, Maryland, that

6   covered wide-range issues, you know, items including legal

7   aspects of the job.

8   **Q.**   What about search warrants?  Did you receive training on

9   search warrants at that time?

10   **A.**   Yes, sir, I did.  And we had continuing training, what

11   they call field legal training, every few years that would

12   cover search warrants or other developments that they thought

13   were appropriate.

14   **Q.**   Okay.  You had that -- that field training throughout

15   your career?

16   **A.**   Yes, sir, I did.

17   **Q.**   So, in regard to search warrants, what kind of training

18   did you receive?  In other words, based on your training, what

19   was your understanding as to what you needed to do to obtain a

20   search warrant?

21   **A.**   To obtain a search warrant, you just have to have --

22   establish probable cause -- that you believe that probable

23   cause has been established that a certain thing to be searched

24   will produce evidence of your crime.

25   **Q.**   All right.  As an agent, can you estimate how many search

Mathews - Direct

1  warrants you were involved in?

2  **A**.    Hundreds.

3  **Q**.    And explain, if you would, just in general -- we're going

4  to talk about this one -- this case in a few minutes, but just

5  in general, what would you do when you decided you needed a

6  search warrant in an investigation?  How did that process work?

7  **A**.    Well, during the course of my career, I've written

8  hundreds of search warrants, various different things, from

9  whether it was drug packages, money laundering, fraud,

10  robberies.  It just kind of depends on -- it depended on what

11  you're exactly looking for.

12       The main basis of a search warrant is establishing what

13  happened and why you believe there's evidence that will be

14  recovered from the -- from that search that you're doing.  So

15  you're basically just going through trying to play out your

16  evidence as to why you believe there's probable cause that

17  you'll find evidence from that search.

18  **Q**.    In seeking search warrants, did you consult -- would you

19  consult with anybody as a general rule?

20  **A**.    Oh, yes, sir, with just about all of them.  You know, you

21  talk to other inspectors.  You talk to other law enforcement

22  agents, especially if it's something that you didn't -- was

23  maybe new to you that you hadn't done before, you know, for the

24  technical aspects.

25       The probable cause part in establishing what happened and

1    didn't happen, you know, is pretty general for all search

2    warrants.  But if there was a technical aspect, we would talk

3    to -- we had legal attorneys with the postal service.  They

4    were called inspector attorneys.  We'd talk with them.  We

5    would talk to other inspectors that had written search warrants

6    that might have been similar, other law enforcement agencies

7    that had written similar search warrants.

8         Then we would also, you know, consult -- obviously,

9    before we took it to a magistrate, we'd consult with the U.S.

10   Attorney's Office.

11   **Q.**   Okay.  So did you participate in the investigation of the

12   Lake Cormorant post office robbery that occurred February 5th,

13   2018?

14   **A.**   Yes, sir, I did.

15   **Q.**   How did you get involved?

16   **A.**   Initially, I was -- like I said, I was supervisor for the

17   Oxford office, and Oxford would cover Lake Cormorant.  I was

18   actually -- during the time that the robbery occurred, I was

19   out of town for a training.  I believe it was in Maryland.

20        But I was out of town for a few days, but I was notified

21   what happened.  I kind of coordinated who needed to show up

22   and, you know, what was going on.  They would brief me on what

23   was -- you know, different things that they found, what was

24   going on while I was away.  And within that first week, I was

25   back in Lake Cormorant helping organize and supervise what was

1  going on there.

2  **Q.**   I was going to ask you, what was your role?  You

3  mentioned organize and supervise.  Anything else as far as what

4  your role may have been in the investigation?

5  **A.**   Yeah.  I mean, I assisted with developing suspects, you

6  know, the reports.  And at some point -- at a later point after

7  Inspector Matney got injured, I kind of took over the lead

8  investigative agent in the case.

9  **Q.**   So, before the Postal Inspection Service sought this

10  geofence warrant, what information did you have regarding the

11  crime?  And the Court's already heard the details of the crime.

12  I'm not trying to get into details.  I'm talking about more --

13  just in general, what -- what evidence did y'all have to go on?

14  **A.**   Before that, we had -- we had done a lot of stuff

15  regarding, you know, our investigate steps in the case.  You

16  know, the initial response started with interviews.  You're

17  looking for videos.  You're looking for witnesses.  You're

18  looking for all kinds of steps to kind of help you put together

19  what the case is.

20      And one of the initial things that we found was a video

21  from a farm that was adjacent to the post office that kind of

22  gave us -- or showed us the robbery in progress and gave us

23  some ideas of other things that we should be looking for.

24  **Q.**   Okay.  The victim in this case is Sylvester Cobbs; right?

25  **A.**   Yes, sir.

**Q.** Did y'all interview Mr. Cobbs?

**A.** Yes, sir, we did.

**Q.** And while he could describe what happened, he could not identify the assailant; correct?

**A.** He could not.

**Q.** Why was that?

**A.** The individual was wearing a mask.

**Q.** Okay. Did you find any other potential witnesses on scene?

**A.** Yes, sir, we did. There was a gentleman that lived across the street from the post office that was initially interviewed by the sheriff's office when they showed up and then subsequently interviewed by inspectors.

**Q.** And what basically in a nutshell had he seen?

**A.** He'd seen a red, maroon car driving in the area that had stopped. Said he walked up to the car to ask them, you know, if they needed any help. He said it seemed kind of suspicious to him. Asked if they needed any help. Said they were looking for Highway 61. He gave them directions to Highway 61 and then went back to his house.

**Q.** Okay. At that time, could that individual identify the person he'd spoken to?

**A.** No, sir, he could not.

**Q.** And you mentioned you had the video; correct?

**A.** Yes, sir, we did.

1   **Q.**   From the information you had at that time -- and I'm

2   talking the November 2018 time period now when -- because

3   that's when y'all got the geofence; right?

4   **A.**   Correct.  November 2018.

5   **Q.**   At that time, could you identify any suspects?

6   **A.**   No, sir.  No, sir.  We didn't have any particular names.

7   **Q.**   How many suspects did you have?

8   **A.**   We believed three because we had -- from the video, we

9   saw a white -- it's, like, a Yukon or a Suburban come -- drive

10   by the post office.  It turns around off camera.  You see it

11   coming back the other direction.  You see an individual get out

12   of that vehicle and come to the back of the post office, and

13   the white SUV leaves out of the -- you know, leaves the

14   opposite direction that it came from -- or it leaves in the

15   direction it came from on the video.

16        And then after we see the truck get there -- our mail

17   truck get there, we see another red, maroon type vehicle kind

18   of follow in the truck.  And it kind of turns around, and it

19   leaves the area, and it comes back.  And it sits there and --

20   just making all kinds of what we believe were suspicious

21   activities during -- during the time of the robbery.

22   **Q.**   And so the inspection service -- Postal Inspection

23   Service eventually decided to seek a geofence warrant; right?

24   **A.**   Yes, sir, we did.

25   **Q.**   Now, we know that Inspector Matney is the one that signed

Mathews - Direct

1   the affidavit and presented it to Judge Percy; correct?

2   **A.**   That's correct.

3   **Q.**   Did you assist Inspector Matney in preparing the

4   affidavit in seeking the search warrant?

5   **A.**   Yes, sir, I did.

6   **Q.**   What did you do?

7   **A.**   Basically, I -- during the course of the investigation, I

8   was speaking to another investigator with a local agency in

9   Alabama.  He had called me for some assistance with a case he

10   was working on, and he explained to me about this geofence

11   search warrant that he had gotten from Google and kind of went

12   through the process of what it was and what it did and what it

13   could provide you.  And so it was like, okay, this is an

14   interesting concept.  Maybe it's something we could use -- use

15   in our -- our robbery.

16       So we also -- so then I also made contact with some other

17   people that had -- had maybe some more technical knowledge.  We

18   had an inspector that assisted us with a robbery in

19   Porterville, Ala -- Porterville, Mississippi, that I knew had

20   some technical knowledge about some of this, you know, phones

21   and different things like that.  I had spoken with her, some

22   other inspectors.

23       She got me in contact with some individuals in North

24   Carolina -- some law enforcement officers in North Carolina

25   that have written some of these and some other people that had

1   some knowledge of how these Google search warrants work,

2   because it was kind of -- at least, to me, it was a new -- a

3   new thing, a new type of search warrant.

4   **Q.**   This is the first time you'd ever actually applied for

5   one; correct?

6   **A.**   That is correct.

7   **Q.**   Okay.  But based on your conversations with other

8   inspectors, are you aware of other geofence warrants that have

9   been approved?

10  **A.**   Yes, sir.

11  **Q.**   So, besides you and Inspector Matney, did you work with

12  any other agents as far as preparing to seek the search

13  warrant?

14  **A.**   Well, in the preparation, you know, we talked to --

15  talked to other inspectors in my office, other inspectors that

16  were working on the case with us at the time, you know, to make

17  sure that we had all of our facts correct.

18          In reviewing the video, I had other inspectors look at

19  the video with me, you know, to get their take on what -- what

20  we were seeing, you know, what they -- you know, what their --

21  what their input was in it.  And I also did that, you know,

22  when we wrote the warrant.

23          You know, it was a collaborative effort.  Wrote the

24  warrant with Inspector Matney.  We reviewed the video together

25  to make sure that we were seeing the same things, that what we

1  saw, you know, matched up to what we were putting in the
2  warrant.

3  **Q.**   So we're going to play the video in a minute, but before
4  we play it, just tell the Court in your own words, what did you
5  see on the video that you thought was important pertaining to
6  probable cause?

7  **A.**   Well, first, obviously, we see the white car and identify
8  the vehicles involved and how many people we believe were
9  involved.  Obviously, a driver of the red vehicle, a driver of
10 the white vehicle, and the person on the back dock of the post
11 office.  So that was -- that was obviously important.

12       Once we see the person get out of the white vehicle and
13 they're coming to the back dock, we see some movement several
14 times during the course of the video that indicate that they're
15 moving their hand.  You can tell their -- that their elbow is
16 bent like their hand's up toward -- toward their head, like a
17 motion, like, using a phone or whatever.

18       But the elbow you could see.  To me, looked like it
19 was -- it was crooked.  It was bent.  Because at times you can
20 even see the right hand kind of dangling free.  And there was
21 several occasions like that where he moved back and forth on
22 the back dock that we -- that we noticed.

23       And then, also, after he left, after the robbery had
24 occurred -- this was prior to the robbery.  After the robbery
25 occurred, there's one particular instance when he comes back to

1    the back dock, and he's kind of bent down, and you see him --

2    it looks like he's looking down, and it looks like he's raising

3    his hand up as if he's looking at something in his hand.

4    **Q.**    Now, you can't see a phone in his hand, can you?

5    **A.**    No, sir, I cannot.

6    **Q.**    Do you know how far it is from the security camera to the

7    back dock of the post office?

8    **A.**    It's -- it's a good distance.  I'm not sure.  I mean, a

9    hundred yards maybe.  I'm not really positive.

10   **Q.**    Hard to see a little phone in there from that distance?

11   **A.**    Correct.  Yes.

12   **Q.**    But you were describing a minute ago after the robbery

13   had occurred before the assailant had left the view that he had

14   squatted down with his hands in front of him?

15   **A.**    Yes, sir.

16   **Q.**    Did that appear to you that he might be using a phone at

17   that time?

18   **A.**    Yes, it appeared possible.  Yes, sir.

19   **Q.**    And you described a minute ago that before -- before the

20   truck pulled up, did you see the assailant walking around with

21   his left hand up to his ear -- is that right? -- his elbow up?

22   **A.**    That's what it looked like.  Yes, sir.

23   **Q.**    What did that appear to you to be?

24   **A.**    To me, it appeared somebody was on the phone.

25              **MR. LEWIS:**  Excuse me, Your Honor.  This is cumulative

1   with the prior testimony.  The video speaks for itself.  This

2   witness did not sign the affidavit that obtained the search

3   warrant.  You know, the prosecution -- and I'm sure in good

4   faith, but this is just another bite at the apple.  They're

5   asking the witness to interpret what the video says.  I object

6   to it.  It's not necessary.  That's been done.

7               **THE COURT**:  Okay.  Thank you.  Move on.

8               **MR. MIMS**:  Your Honor, my intentions were at this

9   point to briefly review the video.

10              **MR. LEWIS**:  Excuse me, Your Honor.  I object to that.

11              **MR. MIMS**:  Can I respond to it, Your Honor?

12              **THE COURT**:  Sure.

13              **MR. MIMS**:  I think we've established this, but if I

14  need to go back through it with Mr. Mathews, I will.  What he's

15  testified to a minute ago is he and Inspector Matney worked

16  together collaborating to put the affidavit together.  They

17  reviewed the materials together.

18          They are complaining in their motion that -- basically

19  they said the Government lied in its affidavit, that they

20  didn't see somebody using a phone.  And I'm trying to put the

21  people on the stand that put this affidavit together to say,

22  no, here's -- here's why we put in there appears they were

23  possibly using a phone.

24          It's the people that put that affidavit together I'm

25  putting on the stand, and I thought it would be important for

1  you to hear from him this is what he saw.  This is why he and

2  Inspector Matney, together, put this in the affidavit.

3  **THE COURT:**  Do you contend that he saw anything

4  different than what Matney did?

5  **MR. MIMS:**  I do not.  Your Honor, if I may -- if I may

6  proffer his testimony, he's going to -- if we walk through the

7  video, he would show you what Inspector Matney showed you

8  earlier.  We see the gentleman with his elbow up to his ear.

9  We see the person squatting and looking forward, and that

10 appears to be a phone.  And I can skip through that.  If the

11 Court has seen it, I understand.

12 **THE COURT:**  I have seen it, and, of course, I've

13 watched the video several times yesterday too.  So I think I'm

14 pretty familiar with the video.

15 **MR. MIMS:**  Okay.

16 **THE COURT:**  If he has additional testimony, if there's

17 parts of the video that he sees something different than the

18 other witness, I would want to hear that.  But I understand the

19 Government's contention as to the positioning of the body that

20 could possibly be holding a phone.

21 **MR. MIMS:**  That's fair enough.  Thank you.  I just

22 wanted you to hear it from him that he saw that too.

23 **THE COURT:**  Yes.

24 BY MR. MIMS:

25 **Q**.  After -- so, Agent Matney -- or Inspector Matney, he's

1   here in Oxford; right?

2   **A.**   Yes, sir, he is.

3   **Q.**   You are in Mobile?

4   **A.**   Yes, sir.

5   **Q.**   And Agent Matney is the lead investigator in the case;

6   right?

7   **A.**   He is, yes, sir.

8   **Q.**   Okay.  So it was Inspector Matney that signed the

9   affidavit and went to present it to Judge Percy; right?

10  **A.**   That's correct.

11  **Q.**   What occurred after the -- after Judge Percy signed the

12  warrant?

13  **A.**   Submitted it through -- Google has a process of a website

14  where you have to submit the application, and then they, I

15  guess, have their lawyers review it and then determine, you

16  know, what -- essentially look at it and find the relevant

17  information to send back to you.

18  **Q.**   Okay.  Now, you're familiar with the whole file; right?

19  **A.**   Yes, sir.

20  **Q.**   In fact, at that time, up until Inspector Matney's

21  injury, you were working with him; right?

22  **A.**   Yes, sir.

23  **Q.**   After he was injured, which was summer of 2019 --

24  **A.**   Yes, sir.  June of 2019.

25  **Q.**   -- you took over as the case agent -- the lead case agent

Mathews - Direct

1    at that time; right?

2    **A.**    Yes, sir, I did.

3    **Q.**    Okay.  So it's fair to say you're familiar with what all

4    happened with Google and what you got back?

5    **A.**    Yes, sir.

6    **Q.**    All right.  So what's the first thing y'all got back from

7    Google?

8    **A.**    The first thing we got back was in April of 2019.  It

9    was -- basically, it was three separate devices -- it showed

10   three separate devices within that geofence area during the

11   time frame between 5:00 and 6:00.

12   **Q.**    And there's no identifiers for the devices.  Fair to say?

13   **A.**    Correct.  It's just -- it's all numerical identifiers.

14            **MR. MIMS:**  Your Honor, for ease, may I present this on

15   the presenter?

16            **THE COURT:**  Yes.

17            **MR. MIMS:**  We haven't identified it yet.

18   **BY MR. MIMS:**

19   **Q.**    Mr. Mathews, do you recognize this document?

20   **A.**    I do.

21   **Q.**    What is this?

22   **A.**    That's a document we received from Google in relation to

23   the search warrant, the initial.

24   **Q.**    That's basically Step 1 of the process; correct?

25   **A.**    Yes, sir.

1  **Q.**   Okay.  What's it -- what's -- it's showing you three

2  devices here; right?

3  **A.**   Yes, sir.  It's three separate devices.  The date was

4  February 5th, which was the time of our robbery, and then the

5  time frame was between 5:00 and 6:00 -- 5:00 and 6:00.

6  **Q.**   And to keep this simple, basically, the devices are

7  identified as 859, 479, and 768; correct?

8  **A.**   Yes, sir.  That's correct.

9  **Q.**   Some of them have more than one time when they actually,

10  for lack of a better word, I'm going to call it, hit.  Is that

11  fair?

12  **A.**   Yes, sir, that's fair.

13          **MR. MIMS:**  Your Honor, I would offer this into

14  evidence as Exhibit G-3.

15          **MR. LEWIS:**  No objection.

16          **THE COURT:**  It will be received.

17     (EXHIBIT NO. G-3 ADMITTED INTO EVIDENCE.)

18  **BY MR. MIMS:**

19  **Q.**   So, Mr. Mathews, what did you do after receiving this

20  information?

21  **A.**   After we received that information, you know, we looked

22  at the longitude and latitude, obviously, that was -- that was

23  showing on there and kind of saw they were, you know, within

24  that fence.  We then -- at that point, Inspector Matney, in

25  May -- I believe it was May of 2019 asked for that second part,

Mathews - Direct

1  because, as you said, there was three parts.

2       The first one -- which I'm sure the judge knows, but the

3  first one was we get that information, and then we look at it.

4  And my understanding of the reason for that is, say, if we

5  were -- you know, had 500 hits, that they would want us to

6  narrow that down to a reasonable number instead of giving 500,

7  you know, identifiers on the -- for the Google owners.

8       So, at that point, we looked at it.  We said, hey, these

9  three -- two of them look like they're -- they could possibly

10  be our suspects because they're hitting, you know, real close

11  to our post office.  There's multiple hits on them.  The third

12  one is kind of an outlier.  We thought maybe could be a

13  witness.  You know, we need information on those.

14       So we submitted that information to Google for -- the

15  second step that we asked for was the hour before and the hour

16  after.  And Inspector Matney submitted that to Google around

17  the end of May.  And then --

18  **Q.**   And did Google -- did Google send back a response to

19  Step 2?

20  **A.**   Yes.  I believe it was May 30th they sent back a response

21  with -- with the hour before and the hour after to Inspector

22  Matney at that time.

23  **Q.**   It was shortly before Inspector Matney went to the

24  training where he ended up getting injured; right?

25  **A.**   That's correct.  That was around June -- the first part

Mathews - Direct

1    of June is when he was going to the training.

2    **Q.**    And then did the inspection service -- Postal Inspection

3    Service send off for Step 3 right before he went to training?

4    **A.**    Yes.  I believe it was on June the 7th he requested the

5    third step that would give the identifiers, and I believe it

6    was June the 10th -- because we were in contact that weekend

7    because he was -- when he was traveling to his training, there

8    was some issues with his flight, and he got there late, and

9    regardless to say, we're talking a lot that weekend.

10   He tells me -- I get this -- he got the information back

11   on the 10th, you know, when we're having this conversation.  So

12   he sends it to me to start doing the research --

13   **Q.**    Okay.

14   **A.**    -- on the information he gets back from June the 10th.

15   **Q.**    And we're talking about the Step 3 information?

16   **A.**    Yes.  The identifiers of the account owners.

17   **Q.**    And who -- what -- who was identified in Step 3?

18   **A.**    Step 3 there was, like I said, three different devices.

19   There was one for Jamarr Smith, and then there was one that

20   listed him as actually the account holder and a phone number

21   associated with him.

22   And then there was another one for -- it was a bleek -- I

23   don't remember the exact e-mail address -- and then a phone

24   number with it, which we were able to identify as related to

25   Mr. McThunel.

1     And then there was another one called

2  permanentwavesrecords.  It was an e-mail address and a phone

3  number associated with it.  It was at the 5:58 mark, the one we

4  thought could be a potential witness that we received

5  information on.

6  **Q.**   Is this the information you received back in regards to

7  Step 3?

8  **A.**   Yes, sir, it is.

9  **Q.**   So you've got the Jamarr Smith account; right?

10  **A.**   Yes, sir.

11  **Q.**   Are you able to take that information and determine who

12  Jamarr Smith was?

13  **A.**   Yes, sir, we were.

14  **Q.**   And then bleek2004, is that part of the information you

15  received?

16  **A.**   Yes, sir, it is.

17  **Q.**   And there's actually -- there's more --

18  **A.**   This is just a condensed version --

19  **Q.**   Yes.

20  **A.**   -- of what they sent that comes in the letter.  When you

21  get the letter back, there's also the attachment that actually

22  had Mr. McThunel's name associated with it.

23  **Q.**   So the attachment had more specifics on each of these --

24  each of these entities; right?

25  **A.**   Yes, sir.  That's correct.

Mathews - Direct

1  **Q.**   All right.  And were you able to identify bleek2004 as

2  Gilbert McThunel?

3  **A.**   Yes, sir.

4  **Q.**   And then the third one that you got, did you run that

5  down and determine that one really had nothing to do with this?

6  **A.**   Yes, sir.  We couldn't find any relation to our case on

7  that one.

8  **Q.**   Okay.  So, after receiving this information and having

9  two people identified -- two potential suspects identified,

10  Smith and McThunel, what did you do?

11  **A.**   Then in -- well, did a lot of research.  And then middle

12  of July -- I think it was about July 17th -- I submitted

13  another search warrant to the magistrate judge for a broader

14  range of information related to Mr. McThunel and Mr. Smith's

15  account, which covered January 1, 2018, to April -- April 30th,

16  2018, for all Google information regarding them, including any

17  location information between those dates.

18  **Q.**   Okay.  So you were able to get location information on

19  Mr. Smith and Mr. McThunel specifically with a second search

20  warrant?

21  **A.**   Yes, sir, with a second search warrant.

22  **Q.**   And just very briefly, what did that information show

23  you?

24  **A.**   It showed travel between -- between Batesville,

25  Mississippi, and our target -- our -- you know, our post office

Mathews - Direct

1  in Lake Cormorant and then travel back, you know, just

2  specifically during the time of the robbery. It was travel up

3  there, the robbery occurred, and then travel back to

4  Batesville.

5  **Q.**  Okay. Did you also seek phone records, what I call toll

6  records on these individuals?

7  **A.**  Yes, sir, we did.

8  **Q.**  Did you obtain those?

9  **A.**  Yes, sir. We got -- we got phone records for -- for all

10  three accounts or for all three individuals, but the phone

11  records showed calls between all of the individuals during the

12  time of the robbery.

13  **Q.**  Now, you said all three. The third person you're

14  referring to is Mr. Ayodele?

15  **A.**  Yes, sir. That is correct.

16  **Q.**  How did you end up determining he was part of this?

17  **A.**  We had found a phone call -- and I believe it was from

18  the tower dump. We had found a phone call between -- I'm

19  trying to remember correctly. It was Mr. McThunel's phone and

20  Mr. Ayodele's phone. I believe it was about a four-minute

21  phone call during the time period of the robbery.

22  **Q.**  Well, and you mentioned the time period of the robbery.

23  I should have asked you this earlier. When did this robbery

24  occur?

25  **A.**  Between 5:15 and 5:35.

Mathews - Direct

1    **Q.**   All right.  You've seen the video; right?

2    **A.**   Yes, sir.

3    **Q.**   Of course, we have, like, an hour's worth of video, but

4    the part from where you first see the assailant dropped off

5    behind the post office until the last -- basically until the

6    robbery is over with, is that the 5:15 to 5:30 time period you

7    just referenced?

8    **A.**   Yes, sir.  Generally --

9    **Q.**   Approximately.

10   **A.**   -- in that time frame, yes, sir.

11   **Q.**   Okay.  Now, did you find any evidence as to who might

12   have a white SUV similar to what's in the video?

13   **A.**   Yes, sir, we did.

14   **Q.**   Who's that?

15   **A.**   Mr. Ayodele.

16   **Q.**   Okay.  Did you find any evidence as to who might own a

17   red Hyundai similar to what you seen?

18   **A.**   Yes, sir, Mr. McThunel.

19   **Q.**   All right.  Were you able to go back to the eyewitness

20   that spoke to the individual in the red car and present any

21   evidence to him to see if he could identify somebody?

22   **A.**   Yes, sir, we did.

23   **Q.**   How did you do that?  What did you do?

24   **A.**   Inspector Martin was out of our Jackson office.  He

25   located Mr. Coffman, interviewed him, showed him three photo

Mathews - Direct

1 lineups, one with each of our suspect's picture in -- in -- not

2 in -- one for Mr. McThunel, one for Mr. Ayodele, and one for

3 Mr. Smith.  And he showed him three different -- different

4 lineups.

5      For the McThunel lineup and the Ayodele lineup, he didn't

6 recognize anybody in those pictures.  But in the one we had

7 Mr. Smith's picture, he picked Mr. Smith as the individual that

8 he saw in the red vehicle during the time of the robbery.

9 **Q.**   So, if Mr. Smith is driving the red vehicle and if

10 Mr. Ayodele is driving his own SUV, that leaves Mr. McThunel;

11 correct?

12 **A.**   That's correct.

13 **Q.**   Did you review Mr. McThunel's phone records from the time

14 from approximately 5:15 p.m. that evening?

15 **A.**   Yes, sir, we did.

16 **Q.**   What did you find?

17 **A.**   We found a phone call between him and Mr. Ayodele.

18 **Q.**   Okay.  Do you recall how long that phone call lasted?

19 **A.**   I believe it was a little over four minutes.

20 **Q.**   Do you recall getting phone records from C Spire on

21 Mr. McThunel?

22 **A.**   Yes, sir.

23 **Q.**   Do you recall what Mr. McThunel's phone number was or at

24 least part of it?

25 **A.**   I think it was -- I don't remember.  I'm not positive.  I

1    don't remember if it was 6029 or 7511.  I remember both of

2    those numbers.  I don't --

3    **Q.**    Let me ask you a question.  Would it be in some of the

4    reports you have in the back?

5    **A.**    Yes, sir, it would.

6    **Q.**    I could show you that and refresh your memory, but to cut

7    to the chase, if -- does 7511 as Mr. McThunel's number ring a

8    bell to you?

9    **A.**    Yes, sir.

10   **Q.**    And 6029 for Mr. Smith?

11   **A.**    Yes, sir.

12   **Q.**    Okay.  Do you see a phone call between those two?

13   **A.**    Yes, sir, I do.

14   **Q.**    Now, what time is that phone call?

15   **A.**    At 7 -- or 5:16.  1716.  5:16.

16   **Q.**    This is military time we're looking at here; right?

17   **A.**    Yes, sir.  That's correct.

18   **Q.**    And this is not UTC time.  Some phone records we get back

19   come in UTC time; correct?

20   **A.**    That's correct.

21   **Q.**    But that's not what is --

22   **A.**    That's not this, no.

23   **Q.**    Okay.  So, approximately 5:16 p.m., we have a phone call

24   between Smith and McThunel that lasted 350 seconds?

25   **A.**    Yes, sir.

1    **Q.**   Okay.  Is that consistent with what you saw in the video

2    when Mr. McThunel had his hand up to his ear?

3    **A.**   Yes, sir, it is.

4    **Q.**   Mr. Mathews, I understand that Inspector Matney is the

5    one who signed the affidavit; right?

6    **A.**   Yes, sir.

7    **Q.**   You worked with him close on that affidavit; right?

8    **A.**   Yes, sir.

9    **Q.**   To the best of your knowledge, was everything set forth

10   in that affidavit true and correct?

11   **A.**   Yes, sir, it was.

12   **Q.**   And, to the best of your knowledge, did you and your

13   coworkers follow the legal process as you understood it to be?

14   **A.**   Yes, sir, we did.

15          **MR. MIMS:**  No further questions, Your Honor.

16          **THE COURT:**  Thank you.

17          Cross-examination?

18          **MR. CHINICHE:**  Yes, Your Honor.

19               **CROSS-EXAMINATION**

20   BY MR. CHINICHE:

21   **Q.**   Good afternoon, Mr. Mathews.

22   **A.**   Good afternoon.

23   **Q.**   I'm going to show you a document that's in this case.  We

24   have referred to it as Document 74-2.  Okay?  And it is the

25   Affidavit in Support of Search Warrant that Mr. -- Inspector

Mathews - Cross by Mr. Chiniche

1   Matney signed. Okay?

2   **A.**   Okay.

3   **Q.**   It is eight pages -- eight pages. If you'll -- let me

4   see if I can -- it's eight pages. It's got a Probable Cause

5   Statement; Evidence, Fruits, and Instrumentalities; Request for

6   Nondisclosure and Sealing. That's so that if there's anybody

7   that -- anybody's device that gets identified, law enforcement

8   doesn't want Google to notify that device holder; is that

9   right?

10   **A.**   Correct.

11   **Q.**   And then it's signed by Inspector Matney November 8th,

12   2018; right?

13   **A.**   Yes, sir.

14   **Q.**   Okay. And it had some attachments to it as well;

15   correct?

16   **A.**   Yes, sir.

17   **Q.**   In the -- you're familiar with getting a search warrant,

18   are you not?

19   **A.**   Yes, sir.

20   **Q.**   You have 19 years of federal law enforcement experience.

21   You've applied for search warrants all -- for all sorts of

22   things, haven't you?

23   **A.**   Yes, sir.

24   **Q.**   You've gotten search warrants on cars, houses, and cell

25   phones; right?

Mathews - Cross by Mr. Chiniche

1  **A.**   Correct.

2  **Q.**   And in the Probable Cause Statement, you all indicate the

3  use of a cell phone; right?  And I believe it is right here,

4  Paragraph 16.

5  **A.**   What it states is "it appears robbery suspect is possibly

6  using a cellular device."

7  **Q.**   Right.  You've got to -- you've got to indicate in this

8  affidavit that the cell phone is possibly used, don't you?

9  Because if you don't indicate that a cell phone is believed by

10  you all to be used, you can't get the search warrant -- or you

11  might be able to get it, but it's not valid; right?

12  **A.**   I don't know that I necessarily agree with that, no.

13  **Q.**   Okay.  All right.  But the reason why -- this statement

14  in here in the probable cause where you outline where the crime

15  occurred, the date, what y'all believe the time to be, you

16  indicate to the magistrate judge that you've got a video, and

17  that based on looking at the video surveillance, it appears the

18  robbery suspect is possibly using a cellular device; right?

19  **A.**   Yes, that's what's stated in there.  Correct.

20  **Q.**   All right.  You're trying to get through this affidavit

21  and application cellular device information, are you not?

22  **A.**   We're trying to get Google device, whether it's a

23  cellular phone or -- it could have been an iPad or whatever,

24  but something that had Google services.

25  **Q.**   Right.  It's got to be a device with Google services on

Mathews - Cross by Mr. Chiniche

1    it; correct?

2    **A.**    It's not necessarily cellular, but, yes.

3    **Q.**    Right.  But you indicate possibly using a cell device?

4    **A.**    That's correct.

5    **Q.**    So, if it were a land line being used in the crime, you

6    would put a land line in this affidavit, wouldn't you?

7    **A.**    That's too --

8    **Q.**    Maybe that's too speculative.

9    **A.**    That's too -- yeah --

10   **Q.**    Too speculative?

11   **A.**    -- too speculative for me to really say.

12   **Q.**    But my point is that this is an important statement --

13   paragraph.  Paragraph 16 is important in order to get -- in

14   order to get this search warrant; is it not?

15   **A.**    Whether it's more important than anything else, I don't

16   necessarily say that.  I mean, I think it's a fact for -- what

17   we believe is a fact that can be added to the search warrant,

18   but whether it's the key to the search warrant, I don't know

19   that I would necessarily say that.

20   **Q.**    Well, if I'm -- if I'm investigating the crime at a

21   house, I have to indicate a very detailed description of that

22   house.  I have to have the address, what the house looks like,

23   and I have to tell the magistrate judge, "Well, I believe that

24   house is involved in a crime or has a suspect" --

25   **A.**    Correct.

Mathews - Cross by Mr. Chiniche

1  **Q.**    -- right?  But this affidavit and this application is

2  devoid of that information.  Has none of that identifying

3  information.  Do you understand?

4  **A.**    Not really, no.

5  **Q.**    Okay.  So to get -- to get around that problem or to fix

6  that problem, this affidavit says to the magistrate judge, "We

7  possibly observe the suspect using a cellular device."  Would

8  you agree with that?

9  **A.**    I don't know that I really understand your question.  I

10 don't know that we're getting around anything.

11 **Q.**    Okay.

12 **A.**    I don't know if I agree with that characterization.

13 **Q.**    Okay.  I understand.  Mr. Mims asked you a minute ago,

14 "Mr. Mathews, did you see a phone in his hand, or you can't see

15 a phone in his hand," meaning the suspect's hand.

16 **A.**    That's correct.

17 **Q.**    And how did you answer?

18 **A.**    I answered correctly.  I said no.

19 **Q.**    "No, I cannot"?

20 **A.**    That's correct.

21 **Q.**    So Agent Matney or Inspector Matney gets approval to

22 issue a warrant to Google, search warrant.  We call that a

23 geofence warrant; right?

24 **A.**    Yes.  It was based on the geofence, yes.

25 **Q.**    And this was your first time doing this; is that right?

Mathews - Cross by Mr. Chiniche

1   **A.**   That's correct.

2   **Q.**   So y'all are borrowing language and consulting with

3   agents probably across the country, right --

4   **A.**   That's correct.

5   **Q.**   -- on how to do this?

6   **A.**   Correct.

7   **Q.**   And you're asking agents, "Hey, did y'all get it done?"

8   "Yes, we did.  No, we didn't," whatever.  Right?

9   **A.**   Right.

10  **Q.**   And this is a form -- because I've seen this form in

11  other cases now.  Okay?  This is not something that you

12  tailored yourself; right?

13  **A.**   Correct.  To a, you know, certain extent, yes.

14  **Q.**   Yeah.

15  **A.**   But, no.  Yeah.  I mean --

16  **Q.**   The facts --

17  **A.**   -- the majority of it we got information from different

18  people and put it together for our own individual search

19  warrant.  Correct.

20  **Q.**   So the facts portion is what you and Inspector Matney

21  wrote out, right, the facts, but the legal language and other

22  sections is borrowed from probably a template; right?

23  **A.**   Well, I don't know if it's necessarily a template.  It

24  was from several different ones.  So it wasn't just one

25  necessarily template.  It was from several different, what we

Mathews - Cross by Mr. Chiniche

1  call, go-bys that we use to get the technical language in

2  there.

3  **Q.**   Okay.  And here we're on the same document in this

4  affidavit, Paragraph 21B.  In Paragraph 21, this is where we're

5  getting to the Step 1, Step 2, Step 3 process; right?

6  **A.**   Correct.

7  **Q.**   Okay.  And in this application, you all are indicating we

8  need "all location data, whether it's derived from GPS, cell

9  tower triangulation, Wi-Fi location, GPS coordinates, for this

10  estimated radius and the -- and for the target time period."

11  And in this case, y'all did 5:00 p.m. Central Time to 6:00 p.m.

12  Central Time; right?

13  **A.**   That's correct.

14  **Q.**   So you're going to Judge Percy asking him to give all

15  location data derived from whatever these sources are; right?

16  **A.**   Correct.  Within that geofence, correct.

17  **Q.**   And then you're going to get raw data.  You're going to

18  get devices which Mr. Mims showed you.  I think we have three

19  different devices.  We had the timestamp; right?

20  **A.**   Yes, sir.

21  **Q.**   After Step 1, you get what's depicted in Government G --

22  Exhibit G-3; right?

23  **A.**   Correct.

24  **Q.**   You get this after Step 1?

25  **A.**   Correct.

1  **Q.**   There's no -- there's no name associated.  There's no

2  e-mail account?

3  **A.**   Correct.

4  **Q.**   Okay.  And so there's Step 2, right, Step 2 and Step 3?

5  And would you agree that, in Step 3, that's when Google turns

6  over -- turns over the e-mail account, I think you said

7  bleek2004; right?

8  **A.**   Correct.

9  **Q.**   Step 3?

10  **A.**   I wouldn't necessarily characterize it as Step 2 and

11  Step 3, but they're steps you have to take in order.  The

12  Number 1 is a step that you have to take in order.  And if you

13  read the attachment, 2 and 3 state upon demand -- after review

14  and upon demand, they would provide that additional

15  information.  It doesn't necessarily say that you have to go to

16  Step 2 or Step 3 in any particular order, but you have to do

17  both of them.

18  **Q.**   Okay.

19  **A.**   It just says that this is available and this is

20  available.  And what we actually did was actually go in a step

21  process.  We went 1; then we went 2; then we went 3.  But it

22  didn't necessarily say after that first -- after we get that

23  first information that we had to follow some particular order,

24  but we had to review the information and then tell them what we

25  wanted.

1    And if we didn't want anything, we wouldn't go back to

2  them for anything.  If we wanted -- you know, this is what you

3  characterize as Step 2, we'd ask them for that, or 3 or both or

4  however.

5  **Q.**    Okay.  All right.  So you and Mr. Matney are going to

6  Magistrate Percy.  You're indicating you want all data,

7  location information.  You're indicating "Each device

8  corresponding to the location to be provided by Google will be

9  identified only as a numerical identifier"; right?

10 **A.**    That's correct.

11 **Q.**    You agree with that?  "Without any further content or

12 information identifying the user of a particular device."  Now,

13 "Law enforcement" -- that's you; right? --

14 **A.**    Correct.

15 **Q.**    -- "will analyze this location data to identify users who

16 may have witnessed or participated in the subject offense and

17 will seek any additional information regarding those devices

18 through further legal process."  Through further legal

19 process --

20 **A.**    That's correct.

21 **Q.**    -- right?  So, once you get to this place in the

22 affidavit and application, you've got to -- you're telling

23 Judge Percy, "We will get additional information through

24 further legal process," but that wasn't done in this case, was

25 it?

Mathews - Cross by Mr. Chiniche

1  **A.**   It was done, yes, sir.

2  **Q.**   It was --

3  **A.**   If we can flip to Attachment A, it defines what the

4  further legal process is.

5  **Q.**   Here's Attachment A.

6         **MR. MIMS:**  Your Honor, if I may, he's referencing

7  what's Government's Exhibit G-2.  It was left off the back of

8  Attachment A.

9  **BY MR. CHINICHE:**

10 **Q.**   Government Exhibit G-2.  Do you agree with me there?  You

11 see that?

12 **A.**   I don't see anything.  Oh, yeah, the number.  Yes.  I'm

13 sorry.

14 **Q.**   That's okay.  Is this G-2?

15 **A.**   Yes, sir.

16 **Q.**   Step 1, Step 2, "devices through further legal process."

17 **A.**   Correction.

18 **Q.**   Okay.

19 **A.**   You were saying Paragraph 1 is Step 1 and Paragraph 2 is

20 what you call Step 2, but, actually, if you look at -- 1 and 2

21 are basically -- one is saying what we want.  2 is saying what

22 they provide.

23 **Q.**   Right.

24 **A.**   So that's -- that's really, I guess what you call,

25 Step 1.

Mathews - Cross by Mr. Chiniche

1 **Q.** Okay. So these are Step 1?

2 **A.** Correct. So Step 3 would -- or Step 2, as you call it,

3 would be Paragraph 3. And the further legal process is

4 providing them -- we providing them a copy of the search

5 warrant and saying comply with Paragraph 3 or Paragraph 4 that

6 says you will give this information upon demand after we

7 reviewed this Step 1 process.

8 **Q.** Right.

9 **A.** And which we did. We submitted to them and asked for all

10 three identifiers.

11 **Q.** But you didn't -- you got the identifier information, but

12 you didn't go back to the federal court to request another

13 subpoena. Instead -- am I right? Because, instead, the

14 request went directly to Google for follow-up information?

15 **A.** Correct. This attachment was part of the search warrant,

16 and so what we did was we resubmitted it to Google and said,

17 "Comply with Paragraph 3 as directed in the original search

18 warrant, that you will provide this upon demand once -- or once

19 it's been -- once Part 1 is evaluated, you will provide this

20 upon demand."

21 So you have -- the legal process was going back into

22 the -- the Google geoportal, resubmitting it and saying,

23 "Comply with this because we've now reviewed the first part.

24 We need these three device informations," and resubmitted them.

25 So, yes, we did. It was -- and correction. It was a search

Mathews - Cross by Mr. Chiniche

1  warrant, not a subpoena.

2  **Q.**   It was a search warrant.  All right.  This is another

3  document.  This is in the record at 74-4.  This is Step 1,

4  Items Number 1 and 2.  Step 2 is Item Number 3.  Step 3,

5  Paragraph 4; correct?

6  **A.**   Right.

7  **Q.**   All right.  But my point is, when this was attached to

8  the application for the search warrant, you all indicated we're

9  going to get location information.  Once we get it, we're not

10  going to know who it is, and there will be -- we will seek

11  additional information regarding those devices through further

12  legal process.

13       And then law enforcement submitted another request to

14  Google, and they got 2, they got 3, and they got 4 without

15  going back to a federal court to get another search warrant.

16  **A.**   That's because the judge had already signed off on -- on

17  these steps.

18  **Q.**   But you represented to the federal court that you were

19  going to get anonymous data and that we're then going to --

20  once we've got anonymous data and we get to look at it and we

21  get to narrow it down, we're going to come back and seek

22  additional information regarding those devices through further

23  legal process.

24       So you're representing to the magistrate judge what

25  you're going to do, but you're not doing it.  It's not

Mathews - Cross by Mr. Chiniche

1  optional.

2  **A**.    I disagree with that.

3  **Q**.    I know you do.

4  **A**.    Because -- because we outlined what the further legal

5  process is.  If you'll read Paragraph 3 and 4, it clearly

6  states after "analysis of the provided records, and upon

7  demand."  To meet the upon demand, we demanded.  We sent a

8  request to them demanding the information.  They provide, you

9  know, the information in Paragraph 3 and the information in

10 Paragraph 4.

11     So, to me, it's clearly written out what the legal

12 process is, and we followed it that the judge signed off on.

13 **Q**.    And I'm submitting a new subpoena has to be issued and

14 approved when you go to Step 2, as well as a third subpoena for

15 Step 4.

16 **A**.    And I would -- I would, I guess, have to disagree.

17 That's not what the judge signed off on.  The judge signed

18 off --

19          **THE COURT**:  I understand -- excuse me.

20          **THE WITNESS**:  Go ahead.

21          **THE COURT**:  I understand each of your arguments.

22 **BY MR. CHINICHE**:

23 **Q**.    And in May of 2019, Google responds to Inspector Matney

24 providing Step 2 data --

25 **A**.    Correct.

Mathews - Cross by Mr. Chiniche

 1  **Q.**   -- right?

 2  **A.**   That's correct.

 3  **Q.**   And it's this information?

 4  **A.**   Correct.

 5  **Q.**   And we know that Google is responding only to the first

 6  search warrant it received because it's referencing the

 7  November 8, 2018, search warrant; right?

 8  **A.**   Correct.  That's correct.

 9  **Q.**   Then, Mr. Mathews, you all got June 2019 another response

10  from Google.  This is Step 3; right?

11  **A.**   Correct.  That's when we got the account identifiers.

12  **Q.**   You're still dealing with the very original search

13  warrant?

14  **A.**   That's correct.

15  **Q.**   And now -- now we've got how many account informations

16  here?

17  **A.**   Three.  The bleek2004, Jamarr Smith, and

18  permanentwavesrecords.

19  **Q.**   What's the name of the person that holds

20  permanentwavesrecords?

21  **A.**   That was not -- that was not in the information.

22  **Q.**   From Google?

23  **A.**   From Google.  Correct.

24  **Q.**   Is this the account y'all say that y'all have ruled out?

25  **A.**   Yes.  We couldn't find any -- any other relevant

Mathews - Cross by Mr. Chiniche

1   information regarding that account.  And that account was the

2   one -- or the hit from Google was actually at 5:58.  It was

3   after the robbery occurred and after police officers and

4   everybody had shown up at the post office.

5   **Q.**   I would submit, Mr. Mathews, I'd like to know who has

6   that account.  Can you tell me?

7   **A.**   No, I can't tell you.  No.

8   **Q.**   What information do you have on permanentwavesrecords?

9   **A.**   I'd have to review my files.  I don't have that with me,

10  no.

11  **Q.**   That information has not been provided to my office, has

12  it?

13  **A.**   I don't know.  I don't know that we know the owner of

14  permanent wave because we never requested that information from

15  Google.

16  **Q.**   So it's possible that the person that owns that account

17  is also involved?

18  **A.**   I don't believe so, no.

19  **Q.**   Based upon these letters right here?

20  **A.**   Based on the time of the hit of the robbery.  The robbery

21  occurred, like I said, between 5:15 and 5:35.  That hit was at

22  5:58.  That's the only hit within the geofence at that time.

23  So, based on our review of the records, we didn't believe it

24  was involved, no.

25  **Q.**   What device is it?

Mathews - Cross by Mr. Lewis

1   **A.**   The one at 479, I believe.

2   **Q.**   479?

3   **A.**   5:58.

4   **Q.**   This one right here (indicating)?

5   **A.**   Correct.

6   **Q.**   859 is one of the defendants; 768 is another defendant?

7   **A.**   That's correct.

8   **Q.**   You're ruling that one out?

9   **A.**   That's correct.

10         **MR. CHINICHE:**  If I may just have a moment, Your

11  Honor.

12         **THE COURT:**  Yes.

13      (CONFERRING OFF THE RECORD.)

14         **MR. CHINICHE:**  I have no further questions.

15         **THE COURT:**  Mr. Lewis.

16                     **CROSS-EXAMINATION**

17  **BY MR. LEWIS:**

18  **Q.**   My name is Goodloe Lewis.

19  **A.**   How are you doing?

20  **Q.**   You requested information from 5:00 p.m. to 6:00 p.m. on

21  the day in question; correct?

22  **A.**   Yes, sir.  The original --

23  **Q.**   Because you thought that that would catch phones in the

24  geofence that were relevant to this case; right?

25  **A.**   That's correct.

Mathews - Redirect

1   **Q.**   And when you caught a phone that you thought was relevant

2   to the case, you would then investigate and figure out who --

3   who owned that phone; right?

4   **A.**   Correct.

5   **Q.**   And so you caught a phone that was within the thing but

6   at 5:58; right?

7   **A.**   Correct.

8   **Q.**   And you can't tell us -- so it's relevant.  It's

9   within the -- it's within the one-hour time frame.  It's

10  relevant.

11  **A.**   Possibly.  Possibly not.

12  **Q.**   Okay.  But you made the decision to not find out who that

13  person was and disclose it to us; correct?

14  **A.**   We determined that --

15          **MR. MIMS:**  Your Honor, I object to the part where he

16  says "disclose it to us."  We're going to clear that up in a

17  minute, but I want to object to that part.

18          **THE COURT:**  Objection noted.  You may proceed.

19  **A.**   We decided not to further investigate that.  Correct.

20          **MR. LEWIS:**  I have no further questions, Your Honor.

21          **THE COURT:**  Mr. Travis, any questions on cross?

22          **MR. TRAVIS:**  No cross.  Thank you, Your Honor.

23          **THE COURT:**  Thank you.  Mr. Mims.

24                    **REDIRECT EXAMINATION**

25  **BY MR. MIMS:**

1  **Q.**   Mr. Mathews, after we indicted this case or maybe even

2  before that, did you provide me a copy of everything in your

3  file?

4  **A.**   Yes, sir, I did.

5  **Q.**   It is fair to say it's quite voluminous?

6  **A.**   It is.

7  **Q.**   In fact, you did it on a couple different occasions

8  as far as giving me a flash drive with volumes and volumes of

9  information; correct?

10  **A.**   That's correct.

11  **Q.**   Is that everything you have pertaining to this

12  investigation?

13  **A.**   Yes, sir.

14  **Q.**   Is that everything you have including anything pertaining

15  to permanentwavesrecords?

16  **A.**   Yes, sir, it is.

17  **Q.**   Okay.

18       **MR. MIMS:**  Your Honor, for the record, all of that

19  information has been provided to each of the defendants.

20  **BY MR. MIMS:**

21  **Q.**   Mr. Mathews, I want to ask another question.  You correct

22  me if I'm -- if I'm wrong.  Did we have a meeting at one time

23  with all three defendants to review discovery?

24  **A.**   Yes, sir, we did.

25  **Q.**   I don't remember if you were present in person or if you

Mathews - Redirect

1    were present by phone.

2    **A.**    I believe it was by phone.

3    **Q.**    By phone.  I was in my office with all three defendants;

4    right?

5    **A.**    Yes, sir.

6    **Q.**    Was that a -- well, just tell the Court, what was the

7    purpose of that meaning?

8    **A.**    To basically explain what the case was.  I had actually

9    developed the -- a PowerPoint that I believed we were going to

10   use in grand jury -- that was before I retired, but I believe

11   we went through the PowerPoint step by step to kind of show the

12   information that we had, kind of lay out the case in general

13   terms to the defense.

14   **Q.**    This was after we had provided discovery to them;

15   correct?

16   **A.**    Yes, sir, it was.

17   **Q.**    Did we give them the opportunity to ask you any questions

18   they wanted to ask you about what was in your file and your

19   investigation?

20   **A.**    Yes, sir.  You gave them free rein to ask anything.

21   **Q.**    Okay.  I'm putting G-3 up here for you to look at again.

22   Again, the permanentwavesrecords was the device that would be

23   479; correct?

24   **A.**    Yes, sir.

25   **Q.**    And that only hit at 5:58 p.m.; right?

1  **A.**    That is correct.

2  **Q.**    Based on your review of the video, we have -- people of

3  interest is the white SUV, the red car, and the assailant

4  behind the post office.  Were all three of those vehicles and

5  people long gone by 5:58 p.m.?

6  **A.**    Oh, yes, sir, they were.

7  **Q.**    Is that part of what led you to rule that person out as a

8  participant?

9  **A.**    Yes, sir, it is.

10 **Q.**    Did you still attempt to identify that person?

11 **A.**    We did attempt, yes, sir.

12 **Q.**    Were you able to do so?

13 **A.**    No, sir.

14 **Q.**    Okay.  One more thing.  If you recall, which -- I

15 understand that we -- they identified McThunel and Smith.  Do

16 you remember which one is device 859 and which one is 768?

17 **A.**    I have it in the record, but off the top of my head, I do

18 not.

19 **Q.**    Okay.

20        **MR. MIMS:**  I have no further questions, Your Honor.

21        **THE COURT:**  Okay.  Have you done -- have you done

22 geofence warrants since this one?

23        **THE WITNESS:**  No, ma'am.  I retired shortly after

24 that.  I retired in July of 2020.

25        **THE COURT:**  Mr. Mathews, I'm still kind of confused

1  about one thing.  So I understand that in Step 1 three numbers
2  were identified -- device numbers were identified.  In earlier
3  testimony, I understood that you narrowed it down to two, but
4  then you actually got information on three?

5       **THE WITNESS**:  We narrowed it down to two for the
6  second -- the second search warrant, for the search warrant
7  that I got in July.

8       **THE COURT**:  Say that to me again.

9       **THE WITNESS**:  For the -- I got a search warrant in
10 July 2019.  We had narrowed it down at that point to two.  That
11 was for Mr. McThunel and Mr. Smith's account.  That's what I
12 was talking about when we narrowed it down to two.  Does that
13 make sense?

14      **THE COURT**:  Huh-uh.

15      **THE WITNESS**:  Narrowed it down to two for the second
16 search warrant, not for the first search warrant.  The first
17 one we were looking at -- we looked at all three devices to see
18 if maybe we can identify the third one and see if maybe that
19 was a witness, that permanentwavesrecords.  We never could
20 identify who that was.

21      But we did -- were able to identify Mr. Smith's and
22 Mr. McThunel's and were able to use other information that gave
23 us probable cause for that second search warrant.  So the
24 second search warrant is when we narrowed it down to two people
25 and got a broader range of information.

Mathews - Redirect

1　　　**THE COURT:**　Your second search warrant was not a
2　geofence warrant?

3　　　**THE WITNESS:**　No, ma'am, it was not.　It was a Google
4　search warrant, but it was not a geofence.　That's correct.

5　　　**THE COURT:**　So, back to the first search warrant that
6　was a geofence, in Step 3, did you learn two sources of
7　information or three?

8　　　**THE WITNESS:**　Three, yes, ma'am.

9　　　**THE COURT:**　So, if you had narrowed it down to two,
10　how did you go about getting the third set of information?

11　　　**THE WITNESS:**　Well, at that point, we hadn't -- we
12　didn't narrow it down to two until after we got all of the
13　information.

14　　　**THE COURT:**　So when we talk about -- some of the
15　pleadings talk about narrowing it down to two.　You're
16　representing to me that in the first search warrant when you
17　did Steps 1 and 2, when you, upon demand, asked for the
18　information in Step 3, you got it on three devices?

19　　　**THE WITNESS:**　Yes, ma'am.　That is correct.

20　　　**THE COURT:**　Okay.

21　　　**THE WITNESS:**　If you would like, Your Honor, I can
22　kind of tell my -- what I understand about why Google likes you
23　to narrow it down.　I can -- I can give you that.

24　　　**THE COURT:**　Did anyone assist you in determining the
25　square meters to search in this case?

Mathews - Recross by Mr. Chiniche

1    **THE WITNESS:**  No, ma'am.  No.  I -- well, I talked to

2    other inspectors about how -- you know, what mapping --

3    **THE COURT:**  The perimeters?

4    **THE WITNESS:**  -- program that you use where you could

5    put the pin in a certain location, and it will tell you the --

6    the coordinates per se.  They kind of, you know, walked me

7    through that, you know, where to go to get that information,

8    how to pin that, but I actually did that myself.

9    **THE COURT:**  Okay.  In light of my questions, Mr. Mims?

10   **MR. MIMS:**  No, Your Honor.

11   **THE COURT:**  Counselors?

12   **MR. CHINICHE:**  Yes, Your Honor.

13                    **RECROSS-EXAMINATION**

14   BY MR. CHINICHE:

15   **Q.**   Mr. Mathews, I want to be -- I want to make sure we're

16   all clear.  You got one geofence warrant -- search warrant in

17   this case; right?

18   **A.**   Correct.

19   **Q.**   And that was based upon an application dated

20   November 8th, 2019; right?

21   **A.**   '18, I believe.

22   **Q.**   '18; right?

23   **A.**   Yes.

24   **Q.**   And, in return, eventually, you all got three devices; is

25   that right?

Mathews - Recross by Mr. Chiniche

1  **A.**   That's correct.

2  **Q.**   And it's these three devices here, bleek2004,

3  jamarrsmith33, and permanentwavesrecords; right?

4  **A.**   That's correct.

5  **Q.**   All right.  And that -- once you had that, in -- you got

6  this information in June of 2019; right?

7  **A.**   Correct.

8  **Q.**   After June 2019, June the 10th, you went and got a Google

9  search warrant on bleek2004 and jamarrsmith33?

10  **A.**   Correct.

11  **Q.**   But you did not get a search warrant on

12  permanentwavesrecords?

13  **A.**   Correct.

14  **Q.**   And once you got that subsequent Google search warrant,

15  not a geofence, that's where you found identifiers for Gilbert

16  McThunel and Jamarr Smith?

17  **A.**   We had information -- no.

18  **Q.**   All right.  When you went and got the Google search

19  warrant, not the geofence, you confirmed the identity of these

20  two accounts?

21  **A.**   If we're talking about the first search warrant, the

22  November 2018 search warrant, we got --

23  **Q.**   You just got this; right?

24  **A.**   Well, no.  As I indicated, the -- we got that, but there

25  was also an attachment that came with it that has more

Mathews - Recross by Mr. Chiniche

1 identifying information.  Like, bleek2004, it says Gilbert

2 McThunel.  Has a phone number associated with him.

3 **Q.** Right.

4 **A.** Jamarrsmith has a phone number associated with him.  So,

5 yes, we had some more -- I'm not really sure of the question,

6 but we had more identifying information than -- than what's

7 particularly on this.  That's what I believe those hash -- what

8 they call the hash values are on the Google.  It's that

9 attachment that has more identifying information about bleek

10 and jamarrsmith accounts.

11 Then when we got -- from there, we developed more

12 probable cause on those two accounts to get the subsequent

13 search warrant that got broader information from January 1,

14 2018, to April 30th, 2018, which got all of their Google

15 information they had, including location from January 1 to

16 April 30th.

17 **Q.** All right.  And it was the geofence that led you to that

18 layered Google search warrant; right?

19 **A.** Yes, it was the information we got from that warrant.  We

20 used that and developed further those -- information about

21 those two accounts.

22 **Q.** Right.

23 **MR. CHINICHE:** Thank you.

24 **THE COURT:** Can he be finally excused, or do you

25 anticipate needing to call him back?

1        **MR. MIMS:**  Your Honor, I do not anticipate recalling

2    him.  May he remain in the courtroom?

3        **THE COURT:**  Yes.  So you're finally excused.

4        **MR. MIMS:**  May Inspector Matney come back in the

5    courtroom if he wants to?  We kept him out in case -- the Court

6    had not excused him completely.  May he come back in?

7        **THE COURT:**  Yes.

8        **MR. MIMS:**  Okay.  Your Honor, I have no further

9    witnesses.

10        **THE COURT:**  Counselors, do you need to take a short

11    break before you start?  You ready?

12        **MR. LEWIS:**  I'm ready if you are.

13        **THE COURT:**  Okay.  I'm ready.

14        **MR. LEWIS:**  Your Honor, the defense calls Spencer

15    McInvaille.

16      (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

17        **COURTROOM DEPUTY:**  Thank you.  You may take the stand.

18        **SPENCER McINVAILLE, DEFENDANTS' WITNESS, AFTER BEING**

19        **DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

20                    **DIRECT EXAMINATION**

21    BY MR. LEWIS:

22    **Q.**    Can you state your name for us, please?

23    **A.**    Yes.  Spencer McInvaille.  Last name is

24    M-c-I-n-v-a-i-l-l-e.

25    **Q.**    What do you do for a living?

1  **A.**   I work for Envista Forensics.  We're a forensic

2  consulting firm.

3  **Q.**   And we're going to get into a little more detail, but

4  what do you do for Envista Forensics?

5  **A.**   So I'm a technical lead.  I work over a few examiners.  I

6  also work a caseload myself.  I deal with various types of

7  digital evidence, from cell phones to geolocation, various

8  disciplines within that group.

9  **Q.**   And so we've designated you as an expert in digital

10  forensics and geolocation analysis.  So why don't you just

11  generally tell us what that is.

12  **A.**   Sure.  So digital forensics revolves around us getting

13  data and evidence off of most digital devices or services that

14  retain these forms of data.  So that could be a cell phone,

15  third parties like Google GPS locations, from ankle monitors,

16  or from those devices.  So analyzing, then, that data that we

17  retrieve to render opinions based on the locations and the

18  activities that occur around those technologies.

19  **Q.**   And how those technology companies store and produce that

20  kind of data; right?

21  **A.**   Right.  So understanding the processes behind that, how

22  they gather this data, what it's used for and its application,

23  you know, now from the private side, to the end user, to here

24  in the courtroom.

25  **Q.**   And so what -- just briefly, what's your education and

1  experience in digital forensics and geolocation analysis?

2  **A.**    Sure.  Prior, I was a law enforcement officer.  I did

3  that for eight and half years.  The last four years

4  approximately working violent crimes.  During that time, I

5  began to deal with digital evidence for our group.  I was

6  dealing with phones and mobile location, geolocation evidence.

7       So I've continued to learn not only on the job but as

8  well as various trainings and certifications over the years.

9  And I've now been with Envista for coming on six years now, and

10  we continue our education into these areas constantly.

11  **Q.**    So something came along a few years ago called the

12  geofence warrant.  You're familiar with that?

13  **A.**    That's correct.

14  **Q.**    And so, you know, again, you don't have to go into a lot

15  of detail, but how did you get involved in dealing with

16  geofence warrants?

17  **A.**    So the geofence warrant itself is mainly a process and --

18  you know, a piece of legal process that's being used to query a

19  set of data from Google in a specific way.

20       Now, the data that's being retained there is based on our

21  common data types that we would use prior to that type of

22  warrant being used.  So cellular data, WiFi connections,

23  Bluetooth, GPS, those types of measurements that get taken.

24  It's now aggregated, though, based on this particular service

25  from Google.

1  **Q.**   And so have you been accepted as an expert --

2       **THE COURT:**  Excuse me.  I ask you to slow down --

3       **THE WITNESS:**  Yes, ma'am.

4       **THE COURT:**  -- for the court reporter.

5       **THE WITNESS:**  Yes.

6  **BY MR. LEWIS:**

7  **Q.**   Have you been accepted as an expert in the field of

8  digital forensics and geolocation analysis?

9  **A.**   Yes.  I've testified about 42 times, I believe, in state

10 and federal court.

11 **Q.**   And you, in fact, testified in the *USA versus Chatrie*

12 case in Virginia, which pertained to the same kind of warrant

13 we're talking about here today; correct?

14 **A.**   Yes.  I have testified twice in the Eastern District of

15 Virginia for federal court as well as the -- I believe it's the

16 Middle District of Florida in Tampa for geofence warrants, as

17 well as various state courts.  I believe about ten times total

18 for location history and geofence warrants.

19 **Q.**   And you were -- you were accepted as an expert in those

20 courts; is that correct?

21 **A.**   That's correct.

22      **MR. LEWIS:**  Your Honor, I would tender Mr. McInvaille

23 as an expert in digital forensics and geolocation analysis.

24      **MR. MIMS:**  No objection.

25      **THE COURT:**  Okay.  So he is accepted as an expert in

1   digital data for geolocation analysis.

2   **BY MR. LEWIS:**

3   **Q.**   Mr. McInvaille, you prepared a report; is that correct?

4   **A.**   I did.

5   **Q.**   And we've attached it to our motion and provided it to

6   the Court.  I'm just going to ask you, what -- what information

7   did you rely on in giving the opinions that you are giving here

8   today?

9   **A.**   Sure.  So I will, of course, want the geofence warrant so

10  that I can understand which process for that request was used

11  in this particular matter, the -- all of the responses from

12  Google as that pertains to that warrant.  Generally, I will get

13  case, you know, documentation, general discovery that provides

14  some details as well.  So all of those together.

15  **Q.**   And so let's just talk about Google for a minute.  Why

16  does Google collect somebody's location history?

17  **A.**   So that's probably the key here, is that this warrant

18  cannot be accomplished or at least you cannot locate anyone

19  with this warrant without this specific service called location

20  history.  It commonly gets confused with the location services

21  like the actual permissions that you give at the device base

22  level.

23        This is an accounts letting settle -- excuse me --

24  accounts level setting that is allowing you to gather your own

25  location information and store it to your specific account.  So

1  it is separate of letting your phone know, hey, this is where I

2  am so I can navigate places, thing like this.  This is an

3  actual service of Google rather than a specific, like, switch.

4      So I kind of use it as this analogy of power inside of

5  your house.  When you flip the switch on and off, that's those

6  location history -- or -- excuse me -- location services that

7  people are talking about, when you put your phone in airplane

8  mode or allow it to gather information to be used.  That has to

9  be on, of course, for location history to operate.  That is a

10  separate service from Google, meaning the actual power it flows

11  through so you can turn it on or turn it off, that gets

12  gathered.

13  **Q.**   Does Google collect this information so it can help the

14  Government solve crimes?

15  **A.**   No.  They -- they have labeled this as a service to the

16  user akin to their journal.

17  **Q.**   Right.  So explain that a little bit.  So what do you

18  mean by journal?

19  **A.**   So it stores within the account.  So, within your Google

20  account that you have, your Gmail account, what it's storing is

21  not only your location history, if you've allowed it to do this

22  operation, it's storing your Google searches, so both voice and

23  text searches, as well as your location history, and then any

24  other information that you're allowing it to gather.  It

25  aggregates that within your -- within your account.

1  **Q.**   And does Google also -- start over.  Would Google also

2  like to sell you an ad, would like to use it for advertising?

3  **A.**   They do, but the actual service of location history

4  does -- is not an -- is not an ad-based service actually.  It

5  is more for the user experience.

6     If you've ever gotten into your vehicle in the morning to

7  go to work but it realizes that you like to stop by a

8  particular place to get coffee every day because you constantly

9  do that, this data set that is being created because you're

10 allowing it to is now what is prompting your phone to say, hey,

11 do you want to stop by and get coffee this morning?  If so,

12 this is the best route to go.

13 **Q.**   Okay.  So let's kick over to a geofence warrant and talk

14 about -- and you're familiar with the warrant we have in this

15 case?

16 **A.**   I am.

17 **Q.**   Let's talk about what this warrant is asking Google to

18 do.  Go ahead.

19 **A.**   So, generally, in a warrant, if you have a Google account

20 and you are looking for information regarding that account, we

21 would draw up a search warrant that says, Google, we want to

22 know about goodloelewis@gmail.com.  And we want location

23 history.  We want e-mails, IP logs, whatever we decide we need

24 based on the investigation, based on what we know about that

25 account.

1    In this instance, because we don't know the specific
2  account that's being requested, the Government is outlining a
3  three-step process that allows you to eventually get to that
4  point, even without knowing who you're looking for.  So, in
5  this instance, to find the person, we need that they have a
6  phone; they need a Gmail account; and then they need location
7  history turned on.  That's the very first part that has to
8  happen.

9    Once the warrant is applied to that and begins to search
10  that sphere of that group of people, that bucket of data, in
11  the first step, what it's going to return is that document that
12  we've seen over and over again.  I believe G-2 maybe was the
13  document that outlines the device ID, the estimated location,
14  and then, obviously, some details about that location, but
15  that's the extent of the information that is received.

16  **Q.**   All right.  So let's stop there.  So here's G-3 actually.
17  Is that what you were just talking about?

18  **A.**   Right.  So, once that request is made, this is the very
19  first step in this process, is learning the anonymized, with
20  air quote, information that is being provided for -- for the
21  data retrieved.

22  **Q.**   Right.  Because we're about to start using probably my
23  least favorite word ever, de-anonymize.  Okay.  My mouth was
24  not made to say that word.

25    Okay.  So -- but let's talk about this Step 1.  Okay?

1  Based upon your knowledge, your experience, where is Google
2  keeping the information that they go to get this Step 1
3  information?

4  **A.**   So, commonly, it's referred to as the Sensorvault where
5  this data is stored.  It is a large repository of users' data.
6  The device identifiers are an important piece of that, because
7  within your Google account, you can have multiple devices
8  capturing this data at any given time.  So, as a result, in
9  this big bucket of data, you have individual device IDs, and
10  then there are locations to go along with it.

11       What this warrant in Step 1 is asking Google to do is to,
12  you know, essentially kind of draw this box within their system
13  and say whose data falls within this group.  As a result of
14  that request, they have to search that entire bucket of data.
15  They can't just look at individual accounts.

16  **Q.**   Okay.  So now we're kind of getting to the point.  How
17  many accounts does Google typically search in these situations?
18  **A.**   This is a 2018 incident.  Google estimates that it was
19  approximately 592 million accounts that had to be searched to
20  determine if you fit into a particular box or circle or
21  whatever polygon is drawn.

22  **Q.**   Okay.  And so how does Google decide if one of these
23  accounts falls into the box?

24  **A.**   So, going back to G-3, I believe is what you said it was,
25  if you look within G-3, the key piece that returns this user's

1  data as responsive to the warrant are the latitude and

2  longitude coordinates that are provided.  So, as long as that

3  point there -- oh, excuse me.  I think I drew on the screen.

4  As long as those points fall within the geofence, then it is

5  returned as responsive.

6  You've -- I don't know if you've seen yet as far as what

7  shows up in the data, but around that reference point, we will

8  then draw a circle around that particular point using that

9  map's display radius to the right, which is in meters.  So that

10 is a circle that gets drawn over that reference point.

11 **Q.**  Okay.  So I'm going to show you then.  This is Figure 5

12 from your report, Page 7 of 36.  And so, yeah, does Google

13 actually search the box?

14 **A.**  So, no, they have to search the entire data set just to

15 see which devices fall within the parameters of the box.  So

16 the search is not limited to the -- to the box.  The return is

17 limited to the box, if that makes sense.

18 **Q.**  Okay.  So show -- tell the Court what you're showing here

19 on Figure 5.

20 **A.**  Okay.  So, within that data set that you see in G-3, this

21 is one of those points.  And so, for example, the center point

22 of this blue circle is likely somewhere in there (indicating).

23 It's probably just to the right of that.  It looks a little off

24 from where I just put it, but it's very close to that.  Since

25 that center point falls within the square, that piece of data

1  is returned in that G-3-piece of paper.

2      The important piece to note there is, when they give you

3  the map's display radius, that's kind of their error radius

4  around that estimation that they have made.  The device can be

5  anywhere within that circle.  So it could be within the shaded

6  area that's in the geofence, but it could also be outside of

7  the geofence.

8      In the particular way that this warrant was drafted, it

9  allowed for -- as long as the center point falls within the

10  geofence, that that data is returned.  There's other ways that

11  you can ask for this to be done, but this is the way that it

12  was done here.

13  **Q.**  Okay.  So -- all right.  So let's continue on.  After --

14  wait.  Have you explained everything you need to explain about

15  how we get this Step 1 data in G-3?

16  **A.**  Correct.  I have.

17  **Q.**  Okay.  All right.  So what happens next?

18  **A.**  So, as it states in the warrant, you will -- law

19  enforcement will analyze this data that's being provided.  So

20  we will take each of those points that are being labeled in

21  G-3, we'll map those out, and start -- and begin to look at,

22  where were these positioned at?  What times were they

23  positioned in those locations?  And then what can I determine

24  from that?

25      Based on that analysis, there's going to be subsequent

1   requests being made to Google or demands made to Google for

2   further data.  So the next step here would be to get what's

3   called contextual data.

4   **Q**.   Okay.  Go ahead.  What's that?

5   **A**.   So contextual data -- the reason they call it that is for

6   that very reason.  It provides context.  So now you are going

7   to see -- rather than just limited to a specific geographical

8   area within that box, we're now going to see generally what you

9   will see as devices travel from one place to the geofence and

10  then leave that geofence or remain within there the entire

11  time.  But what it does, it provides more information.

12  **Q**.   Okay.  And then what happens next?

13  **A**.   So, then, again, you will complete an analysis of that

14  data, then see if that changes anything.  The judge asked

15  earlier about narrowing.  Typically, through the analysis of

16  each of these, you will see narrowing occur.

17         People will decide that, hey, I had three in the

18  beginning.  As a result of the first three sets of -- you know,

19  the first three data points that I see in the beginning, I only

20  need two of those moving on because -- let's say it's based on

21  the time frame or where they're positioned that you say, well,

22  I don't think this person is relevant so I'm not going to

23  include them in the subsequent request.

24         So then, as you move to Step 2, same thing.  You can make

25  another choice and determine, hey, I don't even need this other

1  person anymore because I figured out that they live across the

2  street.  Whatever that is.

3      Step 3, now we will make the decision who do we want to

4  reveal their -- you know, your word "de-anonymize."

5  **Q.**   Okay.  And that's when they get the specific names on the

6  accounts and proceed on from there with other investigative

7  techniques; correct?

8  **A.**   That's right.  So, from my understanding of the process

9  that was gone through here is that, in Step 1, three devices

10 were returned.  In Step 2, three devices received more

11 contextual data.  And Step 3, all three were revealed for their

12 subscriber information.

13 **Q.**   Okay.  All right.  So let's discuss something I think is

14 already clear but maybe use an example about how Google did

15 this process that might help the Court.

16     Did this warrant ask for any -- the identity -- start

17 over.  Did this warrant identify any specific account names

18 that it was requesting information for?

19 **A.**   No.  Again, this is an unknown search.  You are asking

20 Google to search all of the data that they have available in

21 hopes to identify someone.

22 **Q.**   So let's give us -- since this is a post office, let's

23 use an analogy that there is something in a post office box in

24 the post office that the Government wants to know.

25 **A.**   Okay.

1  **Q.**    How does this warrant work in relation to that concept

2  there?

3  **A.**    So, in this instance, rather than say, hey, I want P.O.

4  box number, you know, 400 at the -- I don't know what the zip

5  code is for Oxford, but let's just say whatever the zip code is

6  for Oxford.  That would be a specific request for a box at one

7  location.  Essentially what you're saying here is that I know

8  someone has a P.O. box, and as a result, we need to search the

9  P.O. boxes to find, let's just say, some package that we're

10  looking for.

11        In this instance, rather than just search the boxes

12  within one post office within Oxford, this is going to require

13  the post office to search all of their post office boxes,

14  California, Virginia, North Carolina, and even if you went

15  overseas to, let's say, an APO where they're delivering stuff

16  to soldiers in wherever, we've got to check those too, because

17  that's what's happening here.  It's all of the accounts that

18  they have, not just a specific one.

19  **Q.**    All right.  We talked about this language in the warrant

20  application -- well, it's in the warrant and the warrant

21  application -- about -- and I'll just read it under Step 1.

22  "Law enforcement will analyze this location data to identify

23  users who may have witnessed or participated in the subject

24  offenses and will seek any additional information regarding

25  those devices through further legal process."  Did I read that

1    correctly?

2    **A.**    Yes, sir, you have.

3    **Q.**    And you have reviewed the information that went to Google

4    that's been provided by the Government; correct?

5    **A.**    I have.

6    **Q.**    And you have reviewed the information that came back

7    to -- from Google to the Government; correct?

8    **A.**    That's right.

9    **Q.**    Have you seen -- were there any other warrants issued

10    pertaining to further legal process to do Step 2 and 3?

11    **A.**    No, not in this instance.  It was all revolving around

12    the November 8th search warrant.  This is a common piece of

13    language that I see in geofence warrants.  It's showed up in

14    other warrants in the past as well.

15    **Q.**    Okay.  In this particular case, why didn't the Government

16    just ask for location history for somebody's -- somebody's

17    account?

18    **A.**    Again, they -- I believe it's been testified they didn't

19    know which account to -- to ask for.

20    **Q.**    Okay.  Now, this hasn't come up yet, and I don't know

21    that the Government does think this is analagous, but let's

22    talk about it for a minute.  There's something called "tower

23    dump."  Okay.  What is a tower dump?

24    **A.**    So, in a tower dump, what we're asking the cell phone

25    providers to do is to tell us who communicated on a certain set

McInvaille - Direct by Mr. Lewis

1    of towers.

2         So generally what we're looking at is -- for instance,

3    here at the post office, there is a certain set of cell phone

4    towers for all of the carriers that are going to be positioned

5    in that area that provide service to that specific location.

6    You're then going to ask those carriers to tell you who

7    communicated on those towers during a specific time frame.

8    That way you can begin to identify the numbers that were in

9    that general area in making communications.

10   **Q.**   So what's the difference between what the Government is

11   doing here with this geofence warrant and a tower dump?

12   **A.**   So the tower dump is actually restricted as far as the

13   search to that specific location.  The records pertaining to

14   those particular towers are being searched.  So those

15   particular towers only cover a finite area.

16        As a -- you know, kind of on the flip side of that, for

17   the Google warrants, because that data is not stored in a way

18   that allows you to search it based on a specific geographic

19   area, you're then having to make that search across the full

20   range of data for all of the accounts to find who was in

21   that -- that given area.

22   **Q.**   Okay.

23             **MR. LEWIS:**   Bear with me a moment, Your Honor.

24             **THE COURT:**   Uh-huh.

25        (CONFERRING OFF THE RECORD.)

McInvaille - Direct by Mr. Chiniche

1  BY MR. LEWIS:

2  **Q.**    This came up earlier, and just so maybe there's -- this

3  is clear, the information sought by this warrant, does that --

4  does the information Google returned tell you if somebody was

5  making a phone call within the geofence at any given time?

6  **A.**    No, it does not.  This only provides location information

7  for the devices.

8  **Q.**    Does it indicate if somebody is sending a text to

9  somebody within that period of information?

10 **A.**    Just locations.  That is it.

11 **Q.**    Okay.  So, I mean, you know, does -- okay.  So, in this

12 particular case, did it return these three devices because

13 somebody was making a phone call or texting within that

14 particular fence?

15 **A.**    No.  Location history will collect passively.  It

16 commonly can collect several times a minute.  So, no, this

17 happens just because the device is on.

18 **Q.**    Okay.  All right.

19        **MR. LEWIS:**  Thank you, Your Honor.  That's all the

20 questions I have.

21        **THE COURT:**  Do either of the other defendants' counsel

22 wish to question the expert?

23        **MR. TRAVIS:**  No questions.  Thank you, Your Honor.

24        **MR. CHINICHE:**  Yes, Your Honor.

25                    **DIRECT EXAMINATION**

1   **BY MR. CHINICHE:**

2   **Q.**   So, Mr. McInvaille, when Google got the search warrant

3   from the inspectors in this case, if -- if I had a Google

4   account, Google got into my account; is that right?

5   **A.**   That's correct.

6   **Q.**   And if Mr. Charlie has a Gmail account, Google got into

7   his account; is that right?

8   **A.**   That would be true for every -- and that's for every

9   circle or square or geofence that you draw within a warrant.

10  That happens either one time or multiple times for each

11  warrant.  So for every warrant that comes through.

12  **Q.**   Every warrant.  So if law enforcement gets a geofence

13  warrant in Tampa, Florida, a geofence, and I've got a Gmail

14  account, Paul Chiniche in Oxford, Google is going through my

15  account?

16  **A.**   That's correct.  They would determine if your account has

17  any locations that fall within the parameters of that geofence

18  warrant in Tampa.

19  **Q.**   And you estimated -- how many accounts did Google go

20  through with respect to this particular search warrant?

21  **A.**   So Google estimated in 2018 that 592 million users use

22  location history, and that's the amount that would be searched

23  to facilitate the response.

24  **Q.**   And where do you get that information from?

25  **A.**   I worked a case in California, the *Dawes* case, D-a-w-e-s.

McInvaille - Cross

1   In that matter, a Google employee responded to a request that

2   we had made to ask how many accounts were affected by the

3   search.

4            **MR. CHINICHE**:  Thank you.  I have no further

5   questions.

6            **THE COURT**:  Okay.  Cross-examination, Mr. Mims?

7            **MR. MIMS**:  Yes, Your Honor.

8                      **CROSS-EXAMINATION**

9   BY MR. MIMS:

10  **Q.**   Good afternoon, Mr. McInvaille.

11  **A.**   Afternoon.

12  **Q.**   Before we get into this case in detail in a minute, I

13  just want to go back and ask you a few questions about you.

14  This is the first chance I've had to meet you and really ask

15  you questions.  Have you ever worked for Google?

16  **A.**   No, I have not.

17  **Q.**   Okay.  Have you ever personally submitted a geofence

18  warrant to Google?

19  **A.**   No, sir, I have not.

20  **Q.**   Okay.  What training do you have in Google's operations

21  and procedures?

22  **A.**   I don't have any training.  I just have experience from

23  the cases that I've worked.

24  **Q.**   The cases you've worked.  Explain to me what cases that

25  you've worked.  You're talking about as an expert witness?

1    **A.**    That's correct.

2    **Q.**    Okay.  But you're not talking about as a law enforcement

3    officer?

4    **A.**    We made Google requests in law enforcement as well.  My

5    knowledge of location history comes from -- from both of those.

6    **Q.**    I'm sorry.  Well, let me ask you -- so do you have law

7    enforcement experience?

8    **A.**    Yes, I do.

9    **Q.**    Tell me about that.

10    **A.**    I did eight and a half years at the Lancaster County

11    Sheriff's Office in South Carolina.  I held various titles

12    during that time.  The last four or so years, I worked in

13    violent crime investigations.

14    **Q.**    Okay.

15    **A.**    During that time, I dealt with -- I did all of our mobile

16    phones, cell location, geolocation type evidence prior to

17    coming to Envista.

18    **Q.**    When did you leave there?

19    **A.**    2017.

20    **Q.**    All right.  Did you ever seek any geofence warrants when

21    you were working in South Carolina in law enforcement?

22    **A.**    No.  At the time, that wasn't -- it actually wasn't a

23    widely known technique.

24    **Q.**    Okay.

25    **A.**    It wasn't until a few -- sometime after that that they

1    began to come out.

2    **Q.**    Okay.  So, when I asked you about experience or training

3    in Google's operations and procedures, you talked about, "Well,

4    I know something from my law enforcement experience."  That has

5    nothing to do with their procedures on geofence warrants

6    because you weren't doing them back then; right?

7    **A.**    So the submission for location history accounts or those

8    requests is the same through the portal as you've heard

9    described before.  The process for the geofence, no, was not

10   for law enforcement.

11   **Q.**    Well, and you used a good word there that I was about to

12   use.  "Process."  You understand maybe the process of how you

13   submit things through the legal portal at Google; right?

14   **A.**    Yes, I understand the process.

15   **Q.**    But as far as -- what I'm wanting to know is, on the

16   other side of the house, inside the walls of Google, do you

17   have any training and experience on how they store things and

18   how they do things?

19   **A.**    No, I do not.

20   **Q.**    Mr. McInvaille, how much are you getting paid for your

21   time?

22   **A.**    I'm a salaried employee with our company.

23   **Q.**    Well, my understanding is that, when defendants hire an

24   expert such as you in this case, they have to pay you; right?

25   **A.**    If I worked for myself, yes, they would be paying me, but

1  they're not.  They're not paying me.  They pay my company.

2  **Q.**  They pay your company.  Well, let me ask it this way.

3  How much is your company getting paid for your time?

4  **A.**  I believe it's $250 an hour.

5  **Q.**  Okay.  And I know you mentioned it earlier, but I just

6  want to make sure I have it right.  How many times -- well, you

7  didn't mention this particularly.  How many times have you been

8  designated as an expert before?

9  **A.**  About 42 times, I believe.

10  **Q.**  All right.  And that's the same number of times you said

11  you've testified in court; correct?

12  **A.**  That's correct.  Or testified in total.

13  **Q.**  Right.  So not necessarily in court.  Some may be in a

14  deposition?

15  **A.**  Correct.

16  **Q.**  Do you know how many times you would have testified in

17  court?

18  **A.**  30 some odd -- some odd times.

19  **Q.**  In all of these 42 times total, have you ever testified

20  before on geofence warrants specifically?

21  **A.**  Yes.

22  **Q.**  How many times?

23  **A.**  Three times in federal court and a handful in state

24  court.  I'm not sure of the exact number of just geofence.

25  **Q.**  One of those times, in fact, was in the *Chatrie* case;

McInvaille - Cross

1  right?

2  **A.**  That's correct.  Twice.

3  **Q.**  Okay.  So twice in the same case?

4  **A.**  That's right.

5  **Q.**  And that's the case out of the -- is it the Eastern

6  District of Virginia?

7  **A.**  That's right.

8  **Q.**  That's really one of the earliest reported decisions on

9  geofence warrants, isn't it?

10  **A.**  Yes.  The earliest federal district court level, yes.

11  **Q.**  There's really not much federal case law on this, is

12  there?

13  **A.**  There's not.  They're currently being litigated.

14  **Q.**  And in the *Chatrie* case in which you testified as an

15  expert for the defendants; right?

16  **A.**  Yes.

17  **Q.**  That's one in which the Court said that the good faith

18  exception applies and therefore denied the motion to suppress;

19  correct?

20  **A.**  I believe that's correct.

21  **Q.**  So, Mr. McInvaille, I want to see if we can agree on a

22  few things.  I know we're on opposite sides of this case here,

23  but a lot of times I like to try to see if we can find some

24  common ground and agree on a few things.

25      First of all, Google is certainly capable of determining

1   what devices are located within a geofence; right?

2   **A.**   They can estimate it, yes.

3   **Q.**   I'm sorry?

4   **A.**   It's an estimation, but, yes, they can do it.

5   **Q.**   Okay.  And would you agree with me this information is

6   beneficial to law enforcement in determining who may have been

7   present at the scene of a crime?

8   **A.**   You said it's beneficial?

9   **Q.**   Yes.

10  **A.**   I think it's useful, yes.

11  **Q.**   In fact, FBI and other law enforcement agencies, they

12  have used geofence information to find people who have been

13  kidnapped or find runaway children or find terrorists, even, or

14  other criminals?  Would you agree that FBI and law enforcement

15  agencies have used these to -- used geofences to find that

16  information?

17  **A.**   They could have.

18  **Q.**   In fact, since about 2018, geofences are used quite

19  frequently, aren't they?

20  **A.**   They're becoming more common, yes.

21  **Q.**   Well, more common.  In fact, wouldn't you agree with me

22  that Google gets tens of thousands of these geofence warrants

23  each year?

24  **A.**   That's probably true.

25  **Q.**   Okay.  And when I say "get them," I'm talking about

1  actually gets them and complies with them, not that it's been

2  rejected or it's been refused by the Court.  I'm talking about

3  geofence warrants that are used -- submitted and information is

4  used to help in a case like I'm using.

5  **A.**    That's probably true.

6  **Q.**    Okay.  Now, Google does this through location

7  information; right?

8  **A.**    Location history, yes.

9  **Q.**    Location history.  Thank you.  I appreciate the

10  clarification because I know that's a term that I think you've

11  used in your report is location history; right?

12  **A.**    That's right.  That's the specific product that is being

13  searched.

14  **Q.**    Okay.  So location history -- first of all, that is

15  information that Google gathers from its subscribers to various

16  Google apps and programs; right?

17  **A.**    So, yes, you're allowing Google to collect this and store

18  to your account.

19  **Q.**    Google meaning the customer.  Me as a Google user, my

20  phone.  If I use Google Maps, for example, and if I enable

21  location history, I am providing information to Google; right?

22  **A.**    So you don't actually have to use the application.  As

23  long as you have location history enabled, it will collect.

24  **Q.**    Correct.  If I enable?

25  **A.**    If you enable location history, yes.

1   **Q.**   When I first get a phone, location history is not
2   enabled, is it?

3   **A.**   No.  The -- well, your -- when you initially get an
4   account, no, it is not.

5   **Q.**   Okay.  In other words, I have to agree to enable location
6   history on my account?

7   **A.**   Right, because you're making an account level decision.
8   So it's -- you're making a decision to store your information
9   to your specific account.

10  **Q.**   But that's a decision that I voluntarily make to share
11  that information with Google?

12  **A.**   So it's not so much that you're sharing with Google.  You
13  are storing with Google.  It's kind of like your -- if you have
14  a mini storage unit or something, you are storing your
15  belongings within that account.

16  **Q.**   Okay.  So let me ask you -- I know you were asked some
17  questions earlier about analogies.  Let me make one for you.

18       If you say I'm storing that location in Google -- let's
19  say you are Google, and let's say that my location history is
20  written on this piece of paper.  Instead of me keeping it in my
21  file cabinet, I'm giving it to you to put in your file cabinet;
22  right?

23  **A.**   Correct.

24  **Q.**   And you're putting it in a file cabinet there at your --
25  at your business, not in my house; right?

1  **A.**    Correct.  It's a separate storage.

2  **Q.**    Okay.  And that's what we call a Sensorvault; is that

3  right?

4  **A.**    That's correct.

5  **Q.**    All right.  I'm learning a lot in this case because I --

6  I'm not a technological person.  So it's taking a little while

7  to catch on to all of this.

8          The Sensorvault -- I think of that as kind of an

9  electronic file cabinet basically at Google's headquarters.  Is

10 that fair to say?

11 **A.**    It's probably similar, yes.

12 **Q.**    Okay.  Now, I can use my phone to make phone calls, send

13 texts, search the web, all of that, without location services

14 or location history turned on; is that right?

15 **A.**    That's correct.  You can.

16 **Q.**    Okay.  So location services or location history, that may

17 just be a convenience to me as a consumer.  There may be things

18 that I use that it's a little more convenient to me if I have

19 it turned on; right?

20 **A.**    Right.  It is a product.  Just like you have a house and

21 not have Internet.  You don't have to have it, but you may want

22 it.

23 **Q.**    Well, for example, sometimes when I'm traveling, if I

24 don't have location services turned on and I want to -- I'm in

25 a strange place and I want to look at a map, I have to open up

1  Google Maps and actually kind of scroll around and find, okay,

2  I'm in Destin, Florida.  Where's my road?  Where am I going?

3  Right?

4  **A.**  Yes.

5  **Q.**  But if I have location services turned on, when I hit

6  Google Maps, it pops up and shows me where I am.  It makes it

7  easier to use; right?

8  **A.**  Right.  And you can do that separate of location history

9  as well.

10  **Q.**  Sure.  But I -- in other words, I don't have to do that.

11  I can do it the hard way if I want to; right?

12  **A.**  If you'd like to.

13  **Q.**  Now, Google also uses this location information as well,

14  though.  They do sell ads using this information that I've

15  provided Google to store in their Sensorvault; right?

16  **A.**  So, actually, there's other portions of data that they

17  gather for those.  Location history is not one of those

18  products.

19  **Q.**  So my understanding is, when Google gets a geofence

20  search warrant, it looks in its Sensorvault, it's electronic

21  storage, to pull the requested info -- information; is that

22  right?

23  **A.**  That's correct.

24  **Q.**  In other words, I described this as kind of an electronic

25  file cabinet.  Google, when it's get a geofence warrant, I

1 picture it physically as opening up a drawer and digging

2 through papers.  It's doing it electronically obviously, but

3 it's looking at information it stores at its building at its

4 headquarters; correct?

5 **A.**    Right.  And rather than go to your -- you know, to your

6 filing cabinet and your particular folder of information, it's

7 got to search that entire file cabinet, yes.

8 **Q.**    But it's all information that I, as a user and consumer,

9 have given to Google to store?

10 **A.**    Yes.  It's -- again, you are storing that data with

11 Google.

12 **Q.**    Sure.  There's no -- there's no documentation or contract

13 or anything like that that when I give it to Google to store

14 that says, by the way, Google, you are not allowed to share

15 this with anybody anytime, is there?

16 **A.**    It's held under your account with a username and pass

17 code.  So I don't -- I don't know if there is any document that

18 specifically says that, but it's not just, you know, free

19 hanging out there.  It's stored within the account.

20 **Q.**    So, once Google gets the geofence search warrant and it

21 searches its Sensorvault for the information, it then sends

22 anonymous data to law enforcement of only devices within the

23 box so-to-speak; right?

24 **A.**    With those it estimates, yes.

25 **Q.**    Law enforcement then can review that data and they can

1  select which devices are relevant and ask for additional

2  information if they want to; correct?

3  **A.**   That's right.  That's what the process outlines.

4  **Q.**   Okay.  Now, you were describing a while ago, I think, a

5  process of how Google searches their Sensorvault, that they

6  have to look through everything to see who's in the box.  And

7  I'm -- I'm dumbing it down a lot --

8  **A.**   I understand.

9  **Q.**   -- I know, but they're digging through everything in this

10  Sensorvault to see who's in the box; right?

11  **A.**   Correct.

12  **Q.**   When they do that, they don't look to see where everyone

13  is.  They only look to see who's in the box?

14  **A.**   Again, who falls within those parameters.

15  **Q.**   I'm going to come back to this idea here in just a

16  minute, but I want to -- I want to pause for a second and look

17  at this briefly.  So, assuming that February 5th of 2018 I had

18  location history turned on on my own phone, Google would have

19  that information stored in their Sensorvault; right?

20  **A.**   Correct.

21  **Q.**   So -- but when Google looks in their Sensorvault in

22  relation to this search warrant, they don't look to see where

23  Robert Mims was on that day.  Nobody knows where Robert Mims

24  was at 5:00 on that day.  It only knows whether I was in the

25  box or not in the box; correct?

1   **A**.    Correct.  They just search your account to see if it's in

2   the box.

3   **Q**.    Okay.  Now, would you agree with me that a geofence

4   warrant won't necessarily pick up everybody who's physically in

5   a box?

6   **A**.    No.  Because, again, there's so many -- there's a few

7   different criteria that have to be met for it to occur.  That's

8   why, as described earlier, you don't see the victim and

9   other -- the other people, is that it's -- it's a small -- even

10  though it's -- you know, it sounds like a lot, 600 -- almost

11  600 million accounts, it still is just a small subset of Google

12  users, which is in the 2 billion range.

13        So it's not all -- you know, just -- it's not the --

14  because you have a cell phone, we will find you.  You have to

15  have a cell phone.  You have to have a Google account.  You

16  have to have location history.  And then, to be returned, you

17  have to be estimated within that area.

18  **Q**.    Yeah.  It's certainly beneficial to see who may have been

19  in the box, but just because your name or your device doesn't

20  pop up doesn't mean you weren't there; correct?

21  **A**.    That can be true, yes.

22  **Q**.    Because, for example, it only hits, what -- it only

23  checks for information every five, six, ten minutes.  How

24  often?

25  **A**.    It can be multiple times a minute most of the time.  I've

1  seen it, you know, six times a minute, two times a minute.  It

2  stores quite a bit of data.

3  **Q.**   Okay.  Well, and I thought I'd seen that sometimes that

4  it could be longer.  It could be more like five minutes.  I may

5  have that wrong.  But could it be more than a five-minute

6  interval?

7  **A.**   The way it's described in the data I've seen, it's

8  generally not that long, no.

9  **Q.**   Okay.  Fair enough.  But if you're somebody like the

10  driver of the white SUV who comes through briefly and then

11  comes back through and drops somebody off and leaves, your

12  device might not talk to Google in the few moments you drive

13  past; right?

14  **A.**   It's possible.

15  **Q.**   So you might not -- so your device may not hit

16  so-to-speak because you're only there briefly?

17  **A.**   It's possible.

18  **Q.**   Okay.  Or you could just have location services off;

19  correct?

20  **A.**   Yes.  Again, if it doesn't show up, it very well could be

21  because location history is not an -- not an enabled option.

22  **Q.**   So there are a little over 20 people in this room.  If we

23  did a geofence for this room for right now, we're not

24  necessarily going to get 20 devices that hit, are we?

25  **A.**   No.  I would only expect about three or four.

1  **Q.**   Okay.  Now, one other thing to be clear, this search

2  warrant -- I've done search warrants for phones.  You probably

3  did too when you were a police officer.

4  **A.**   I have, yes.

5  **Q.**   When you're looking for text messages setting up a drug

6  deal or pictures that may be important or you're searching for

7  e-mails or things like that, that's not what a geofence warrant

8  is about, is it?

9  **A.**   No.  It's just about location.

10  **Q.**   That's right.  Just about location.  You're not searching

11  for communications on a phone.  That's something separate?

12  **A.**   Correct.

13  **Q.**   Let me ask you, Mr. McInvaille, what is an IP address?

14  **A.**   It's Internet Protocol address.  It allows essentially

15  the tracking of what occurs across the Internet.  So, when

16  requests are made for particular websites, essentially, you're

17  going to be making that request for a particular IP address out

18  to another IP address that's a, you know, Google or whoever,

19  that way it facilitates the transaction of the information.

20  **Q.**   Okay.  So, normally -- I've got an iPad, and most

21  evenings I get on it at some point for a little while and surf

22  the web on my iPad.  My iPad would have a specific IP address,

23  wouldn't it?

24  **A.**   So your home Wi-Fi would.

25  **Q.**   My home Wi-Fi?

1  **A.**    Correct.

2  **Q.**    Got you.  So, in other words, my wife's computer, my

3  daughter's phone, my iPad would all work off the same IP

4  address at my home?

5  **A.**    Yes.  Generally off of different ports but, yes.

6  **Q.**    Okay.  Now, would you agree that Google keeps millions

7  and millions of IP addresses?

8  **A.**    Yes, they do.  Within those accounts, they will also

9  store IP addresses as well.

10  **Q.**    Okay.  Would you agree it would be far more than 592

11  million?

12  **A.**    More IP addresses?

13  **Q.**    Yes.

14  **A.**    Yes.

15  **Q.**    Would you agree with me that Google would have to search

16  every customer to see who is using an IP address at a specific

17  date and time?  In other words -- let me back up because I

18  should have asked a different question at first.  Have you seen

19  search warrants to determine whose IP address this is?

20  **A.**    Yes.  If you have the IP address and you're trying to

21  determine its -- its owner?

22  **Q.**    Yes.

23  **A.**    Yes.

24  **Q.**    Okay.  So if I send -- if I want to know -- if I've got

25  the IP address and I want to know who does that belong to, I

1  can ask Google about it, and they would have to search every
2  customer to see who's using that IP address at a specific date
3  and time?

4  **A.**   So, for that example, what you would do is -- IP
5  addresses are like phone numbers.  They're owned by the
6  individual companies.  So, you know, let's say Comcast or
7  someone like that, they own a block of IP addresses.

8      So then when you determine that that one falls within
9  their block, you go to them with a search warrant or whatever
10  legal process.  You make that request to them and say, "At this
11  date and time, this IP address was used, and I need the
12  subscriber information from it because of X probable cause."
13  They will then query for that specific IP address to tell you
14  the subscriber.

15  **Q.**   Law enforcement can actually request Google identify the
16  user of the IP address with just a grand jury subpoena; right?
17  **A.**   That's like -- yes, probably.

18  **Q.**   Okay.  And isn't it true that an IP address can show a
19  person using a Google address in a specific location such as a
20  house?

21  **A.**   Yes.  You can resolve them back to specific addresses,
22  because, again, like the Wi-Fi in your home, it's in a fixed
23  location.

24  **Q.**   And even though there's millions and millions and
25  millions of IP addresses out there, you can get all of that

McInvaille - Cross

1   with just a grand jury subpoena, can't you?

2   **A.**   You can, but you're making a very specific request.

3   **Q.**   All right.  Now, I want to show you something.  With

4   assistance from somebody in my office who knows far more about

5   technology than me, we created this document last night.  And I

6   use the term "we" very loosely.

7        Do you recognize -- well, first of all, before I ask you

8   about that, let me go back for a second.  In your report -- you

9   were shown this a minute ago.  I believe you were asked a

10  question about this box right here (indicating).  I don't have

11  a color copy.  I have -- I think when I copied I didn't use

12  color, but this is the same box you were shown a few minutes

13  ago; right?

14  **A.**   It is.

15  **Q.**   And this is basically where you've got the geofence box

16  as a square; correct?

17  **A.**   Correct.

18  **Q.**   And that is basically around -- the post office is right

19  here (indicating); right?

20  **A.**   Correct.

21  **Q.**   And then you were asked some questions about -- about one

22  of the hits that came back in Step 1, and you've drawn this

23  basically circle that's a -- it's a 347-meter radius from the

24  latitude and longitude given for that hit; correct?

25  **A.**   Correct.

1  **Q.** Okay. Because you were asked some questions about, well,
2  the device could have been inside or outside the box; right?
3  **A.** That's right.
4  **Q.** So why didn't you plot more than just one point with the
5  largest radius?
6  **A.** I don't recall if this is the largest, but I was asked
7  to -- to show an example of where the device -- essentially
8  where the device could be in relation to -- to a data point.
9  **Q.** Okay. Well, we had nine other points. I'm going to
10 throw out the one at 5:58 that we don't believe was --
11 **A.** Okay.
12 **Q.** -- was related to it. I'm talking about the -- I'm
13 talking about the seven points related to device 859 and the
14 three points related to device 768. Why didn't you plot the
15 other nine points?
16 **A.** Again, this is just an example for that one question
17 about how it looks where -- where the data point falls because
18 I have all of them plotted.
19 **Q.** Okay. You would agree that GPS is more accurate than
20 Wi-Fi; is that correct?
21 **A.** It can be.
22 **Q.** It can be? You don't think it usually is?
23 **A.** Yes, it can be more accurate. Yes.
24 **Q.** Okay. That's why, in fact, on three of these the source
25 is GPS. The three associated with 768; right?

1  **A.**  Correct.

2  **Q.**  And the seven associated with device 859, the source is

3  WiFi; right?

4  **A.**  That's correct.

5  **Q.**  And we see the GPS has a much smaller radius around the

6  latitude and longitude; right?

7  **A.**  That's right, but that's not always true.

8  **Q.**  Okay.  So I want to go back now to the chart that I had

9  help creating.  Let's look at the green -- at the green ones

10  first because those are three points.  You said you went

11  ahead -- that maybe when you were working on this you plotted

12  all ten points?

13  **A.**  Yes, I plotted all the data.  Yes.

14  **Q.**  Okay.  So would you agree with me that the ones in green

15  are the three points associated with device 768?

16  **A.**  If they're plotted correctly, yes.  I'll just assume that

17  you have done this properly.

18  **Q.**  Okay.  Well, if we need to, I've got the person who put

19  this together.  We can bring her in here in a minute and talk

20  about it but --

21  **A.**  Unless you don't think it's correct, again, I said I'd

22  trust you.

23  **Q.**  Okay.  Fair enough.  And the circles around each point --

24  I've got a -- I've got one that zooms in a little bit better

25  we'll look at in a second, but the circles around each point

McInvaille - Cross

1   would just be the radius in meters around the latitude and

2   longitude; correct?

3   **A.**   That's what it should be, yes.

4   **Q.**   Okay.  And then for the blue ones, what we've got here,

5   the outer circle would be the same one that you had shown in

6   your report, the 347 meters; right?

7   **A.**   It appears to be, yes.

8   **Q.**   Okay.  Well, let me go back for a second.  You would

9   agree with me, for the seven points associated with device 859,

10  it's all the exact same latitude and longitude?

11  **A.**   It is.

12  **Q.**   Okay.  And that's where we have the blue dot right here

13  (indicating), the blue pinpoint?

14  **A.**   Correct.

15  **Q.**   And then we have radiuses around them.  And I will just

16  tell you, for purposes of keeping this simple, rather than

17  trying to clutter up this chart with seven different blue

18  lines, I had my assistant plot the largest one, which is 347

19  meters, and the smallest one, which is the inner one, which is

20  92 meters, and then one that was 146 meters.  Does that appear

21  to be accurate to you?

22  **A.**   Again, trusting that you did it properly, yes.

23  **Q.**   You won't dispute that it's accurate?

24  **A.**   I'm not, no.

25  **Q.**   All right.  And I'm going to put this one up here.  This

 1  one kind of cuts off part of the -- part of the outer one, but

 2  it helps us zoom in on the picture a little bit better.  It's

 3  the same chart, just zoomed in a little bit.

 4       The square box here (indicating), that is the geofence.

 5  That's the parameters of the geofence; right?

 6  **A.**  Correct.

 7  **Q.**  Okay.  So, on device 768, the green ones, the entire

 8  circle -- and, again, you said earlier the device is somewhere

 9  in the circle; right?

10  **A.**  It should be, yes.

11  **Q.**  Yeah.  The pinpoint doesn't really mean anything.  It's

12  somewhere in that circle?

13  **A.**  Right.

14  **Q.**  And the entire circle on the three green hits are all

15  within the geofence box; correct?

16  **A.**  That's correct.

17  **Q.**  Okay.  Now, I want to look at the smallest blue line.

18  That's the smallest, shortest diameter, the 92-meter diameter.

19  You can see here (indicating).  This is the back of the post

20  office; right?

21  **A.**  It appears to be, yes.

22  **Q.**  Okay.  And the edge of that line runs right along right

23  there -- where we were watching the video earlier, it would

24  just cover where the assailant was hiding behind the post

25  office, wouldn't it?

1  **A.**   Yes.

2  **Q.**   All right.  And that's the tightest radius on the blue.

3  The 146, which is the second biggest radius, would certainly

4  encompass the post office, and the 347 would as well, wouldn't

5  it?

6  **A.**   That's correct.

7  **Q.**   So while, admittedly, on the 347-meter radius, a good bit

8  of it's inside the box, a good bit of it is outside the box,

9  but for the other eight -- oh, I'm sorry -- the other six

10  related to device 859, that would be located mostly inside the

11  box, wouldn't it?

12  **A.**   Better than the other, yes.

13  **Q.**   Okay.  In fact, with the smallest one, it's

14  overwhelmingly inside the box, isn't it?

15  **A.**   Yes.  Much better than 347.

16  **Q.**   Okay.  There was some discussion a minute ago about

17  further legal process.  Is it fair to say that you are not a

18  judge?

19  **A.**   I am not.

20  **Q.**   Okay.  And you are not -- you've not been proposed as an

21  expert on the law; correct?

22  **A.**   No, I'm not.

23  **Q.**   Okay.  So I'm going to use myself as an example.  Okay?

24  I'm just going to give you an absolute hypothetical.  I am a

25  very happily married man.  I will tell you this is just a wild

McInvaille - Cross

1  hypothetical.

2      But if my location history was turned on on February 5th

3  of 2018 at 5:30 p.m., in theory, my information would be stored

4  in this Sensorvault, and Google would review what's in their

5  Sensorvault to respond to the search warrant; right?

6  **A.**  Correct.

7  **Q.**  Okay.  If I was somewhere I didn't want somebody to be --

8  if I was at my girlfriend's house, for example, and I didn't

9  want my wife to know about it, Google's not going to find this

10 by searching their Sensorvault, are they?

11 **A.**  Say that again.  I'm sorry.

12 **Q.**  If I'm somewhere I don't want to be on February 5th of

13 2018 at 5:30 p.m., this search warrant is not going to show it

14 unless I was at the Lake Cormorant post office; right?

15 **A.**  Right.  They're not going to call your wife.

16 **Q.**  Yeah.  If I was at my girlfriend's house at 5:30 p.m.

17 that evening, the Postal Inspection Service isn't going to

18 know, are they?

19 **A.**  No.  Unless your girlfriend stays at the post office.

20 **Q.**  That's right.  Google's not going to even know because

21 they're not looking to see where I am.  They're just looking to

22 see was my device in the box or not; right?

23 **A.**  Yeah.

24 **Q.**  Okay.  And while Google might search their Sensorvault,

25 they may know where I am, they're going to know anyway because

1   I've already given them that information, haven't I?

2   **A.**   Yeah.  But, again, this isn't something that they just

3   are willingly going through.  This is a -- again, a legal

4   demand they're going to search this data for.  So, no, they're

5   not just looking to see where you are.

6   **Q.**   I agree.  But unless I'm at the Lake Cormorant post

7   office that evening, the only people that's going to know that

8   is Google, and they already know it because I've already shared

9   that information with them; right?

10  **A.**   But, again, you make it out as though they're keeping

11  tabs on you being there.  Again, they're only looking in this

12  instance.  So they would only know if you were there, yes,

13  because they're looking.

14  **Q.**   Just a couple more questions for you.  Google sends this

15  information back in response to the geofence warrant, and,

16  basically, it showed two devices were there.  And you don't

17  disagree -- and the devices I'm talking about are device 859

18  and 768.  Okay?  You don't disagree that in Step 3 they

19  disclose that those devices belong to Jamarr Smith and Gilbert

20  McThunel?

21  **A.**   No.

22  **Q.**   Okay.

23  **A.**   In the beginning, you said -- you said two or three?

24  **Q.**   I'm sorry.  They sent back three.

25  **A.**   Okay.

1    **Q.**    But I'm ignoring the third one about whatever record --

2    waves records because --

3    **A.**    Okay.

4    **Q.**    -- that -- I don't believe that's relevant to this.

5    **A.**    Got you.

6    **Q.**    It's at that point they say device 859 and 768 were

7    present in the vicinity of Lake Cormorant post office; right?

8    **A.**    Correct. Those devices.

9    **Q.**    All right. And you would agree me that we've been able

10    to identify those devices in Step 3 as Smith and McThunel?

11    **A.**    For those accounts, yes.

12    **Q.**    For those accounts. Okay. So you don't disagree that

13    Smith and McThunel were present at the Lake Cormorant post

14    office at 5:30 p.m. that evening, do you?

15    **A.**    I can't say them physically, but an account that you have

16    associated with them, yes.

17    **Q.**    Okay. Their devices were present, weren't they?

18    **A.**    The devices with those accounts, yes.

19    **Q.**    And, in fact, you've watched the video here. I assume

20    you've watched it before.

21    **A.**    Yes.

22    **Q.**    You do see on the video where the assailant has his elbow

23    up to his ear for three minutes standing behind the post

24    office, don't you?

25    **A.**    So I watched today, but I -- honestly, from that TV, I

1    couldn't see it, but, again, I wasn't close enough to be able

2    to see it.  I can't -- I can't rule on that either way.

3    **Q.**    Okay.  And you were here a while ago when we put the

4    phone records up.  You don't dispute that the phone records

5    confirm that McThunel and Smith were on the phone with each

6    other for a five -- roughly five-minute phone call around 5:15

7    p.m. that evening, do you?

8    **A.**    I haven't reviewed those records.

9    **Q.**    Let's take a look at them real quick.  Here's the phone

10   records from C Spire.  Did you ever review phone records when

11   you were a police officer?

12   **A.**    Yeah, I've reviewed one or two sets.

13   **Q.**    Okay.  So here's the start time, 1716 and 10 seconds.

14   You understand it's military time; correct?

15   **A.**    I do.

16   **Q.**    And that's on February 5th; right?

17   **A.**    Correct.

18   **Q.**    And in civilian time, that would be 5:16 p.m., wouldn't

19   it?

20   **A.**    Correct.

21   **Q.**    And we have a phone call.  The calling number would be

22   6029.  The called number would be 7511.  I'll represent to you

23   that's Jamarr Smith's number and Gilbert McThunel's number.

24   And the duration of the call lasted 350 seconds; right?

25   **A.**    Okay.

 1   **Q.**   And if my math is correct, I guess that's about five
 2   minutes and 50 seconds; right?
 3   **A.**   It's close.
 4   **Q.**   Okay.  So you don't dispute, do you, that, in fact,
 5   Gilbert McThunel was on the phone with Jamarr Smith, assuming
 6   that I have not lied to you about the -- whose numbers those
 7   are?
 8   **A.**   No.  Can -- can I see those records?
 9   **Q.**   Absolutely.
10         **MR. MIMS:**  May I approach the witness, Your Honor?
11         **THE COURT:**  You may.
12   **A.**   Does it have a definition sheet with it or not?
13   **BY MR. MIMS:**
14   **Q.**   It does.  Feel free to dig through it.  Just please don't
15   get it out of order because I'll never get it back.
16   **A.**   Got you.  I know you guys like printing records.  It's
17   not a good idea.
18   **Q.**   I'm sorry?
19   **A.**   I know you guys like printing these things.  It's
20   terrible.
21   **Q.**   Yeah, it is.
22   **A.**   You said the definition sheet is here?
23   **Q.**   It should be.  I believe I attached it.  It may be at the
24   very back.
25   **A.**   Okay.  (Reviews record.)  Okay.  I just wanted to be able

1    to review them since you asked me about them.

2    **Q.**    I'm sorry?

3    **A.**    I just wanted to be able to review them since you asked.

4    I just had not seen them.

5    **Q.**    All right.  Thank you.

6         **MR. MIMS:**  Your Honor, I have no further questions.  I

7    would offer into evidence the plotting of some of these points

8    that I referred to with the expert.  I'd offer them as G-4A and

9    G-4B.

10        **THE COURT:**  Any objection?

11        **MR. CHINICHE:**  May I just take a look at them?

12        **THE COURT:**  Certainly.

13        **MR. MIMS:**  Oh, I'm sorry.

14        (CONFERRING OFF THE RECORD.)

15        **MR. CHINICHE:**  No objection.

16        **MR. LEWIS:**  No objection.

17        **THE COURT:**  Thank you.  They'll be received.

18        (EXHIBIT NOS. G-4A AND G-4B ADMITTED INTO EVIDENCE.)

19        **MR. MIMS:**  Your Honor, with that, I have no further

20   questions.

21        **THE COURT:**  Redirect.

22                         **REDIRECT EXAMINATION**

23   BY MR. LEWIS:

24   **Q.**    You were asked about practices inside Google, you know,

25   what their specific interior practices are.  And I'm not sure

1   if this is an issue or not, but if the Court desired to hear

2   what goes on at Google, the Court has the power to subpoena

3   Google employees, which may be painful for us to listen to, to

4   come and testify about that; correct?

5   **A.**   It's happened before.

6   **Q.**   Right.  I was about to say, in the *Chatrie* case, a number

7   of Google employees testified; correct?

8   **A.**   That's correct.

9   **Q.**   And then in the *Dawes* case in California, which is maybe

10  a little more convenient, there were Google -- did Google

11  employees testify or did they just do affidavits?

12  **A.**   No.  They completed declarations to avoid having to come

13  for testimony.

14  **Q.**   And so you have relied on these declarations in your

15  testimony today as to about what Google practices are; correct?

16  **A.**   Right.  And those applied to those matters that I was

17  working, yes.

18  **Q.**   And, in fact, those declarations were attached to a

19  report that we've provided the Court; correct?

20  **A.**   That's correct.

21  **Q.**   Okay.  You were asked a series of questions about turning

22  on and off location history.  Is it your testimony that someone

23  turning on location history and, therefore, providing that

24  information to Google no longer has an expectation of privacy

25  in that information?

1   **A.**   No, I don't.  And from reviewing the documents that have

2   been provided, the *amicus* brief in *Chatrie*, those things,

3   Google also doesn't akin it to the release of it.  They -- they

4   view it as protected.  They require themselves that you provide

5   a search warrant.  There have been other agencies in the field

6   that can get that data without a search warrant, but Google

7   requires it.  So they do not feel that it's non-protected

8   material.  They describe it as a journal.

9   **Q.**   Okay.  And Mr. Mims gave a long -- perhaps overlong

10  example of him not -- him being at his girlfriend's house.  You

11  understood him to be saying that he would have an expectation

12  of privacy in that information?

13  **A.**   You would think that everybody would, yes.

14  **Q.**   In the warrant that was sent to Google in this case in

15  November of 2018 -- now, let's not get confused about these

16  warrants that were sent in 2019.  Those warrants had specific

17  what?

18  **A.**   Account names.  So, as a result of the geofence request

19  where the three accounts were subsequently retrieved back from

20  the three different steps, then there were -- the narrowing

21  occurred in a separate piece.  That occurred afterwards, after

22  the accounts were identified.

23  **Q.**   Okay.  This warrant in November of 2018, did it request

24  information for a specific IP address?

25  **A.**   The geofence warrant?

McInvaille - Redirect by Mr. Chiniche

1  **Q.**   Right.

2  **A.**   No, it did not.

3  **Q.**   Did it request information about a specific phone number?

4  **A.**   No, it did not.

5  **Q.**   Did it request information about a specific e-mail?

6  **A.**   No.  It actually asked for anonymized information.

7  **Q.**   Did it ask for information about a specific Google

8  account?

9  **A.**   No.

10         **MR. LEWIS:**  I have nothing further, Your Honor.

11         **THE COURT:**  Okay.  I have two or three things I want

12  to ask.

13         **MR. LEWIS:**  I'm sorry.  He --

14         **MR. CHINICHE:**  Your Honor --

15         **THE COURT:**  Oh, I'm very sorry.  Come ahead,

16  Mr. Chiniche.

17                      **REDIRECT EXAMINATION**

18  **BY MR. CHINICHE:**

19  **Q.**   Mr. McInvaille, why don't you testify for prosecutors?

20  **A.**   They don't need private companies to assist them.  They

21  have law enforcement agencies that they can request services

22  from.

23  **Q.**   And presumably free to them; right?

24  **A.**   Yeah.  I've never seen a prosecutor pay the FBI for their

25  work.

McInvaille - Redirect by Mr. Chiniche

1    **Q.**   And does Google offer any training that you could go to?

2    **A.**   No.

3    **Q.**   So that's why you haven't had any training?

4    **A.**   Right.  There are a few law enforcement only classes that

5    are available out there that go directly towards the process of

6    the request, not so much the technology.

7    **Q.**   Okay.

8    **A.**   So essentially teaching people that this is an option.

9    **Q.**   All right.  And Mr. Mims showed you a diagram from last

10   night, Government G-4A and G-4B.  You see those?

11   **A.**   Yes.

12   **Q.**   And the radius -- that's similar to the one in your

13   report; is that correct?

14   **A.**   It is.

15   **Q.**   And then I believe this is the zoomed in -- zoom-in

16   version?

17   **A.**   It appears to be, yes.

18   **Q.**   And in this diagram, you're familiar with the landmarks

19   here.  The intersection of the road; right?

20   **A.**   Yes, the railroad tracks.

21   **Q.**   Railroad tracks that we saw the train on the video.  And

22   this is the post office right here (indicating); right?

23   **A.**   Correct.

24   **Q.**   None of these devices are in that parking lot of the post

25   office, are they?

1   **A**.   The circles intersect with the parking lot, but, you

2   know, they -- I wouldn't say that they're -- they're not

3   confined to the parking lot, no.

4   **Q**.   Right. The GPS coordinates where those green pegs are?

5   **A**.   No. They're -- again, they're not confined to the -- to

6   the parking lot.

7   **Q**.   Which is right here (indicating)?

8   **A**.   Correct.

9   **Q**.   Thank you, Mr. McInvaille.

10         **THE COURT**: Mr. Travis?

11         **MR. TRAVIS**: No thank you, Your Honor.

12         **THE COURT**: So I understand that you've testified

13   about 42 times. I'm really looking for some information, kind

14   of historical, that might help me here.

15         In those cases where you've testified, have you seen

16   in some instances the language that is used -- that is attached

17   to the affidavit in this case?

18         **THE WITNESS**: Similar language, yes.

19         **THE COURT**: So this language in Paragraph 2 says "Law

20   enforcement will seek additional information regarding those

21   devices through further legal process." Have you ever

22   testified regarding what that further legal process entails?

23         **THE WITNESS**: So the other cases that I've had

24   where -- so each of these warrants kind of -- they facilitate

25   their own steps. So the over -- the overall process from start

1   to finish is generally about the same.  Sometimes Step 2 gets
2   removed, and then sometimes Step 2 is in there.  The other
3   piece that gets added or removed is the "further legal
4   process."

5        So, for example, in *Chatrie*, that warrant is very
6   similar to this warrant.  The one piece that this warrant has
7   that *Chatrie* does not is the "further legal process."  So, for
8   example, switching over to other cases that I've worked where
9   they say "further legal process," it's because more warrants
10  are required to go through the steps.

11       In the *Dawes* case, we actually learned that from the
12  time that that initial search warrant was done to subsequent
13  search warrants that that team was initiating later, that the
14  judge had actually asked them to begin adding in a step to get
15  further legal process for each and every request throughout the
16  steps.

17       So they would go from Step 1 with the original
18  warrant, get that data.  They would then analyze and take a
19  look at it.  If they decided we want, you know, one or three of
20  these people to move on to the subsequent steps, they would go
21  get a new warrant, make that request to Google, and then,
22  again, analyze and, if needed, make another subsequent request
23  with legal process -- new legal process.  A brand new search
24  warrant.

25       So, essentially, for a three-step process, they would

1   go get three warrants.  In the initial warrant, they would

2   describe that I'm going to do each of these things with a

3   separate warrant in between each one.  And that's generally the

4   way it's described, is with further legal process.

5          **THE COURT:**  So, to clarify, I had questioned myself as

6   to whether the intent might be that there be a separate warrant

7   for Step 2 and a separate warrant for Step 3.

8          **THE WITNESS:**  I've seen that several times, yes.

9          **THE COURT:**  Now, you've seen that, but have you seen

10  it in all your cases?

11         **THE WITNESS:**  No.  Again, these warrants have been

12  tailored in -- in different ways.  There's times that I see all

13  three steps.  There's some times that I see two steps.  There's

14  times that I see three steps with warrants in between or just

15  two steps with warrants in between.  It's really on how it's

16  been tailored and presented to the judge.

17         **THE COURT:**  So, to be clear, looking at this

18  particular one, when you see in Paragraph 2 -- do you need to

19  look at this language?

20         **THE WITNESS:**  I -- I recall it.

21         **THE COURT:**  Okay.  When you see in Paragraph 2 "and

22  will seek any additional information regarding those devices

23  through further legal process," in all of your other cases,

24  your testimony has been consistent that that requires

25  additional warrants at each stage?

1    **THE WITNESS**:  Right.  Because if you actually read

2    that paragraph, what it states is it outlines we are going to

3    ask for and receive the anonymized data, which is that G-3 page

4    that they've shown us several times.

5    Once we have that information, we will analyze, and

6    then if we want to seek more information.  So, if we want the

7    contextual information and if we want to determine who the

8    subscriber is, that we will get further legal process.

9    In my other cases that I have had where that is

10   spelled out, there are multiple warrants for this one process.

11   **THE COURT**:  So is it fair to say that in the cases

12   you've testified that what you deem as an expert to be required

13   is dependent upon the language in the search warrant?

14   **THE WITNESS**:  Exactly, yes.

15   **THE COURT**:  Okay.  So tell me -- this 68 percent

16   accuracy that I see referred to, can you tell me what that

17   means?

18   **THE WITNESS**:  Yes.  So if you recall the two pictures

19   that we've been going through with the circles around the

20   geofence, those circles on that map's display radius has been

21   provided.  So, as Mr. Mims said, you can take that latitude and

22   longitude, drop it on the map.  You then draw the circle around

23   that reference location.

24   **THE COURT**:  Uh-huh.

25   **THE WITNESS**:  Then you can kind of forget that that

1  center point exists at that point.  You can take the little pin
2  drop and pull it out, get rid of it, because now what we know
3  is that the device should be within this circle.

4      Now, Google has testified that it is their goal that
5  68 percent of the time the device should be located somewhere
6  within that circle.  So for -- let's just take the 92-meter
7  circle that's in the center here, that center blue circle, the
8  smallest one.  Google is saying that the device should be
9  located within the boundaries of that circle 68 percent of the
10 time, meaning there is a chance that the device could be
11 outside of the circle somewhere as well.

12     **THE COURT:**  And back to Mr. Chiniche's question, like
13 this diagram here does not represent that the green -- where
14 the green dot is positioned on the map means that the person
15 with the device was standing at that exact location?

16     **THE WITNESS:**  Exactly.  So it's somewhere within
17 the -- it should be somewhere within each of those circles.
18 Each one of those is a separate measurement.

19     **THE COURT:**  So you started doing this in 2017?

20     **THE WITNESS:**  I began working at Envista in 2017, yes.

21     **THE COURT:**  So help me with the history.  At that
22 time, I don't think there was a case -- our search warrant was
23 signed in November of 2018.  To your knowledge, what -- what
24 law -- what were you using prior to the decision -- the first
25 decisions that came?

1    **THE WITNESS:**  So this process of asking for this data

2    is relatively new.  The underlying data, the location history

3    specific to a person's account, we've been -- I've been

4    reviewing that since -- since I was in law enforcement 2013.

5    That's -- that's a function that we've been able to get and

6    review.

7            So that technology, as far as how that process and how

8    that data is collected and used and how that works, has been

9    reviewed by law enforcement for, you know, ten years now.

10   **THE COURT:**  Primarily from cell tower dumps?

11   **THE WITNESS:**  So, no, from Google itself.  But, again,

12   that request at that time was and still is, in some instances,

13   the specific account.  I'm asking for your specific account

14   because I want to know where you are versus this is a new

15   request that has been tailored so that if I don't know who you

16   are and I want to try to find you, then I can find you.

17   **THE COURT:**  Okay.  Have you testified before regarding

18   whether or not a search was overbroad?

19   **THE WITNESS:**  Yes.  So I often get asked that in these

20   specific requests.

21   **THE COURT:**  So, in *Google V*, that was 875 square

22   meters.  This one is, like, 98,000 square meters.  I don't

23   recall anybody has mentioned that today.  Is that overbroad or

24   not?

25   **THE WITNESS:**  So, in terms of the box that you see

1   drawn, one of the important things to understand here is that

2   the -- the only thing that the time in the box restricts is how

3   much data they receive back.  It has no impact on the search

4   that's conducted.

5        So I often tell you that if you -- if you took one of

6   the tiles on the floor and said, "Hey, Google, I want to know

7   who's in that -- on that -- standing on that tile for one

8   minute," the search of all of the users still has to occur.

9   Now, because we made that box so very small, they might only

10  return one person, but they had to still search everyone.

11       So the box really does nothing to restrict the search.

12  It only restricts what they get back in return.

13            **THE COURT:**  The result?

14            **THE WITNESS:**  Right.

15            **THE COURT:**  So the fact that this search is three or

16  four acres doesn't matter?

17            **THE WITNESS:**  Honestly, no.  If they would have drawn

18  it bigger, they may have returned more users, but the search

19  was still the same.  If you draw it smaller to just the

20  confines of the -- of the parking lot or the building there or

21  the back of the building, you may have returned less users,

22  but, again, it's not going to change the search that was made.

23            **THE COURT:**  I think I understand.  So, in this

24  affidavit, it mentions all location data, including cell tower,

25  GPS, and other Wi-Fi means.

1          **THE WITNESS:**  Right.

2          **THE COURT:**  Is -- is there anything about this case

3     that is significant to you about the source?  Do you even know

4     the source?

5          **THE WITNESS:**  So it tells you in the -- in the records

6     what source was used to derive each of the locations.  So if

7     you look at that G-3 -- it should be about four columns over, I

8     believe, four or five columns over -- you'll see the source

9     that was used.

10          **THE COURT:**  And several of those -- that first number,

11     whatever it was, it shows Wi-Fi.  Then the last three, I think

12     it is, shows GPS.  Does that matter?

13          **THE WITNESS:**  No, it does not.  What you're looking at

14     is that is, at that time, what Google used to determine those

15     locations is really all it is.  It doesn't -- it doesn't change

16     what the scope of the search was or any of that.  So, no, I

17     would say it's insignificant.

18          **THE COURT:**  And it doesn't speak to the accuracy?

19          **THE WITNESS:**  No.  Wi-Fi is -- all of them are

20     estimations.  Wi-Fi is even more of a broader estimation than

21     GPS, but, no, it should not have any significant problem with

22     the -- with the accuracy.  What you see there is relatively

23     what you get.

24          **THE COURT:**  In the cases that you've testified in, is

25     it always alleged in the affidavit that a phone was used or

1   possibly used?

2         **THE WITNESS**:  I can't speak to that and say that every

3   one, but I know I have seen it where it's mentioned.  But, of

4   course -- so, for example, in *Chatrie*, in that matter, the

5   person was standing directly underneath a camera.  You could

6   see the physical phone in their hand.  You could see the color

7   of the phone.  That's how close it was.

8         So I can't speak to all of them but -- actually, no, I

9   can -- I can say for sure that not all of them reference having

10  a phone.  *Dawes* in California does not reference having a phone

11  because they didn't have any pictures, video, any inclination.

12  It was just looking because they thought they may just because

13  people have phones.

14        **THE COURT**:  Did you testify in *Google IV*?

15        **THE WITNESS**:  I'm sorry?

16        **THE COURT**:  Did you testify in the case that's denoted

17  as *Google IV*?

18        **THE WITNESS**:  Which one is that?

19        **MR. LEWIS**:  Your Honor, *Google I, II, III, IV,* and *V*

20  were all *ex parte* matters --

21        **THE COURT**:  Got you.

22        **MR. LEWIS**:  -- where the magistrate judge just ruled

23  on them.  And this is maybe kind of new to me, but had a

24  written opinion based on a warrant application.  The only

25  developed records -- you could ask him, but *Chatrie*, *Dawes*,

1　maybe a case in Florida where there was an evidentiary hearing

2　like this, Your Honor.

3　　　　**THE COURT**:  Okay.  So, Counselors, put this in the

4　back of your mind.  Later, after you make your argument, I do

5　have some questions for you, but it's my understanding that the

6　*Google IV* case, the affidavit did not allege that the suspect

7　had a phone?

8　　　　**MR. MIMS**:  That may be.  I have got it here.  I can

9　look at it.  But, in fact, there are many, many cases in which

10　there's no allegation in the affidavit that the subject had a

11　phone.  I've gotten geofence warrants before on cases I've

12　worked on where we had no video, had no idea whether there were

13　phones there or not.  The affidavit is based on a statement

14　that, hey, criminals, like everybody else, they all have a

15　phone.  And if they have a phone, Google could have location

16　information.

17　　　　**THE COURT**:  Okay.  Is it significant to you in this

18　case that of the three device numbers that came back to turn

19　out to be two of the defendants in this case, the other, the

20　permanentwaves dot whatever, was not further searched?  Does

21　that in any way make the identity of the two positive hits less

22　reliable?

23　　　　**THE WITNESS**:  No.  My only concern with the -- I'm

24　sorry -- the waves account -- I can't recall the first part --

25　is that, you know, the portion that had been described earlier

1 about realizing that that account was insignificant to the

2 investigation based on time comes from the very first step of

3 the warrant. So you see that time that was being used, that

4 1758 time there on the screen, that comes from the very first

5 data set.

6 And as a result of even realizing that that was

7 insignificant due to the time, it's -- that account still

8 progressed through Step 2 and Step 3. And then, instead of

9 getting the further information to get more locations for that

10 account that would have shown you where this person possibly

11 lives, where they go to work every day, things like that that

12 would allow you to identify them was not sought.

13 So it's weird that this device makes it through all

14 three steps and then is determined to not be relevant based on

15 a piece of information that came from the very first step.

16 **THE COURT:** Okay. Mr. Mims. Any questions in light

17 of mine?

18 **MR. MIMS:** I do, Your Honor.

19 **RECROSS-EXAMINATION**

20 BY MR. MIMS:

21 **Q.** Mr. McInvaille, in relation to that last set of

22 questions, you did -- you were here when Mr. Mathews testified;

23 right?

24 **A.** Yes.

25 **Q.** You did hear him say they tried to figure out who

1  permanentwavesrecords was and could not locate that; correct?

2  **A.** Yes.

3  **Q.** Okay. So they didn't just completely ignore it. They

4  tried to follow up and couldn't find it?

5  **A.** Yes.

6  **Q.** Because it could have been a person who was in the

7  vicinity at the time and may possibly have been a witness;

8  right?

9  **A.** It's possible.

10 **Q.** Okay. But from the video, it clearly wasn't somebody who

11 was involved in the robbery, was it?

12 **A.** I don't -- I don't know that I can make that

13 determination.

14 **Q.** Okay. So you were asked a question about this further

15 legal process. You would agree with me that in this language

16 here that's in the second page to Attachment A to the warrant,

17 the language that kind of lays out Step 1, Step 2, and Step 3,

18 right --

19 **A.** Correct.

20 **Q.** -- it doesn't say anything about -- it doesn't say

21 specifically going back for another search warrant, does it?

22 **A.** It says "further legal process."

23 **Q.** I understand it says that. It doesn't say go back for a

24 search warrant, does it? It doesn't use the word "search

25 warrant," does it?

1  **A.**   What would be legal process then?

2  **Q.**   Sir, I'm asking you, does it say go get another search

3  warrant?

4  **A.**   I'm just trying to understand what legal process would be

5  if it's not a search warrant.

6  **Q.**   Mr. McInvaille, I appreciate -- I appreciate that.  I'm

7  asking you a very specific question.

8  **A.**   Okay.

9  **Q.**   When it comes to Step 2 and Step 3 --

10        **THE COURT:**  Answer his question.

11  **BY MR. MIMS:**

12  **Q.**   -- it does not use the words "go get another search

13  warrant," does it?

14  **A.**   No.  It says "further legal process."

15  **Q.**   Okay.  And my understanding is when -- when I've talked

16  with case agents -- and I've dealt with multiple geofence

17  warrants.  I've talked to them about how do you do this, what

18  do you submit to Google -- they always talk about the Google

19  legal portal.  Do you call -- have you heard it called the

20  legal portal?

21  **A.**   Yeah.  LERS, L-E-R-S, the portal.

22  **Q.**   Okay.

23  **A.**   It can be named a few things.

24  **Q.**   What does LERS stand for?

25  **A.**   Law Enforcement Resource something, I believe.

1   **Q.**   Okay. If you're wanting to have legal communications on

2   search warrants with Google, you go through this legal portal,

3   don't you?

4   **A.**   Yes.

5   **Q.**   All right. And, in fact, this Attachment A says -- in

6   regards to Step 2 and Step 3, it says that once these accounts

7   have been identified in Step 1, the devices that were present,

8   law enforcement may review those, and upon demand, the provider

9   shall provide more information; correct?

10   **A.**   Yes.

11   **Q.**   And, again, it says the same thing in Step 3. Upon

12   demand, the provider shall provide; right?

13   **A.**   Yes.

14   **Q.**   Now, would you agree with me that Google is not

15   necessarily the most law enforcement friendly company out

16   there?

17   **A.**   They seem to respond, what, 10,000 times a year it

18   sounded like.

19   **Q.**   Really. Have you ever -- have you ever as a case agent

20   submitted geofence warrants to Google? You haven't, have you?

21   **A.**   No. I've submitted other requests.

22   **Q.**   Would you disagree with me if I told you that Google

23   would be very hesitant to refuse (sic) to comply if they didn't

24   think you had dotted all of your I's and crossed all of your

25   T's legally?

1    **A.**    Say that again.

2    **Q.**    Would you disagree with me if I told you that Google

3    would not hesitate to reject your warrant if you didn't take

4    all of the appropriate steps in their mind?

5    **A.**    That's right.  They will.

6    **Q.**    I'm sorry?

7    **A.**    They will reject your warrant, yes.

8    **Q.**    Yes.  Now, you talked about the 68 percent probability.

9    I've never really fully understood that.  What you're telling

10   me is, when you draw this circle -- or when Google provides

11   information that leads to these circles, that there's a

12   68 percent probability that the device is inside the circle;

13   right?

14   **A.**    Correct.  Yeah.  Forget the geofences here.  Just look at

15   the circle.  One individual circle at a time.  68 percent of

16   the time it's in the circle.

17   **Q.**    Which means 32 percent of the time it might not be or

18   wouldn't be?

19   **A.**    It's possible, yes.

20   **Q.**    Okay.  But wouldn't -- even for the 32 percent, we're not

21   saying there's a 32 percent chance that that device is back

22   home in Batesville an hour away.  It just might be over here,

23   not inside the circle; right?

24   **A.**    It could be.

25   **Q.**    Well, let's talk about -- I'm not talking about could be.

1  What I'm saying is, you're telling this Court that, well -- if

2  I understand it correctly.  If I'm wrong, tell me.  What I

3  understand you saying is, just because Google says here's your

4  latitude and longitude, here's your radius, draw a circle, it's

5  still only a 68 percent chance you're inside that circle.

6      What I'm saying is, that doesn't mean there's only a

7  68 percent chance they are really there at all, period.

8  There's still 100 percent chance they're near this post office.

9  They might just be outside the circle, not inside?

10  **A.**  Again, that's possible.  That's correct.

11  **Q.**  What's not possible is it doesn't mean there's a

12  32 percent chance they were nowhere near here?

13  **A.**  I don't think they would be -- you said Batesville.  No,

14  I don't think so.

15  **Q.**  Yeah.  They're not an hour away or they're not 30 minutes

16  away?

17  **A.**  Correct.

18  **Q.**  They're here?

19  **A.**  Somewhere, yes.

20  **Q.**  Okay.  And the last thing, you were asked some questions

21  about the size of the box.  You can draw a geofence box all

22  sorts of different sizes, can't you?

23  **A.**  You can.

24  **Q.**  In fact, sometimes you don't draw a box.  Sometimes you

25  just put one latitude and longitude and say -- and you do a

1   radius around that and say give me everything within a hundred

2   meters of this latitude and longitude; right?  You've seen

3   those?

4   **A.**   Yes.  You can even see people where they'll draw polygons

5   that cover just the parking lot and a strip of the road, or,

6   you know, it can be shaped like a "T."  It can be anything.

7   **Q.**   And you typically base that on the different crime scenes

8   you're dealing with; right?

9   **A.**   They probably do, yes.

10  **Q.**   So, in this case, we had evidence from the video that

11  you've got -- you've got the assailant -- let me get the other

12  one that zooms in.

13       You've got an assailant that's here behind the post

14  office (indicating).  You've got a white SUV that comes across

15  the road and down here and back twice (indicating).  You've got

16  a red car that comes in here -- I can't remember the direction

17  it comes from, but it comes in here -- I think it comes this

18  way (indicating), and then it goes across the tracks and turns

19  around and comes back and then comes up here in the roadway in

20  front of this building right here (indicating).

21       So, in other words, here it makes sense.  Don't just draw

22  a little box right around the post office, but let's encompass

23  these roads where the cars are traveling.  That makes sense,

24  doesn't it?

25  **A.**   Again, yeah, you could draw the polygon to cover, you

1  know, the areas that you're describing in the video.  You could

2  tailor it to those -- you know, to that strip of road, that

3  section.  You could tailor how you -- how you need it.

4  **Q.**  Have you ever been to Lake Cormorant, Mississippi?

5  **A.**  I'm sorry?

6  **Q.**  Have you ever been to Lake Cormorant, Mississippi?

7  **A.**  No, sir.

8  **Q.**  I will tell you there is nothing there, as you can

9  probably see from this map.  There's literally nothing there.

10  At 5:30 on a Monday afternoon --

11      **MR. LEWIS:**  Excuse me, Your Honor.  I think people

12  from Lake Cormorant would object to that.

13      **MR. MIMS:**  I'm not sure there's anybody from Lake

14  Cormorant to object to it.

15  **BY MR. MIMS:**

16  **Q.**  But let me ask you this question.  You would agree with

17  me there would be a difference in the number of people you

18  might expect in Lake Cormorant, Mississippi, at 5:30 p.m. on a

19  Monday afternoon compared to the Oxford Square at noon on a

20  football Friday weekend?

21  **A.**  Right.  You're going to return a different set of users,

22  yes.

23  **Q.**  Right.  And so, in a case like this where you're looking

24  at a crime in Lake Cormorant, you might draw a bigger box

25  partly because you've got roads you're trying to cover, but

1  partly because you know you're only going to get a few devices
2  anyway; right?
3  **A**.   It's possible.
4  **Q**.   Whereas, if -- you've probably never been to Oxford on a
5  football Friday, but let me tell you, it gets crazy around
6  here.  If you had a crime on the Square at noon on a Friday
7  before a football game, you're going to have to probably draw a
8  small box or you're going to get way more information?
9  **A**.   Right.  They're going to respond with more users, yes.
10 **Q**.   Yeah.  So the size of the box can sometimes be related to
11 your location and the number of people that may be there;
12 right?
13 **A**.   It could.  It restricts the return, yes.
14 **Q**.   All right.  Thank you.
15         **MR. MIMS**:  No further questions, Your Honor.
16         **THE COURT**:  Let me ask you a question, and so you will
17 know it when you get there.  On the 32 percent, does that mean
18 that someone could be inside the radius and not be detected?
19 Is that some of the 32 percent?
20         **THE WITNESS**:  Yeah.  I mean, you could have -- so it
21 kind of goes both ways.  In cases that I've had, you'll either
22 have people who never entered the geofence -- if they have a
23 bad estimation or an estimated inside, well, now their data
24 gets returned versus -- you can also have bad estimations the
25 other way.  Let's say you know that device is squarely within

McInvaille - Recross

1  the geofence but a bad estimation is made by Google and puts

2  them outside of the fence, now their data is not returned.  So

3  that actually cuts both ways.

4          I've seen plenty of data where in Step 2 you see

5  people travel.  Let's just say -- you know, this covers a lot

6  of the street, but there are some that will meet up close to

7  the street but not encompass it.  You'll see people travel and

8  then jump in and jump back out.  You can tell they never

9  stopped.  There's no way they stopped based on their path of

10  travel and speed.

11          **THE COURT:**  Okay.

12          **MR. MIMS:**  May I follow up on that?

13          **THE COURT:**  Yes, sir.

14  **BY MR. MIMS:**

15  **Q.**    Mr. McInvaille, just one question on that.  Fair to say

16  that as far as this whole 68 percent deal, Google is exercising

17  its own good faith to try to comply with the warrant to say who

18  they reasonably believe to be within the parameters?

19  **A.**    Again, they're returning the estimates that they have,

20  yes.

21          **THE COURT:**  Counselors?

22          **MR. LEWIS:**  We have no questions.

23          **MR. CHINICHE:**  No, Your Honor.

24          **MR. TRAVIS:**  No thank you.

25          **THE COURT:**  Let's take a break and then -- you're

1    finally released.  You can sit in the courtroom.

2         Counselors, are you ready for arguments?

3         **MR. MIMS**:  Your Honor, may I bring something up before

4    we get to the break?

5         **THE COURT**:  Yes.

6         **MR. MIMS**:  Your Honor, I do have one potential

7    rebuttal witness.

8         **THE COURT**:  Okay.

9         **MR. MIMS**:  I don't think it's necessary, but I want to

10   see if I can reach an agreement with defense counsel.

11        So last night Wendi Grossi, who is in our office and

12   who has knowledge on how to run this CellHawk program and plot

13   points and the radius, she did these for me.  And as I was

14   asking Mr. McInvaille, the green dots with the circles around

15   them are the radiuses corresponding to the three hits on that

16   exhibit, the other, we just took three of the radiuses; we

17   plotted the main point; and then drew the 92, the 146, and the

18   347.  I can call Wendi in here to say that's what I did, but if

19   they'll agree that that's --

20        **THE COURT**:  Confer with them, and if it's necessary,

21   we'll take her as a rebuttal.

22        **MR. MIMS**:  Okay.  All right.

23        **MR. LEWIS**:  The point is they're in evidence.  What is

24   there to rebut?  What evidence needs to be rebutted?  They're

25   in evidence.

1          **MR. MIMS**:  The point is simply, since I crossed

2    Mr. McInvaille on it -- and he didn't dispute it, but then

3    again, he hasn't drawn it himself today on this.  If there's

4    some dispute that that's what this is, I can call Wendi to put

5    it in the record that's what this is.

6          **THE COURT**:  If that's --

7          **MR. LEWIS**:  That's not rebuttal evidence, Your Honor.

8          **THE COURT**:  Well, aside from that, I would say this to

9    help perhaps make the decision, speed it on.  I'm not

10   questioning it.  Okay?

11         **MR. MIMS**:  Okay.

12      (RECESS TAKEN.)

13         **THE COURT**:  Okay.  We're back on the record.

14         So I've read your arguments -- your motions and your

15   arguments and your memos.  I, hopefully, pretty much reviewed

16   the cases cited.  So I need you to hit the high points, and

17   then I do have some questions for y'all.

18         **MR. LEWIS**:  I assume that you want to hear from me;

19   right?

20         **THE COURT**:  Yes.

21         **MR. LEWIS**:  And, Your Honor, I'm going to try to --

22   because I know the Court has read the briefing, I'm going to

23   try to take what we heard here today and apply that to the law.

24         **THE COURT**:  Okay.

25         **MR. LEWIS**:  And I'm going to do the best I can, and I

1   hope I don't just, you know, bog down into minutiae.  But as

2   the Court's aware, we're making four primary arguments, and

3   there's a lot of components to each of them.

4           But our first is that the warrant should be

5   invalidated because of a misrepresentation of fact in the

6   Probable Cause Statement.  It's a *Franks* argument, Your Honor.

7   Number two, that the Government did not comply with the plain

8   terms of the warrant, which required further legal process to

9   go to the next steps of the -- of the warrant.  Then our third

10   argument is a more general and broad argument, which is that

11   the warrant violated the Fourth Amendment.  It was a general

12   warrant.  It was not particular, and it lacked probable cause.

13   And then, finally, our fourth argument is that the good faith

14   exception should not apply.

15           So, again, I'm just going to try to get right to what

16   the evidence was here today and how it applies to these various

17   arguments.  And the first one is that it was a defective

18   argument -- I'm sorry -- a defective affidavit and warrant.

19           As the Court is aware, *Franks* -- the *Franks* case

20   requires affidavits to be truthful.  The Fifth Circuit has held

21   that also an affidavit in support of a warrant cannot

22   manipulate facts subtly.  There is also authority that a

23   warrant should contain exculpatory information.

24           **THE COURT:**  Mr. Lewis, I so apologize that I

25   interrupted you.

1    Ms. Tracy, will you come get real time back up.  I've
2    lost it.

3        (CONFERRING OFF THE RECORD.)

4        **THE COURT:**  Thank you.

5        Okay.  Proceed, Mr. Lewis.  I apologize.

6        **MR. LEWIS:**  Sure.  So I'm talking about defective
7    affidavit, and the -- Paragraph 16 of the warrant is what
8    we're -- I'm sorry -- the affidavit is what we're talking
9    about.  "Postal inspectors conducted a detailed review of the
10   video surveillance, and it appears that the robbery suspect is
11   possibly using a cellular device both before or after the
12   robbery occurs."

13       And the evidence here today has shown quite clearly --
14   and the Government, I believe, concedes -- that no cellular
15   device whatsoever is shown in the video.  And we had a lot of
16   discussions about what putting your left arm by your head means
17   and what it -- what that signifies and what was going on at
18   that time.

19       But the fact of the matter is, Your Honor, that a more
20   candid or truthful statement in the warrant application would
21   be something to the effect -- not that somebody might have
22   possibly been using a cellular device but that the -- the
23   suspect was putting his left hand by his ear.  That's truthful,
24   according to them.

25       Now, the Court can decide.  I don't -- the fact that

1    we had to spend two hours this morning studying video and

2    interpreting video I think makes my argument for me as to what

3    the video shows, and how hard we had to work to -- you know, to

4    explain what the video shows and says I think is really all --

5    all the Court needs to know.

6          So, now, you heard Inspector Matney testify that it

7    was his understanding that the information about cell phone use

8    was a prerequisite or a requirement to obtaining a geofence

9    warrant.  Now, as a matter of fact, I don't know if that's true

10    or not.  The Court's heard testimony that there are geofence

11    warrants that don't have that language in there, but the

12    importance of that is, Your Honor, that Inspector Matney

13    believed it had to be in there and, therefore, was incentivized

14    to state that there was cell device usage when, in fact, a more

15    truthful statement would not support that.

16          So, you know, it's -- the Court can understand why

17    that is in there.  That's what was in the "go-by."  He had been

18    told by people that you had to have it in there if you're going

19    to get a geofence warrant.  It's in the form.  That was the

20    evidence that came out here today.

21          Okay.  Argument number two, further legal process.

22    I'm not sure I can do better than Mr. McInvaille on questions

23    put to him by the Court, which were that every geofence warrant

24    he has seen that contains the further legal process language

25    has required -- a court has required that the agent go back and

1  get another warrant.  And it makes sense, Your Honor.

2  Think about the fact that the -- Google has just

3  produced some anonymous data.  Now, in this particular case, it

4  was not a lot of anonymous data; right?  It was three devices.

5  But it didn't have to be.  Using their example, the geofence

6  warrant could have been the Oxford Square on game day weekend.

7  That would have produced hundreds, if not thousands, of returns

8  of hits.  This is a lot of information.  This is anonymous

9  information.  This is information that the user has an

10  expectation of privacy in.

11  Does it not make sense that the agent should -- going

12  back and picking out, "I want this one, I want this one, I

13  don't want those two, but I think I want that one, and I want

14  that one and that one, when the agent comes back to the Court,

15  should not the Court have to approve that?  It's completely

16  arbitrary.  It's completely discretionary in that -- for the

17  agent.

18  So, therefore, in this case, Your Honor, obtaining

19  this de-anonymized data was, by definition, warrantless.  That

20  was a warrantless search.  It was specific user information

21  that was provided by Google without a warrant.

22  And, again, if the agent is going to get somebody's

23  specific information -- a specific account information, doesn't

24  it make sense that they would have to go back to the Court for

25  approval to do so?  Because, as the Court figured out or noted,

1  you're narrowing.  You're taking a large universe of

2  information that's anonymous, narrowing it down into specific

3  information that is not.  And so it can only mean coming back

4  to the Court for obtaining another warrant.

5          I don't know what their argument is.  I really don't.

6  I do not know what their position is as to further legal

7  process meaning something other than obtaining the authority of

8  the Court to do what they want to do.

9          Third argument, improper general warrant.  Okay.  I

10  don't know if this is an argument.  I don't know if this is

11  something the Court is concerned about.  Maybe we'll find out.

12  But I think we start with the principle that a person has a

13  general expectation of privacy in their location history.  You

14  know, I don't know that that's in dispute in this case, but I

15  guess we'll find out.

16          So in order to search that information, the Government

17  has got to have probable cause and has got to have a particular

18  warrant.  So the probable cause fails here because they were

19  not searching any particular account, that this is inverted

20  probable cause.  Okay?  That we think somebody committed a

21  crime within this geofence; therefore, let's search 592 million

22  devices to see which are in there.  Okay?  There is not

23  probable cause to search 592 million devices.  I think the

24  Government would agree with that.

25          The -- so in typical probable cause, we believe that

1   this suspect, Mr. X, has committed a crime.  We want Mr. X's

2   phone data.  Okay?  That is completely lacking here.  And I

3   said I wouldn't do it, but I think I will.

4         The Court is familiar with the *Ybarra* case, which was

5   relied on heavily by the Court in *Chatrie* in invalidating the

6   warrant, and really -- really applies to this situation.  And

7   I'm just going to point it out.  I again apologize for

8   repetition.

9         But in that case, there was evidence that in the

10   Aurora Tap Tavern somebody named Greg might have narcotics on

11   their person.

12         **THE COURT:**  I remember the case.

13         **MR. LEWIS:**  Okay.

14         **THE COURT:**  Can't search everybody in the bar.

15         **MR. LEWIS:**  Right.

16         **THE COURT:**  Okay.  I got it.

17         **MR. LEWIS:**  So you can't search everybody in the world

18   to see if somebody was in the fence.  It's the same --

19         **THE COURT:**  Let me stop you right there and ask you

20   this.  Isn't it a fact, though, that the searches are

21   different, the extent of the searches are very different in the

22   sense that, if you walk in the bar and there's 30 patrons and

23   you search all of them, you have searched the person of 30

24   persons versus 592 million people never know they've ever been

25   looked at?  Is it even fair to call it a search?

1    **MR. LEWIS:**  Well, I think courts have held that a
2    search of the Sensorvault is a search.  I don't know if that's
3    in dispute.  But the idea is Google Sensorvault is the Aurora
4    Tap Tavern.  We believe somebody in that Sensorvault has
5    committed a crime.  We're going to search the location history
6    for everybody in that Sensorvault and find out who was in this
7    box; and, therefore, we'll start, you know, pursuing these
8    leads.

9              **THE COURT:**  Yeah.

10             **MR. LEWIS:**  So, again, I think -- I mean, again, the
11   Court in *Chatrie* relied heavily on *Ybarra* in invalidating the
12   warrant, and I -- you know, I think that applies here.

13             And then the other requirement of a valid warrant is
14   particularity.  And this is phrased in a lot of different ways.
15   So what's really unparticular about the warrant is it doesn't
16   identify anybody in particular that needs to be searched.  But
17   what is especially defective about the warrant and what is --
18   makes it unparticular is that the Government decided who to
19   search in Step 2 and 3.  It gave the Government the power to
20   say we're going to -- we're just going to look at these
21   accounts and not those accounts, completely arbitrarily, in
22   their discretion, without court intervention, without a court
23   saying that's proper.

24             And in this particular -- and the point that
25   Mr. McInvaille was making is that the Government has apparently

1  decided that one of these accounts returned anonymously, that

2  this is an innocent person.  This is somebody that didn't do

3  anything wrong.  I'm sorry.  And I -- I'll look it up.  I can't

4  find it, but you know what I'm talking about, Your Honor, the

5  one they didn't pursue.

6         **THE COURT:**  Right.

7         **MR. LEWIS:**  But guess what?  That person got their

8  data disclosed to the Government even though the Government

9  didn't think they did anything wrong.  It made it all the way

10  through the process.

11       Fourth argument, no good faith exception.  So the good

12  faith exception does not apply when certain factors are

13  present, including incorrect or false statements in the

14  underlying affidavit, which I've discussed above and will not

15  go over again.

16       But also the affidavit omitted the true scope of the

17  search.  Judge Percy was not told that 592 million accounts

18  would be searched in order to -- in order to complete the -- or

19  to respond to the warrant.  So I don't think the magistrate

20  would approve that warrant.  I think that's important

21  information.  That's information that should have been

22  considered by the magistrate, and that was not in there.  So,

23  you know, an omission of important facts also should work

24  against the good faith exceptions applicability here.

25       The second reason the good faith exception should not

1    apply is the warrant was clearly lacking in indicia of probable

2    cause.  I won't restate the argument, other than to say the

3    warrant identified no suspects.

4            And then, finally, the warrant was facially deficient

5    in its scope and purpose.  It did not identify how many people

6    it would be required to search.  It was just a bad warrant on

7    its face.

8            So I hope I -- I hope I did okay just summarizing and

9    making it relevant.  And that's all I have, Your Honor.

10    **THE COURT:**  Thank you very much.  Do any of your

11    co-counsel wish to make any arguments?

12    **MR. CHINICHE:**  No, Your Honor.  I believe Mr. Lewis

13    has adopted our argument but would like to reserve the right to

14    respond to any Court's questions.

15    **THE COURT:**  Yes.

16    **MR. CHINICHE:**  Thank you, Your Honor.

17    **MR. TRAVIS:**  My statement is the same, Your Honor.

18    **THE COURT:**  Thank you.  I've got to get all of y'all

19    home pretty soon.  It's getting bad.

20            Okay.  Mr. Mims.

21    **MR. MIMS:**  Thank you, Your Honor.

22            Your Honor, I think I'm going to start by just kind of

23    briefly outlining my argument.  I'm going to try very much not

24    to regurgitate what's already in my brief.  I know you're very

25    familiar with it.  And I want to address -- go through

1    Mr. Lewis's arguments, and some of it may be a little bit
2    redundant, but I want to -- I want to specifically talk about
3    some points he raised.

4          **THE COURT**:  Absolutely.

5          **MR. MIMS**:  First of all, the first thing that I want
6    to talk about is probable cause and particularity.  So for
7    probable cause, you have the affidavit of Todd Matney.  Of
8    course, Stephen Mathews assisted him in drafting that
9    affidavit, reviewing the evidence, and putting the affidavit
10   together.

11         Inspector Matney is the one who presented it to the
12   judge because he's the one here in Oxford.  That was back when
13   we were still going before the magistrate judge in person every
14   time.  Nowadays we often do that by phone.  But because Agent
15   Matney is here and he is the lead investigator, he presented
16   the warrant with the affidavit to the judge.

17         In the Probable Cause Statement, there's a lot there,
18   but the one key part here that we're all talking about is a
19   statement where he says, "Based on review of the video, it
20   appears that the subject was possibly using a cellular device."
21   Now, first of all, I do want to talk about the fact that you
22   don't even have to show that.  That is not a requirement to
23   obtain a geofence warrant.

24         In *Google III*, which is 497 F.Supp.3d 345, the Court
25   stated, "In this case, it is important to note that there is no

1  evidence in the affidavit that any of the suspects possessed
2  cell phones or used cell phones in the commission of the
3  offense nor is there any additional evidence that perpetrators
4  or witnesses of the crime used Google applications or operating
5  systems that would store location data." *Google III* is one the
6  cases in which the Court found the geofence warrant to be
7  constitutionally valid.

8         We do geofence warrants all of the time in which we
9  don't have the benefit of video.  We just know a crime has
10  occurred at this location.  We have no clue who committed it.
11  It's a fantastic tool for identifying who was present.  And
12  that's what it is.

13         We're not searching a person.  We're not searching a
14  car or a house or a cell phone for evidence of a crime.  We're
15  searching to find out who was present.  And you do not have to
16  say that a cell phone -- that we saw a cell phone in a video or
17  that we have evidence a cell phone was used to commit the
18  crime.  It is enough to simply say criminals, like everybody
19  else, they use cell phones, and we think Google may have
20  information.  And thousands of these are issued every year
21  based on that.

22         Now, with that being said, I will readily stand up
23  here and admit, if an agent put something in an affidavit, it
24  better be true.  And I'm not about to come up here and say,
25  well, excuse a misrepresentation.  If it's in an affidavit, it

1 | needs to be true. Inspector Matney's statement was true.

2 | Mr. Lewis commented in his argument that the
3 | Government admits no cellular device was shown in the video.
4 | And that's absolutely true. If Inspector Matney's affidavit
5 | had said, "We see a cell phone," that would not be true. If it
6 | said 100 percent guarantee the cellular device was in use, that
7 | would not be true. That's not what he said. He said, based on
8 | our review, it appears he was possibly using it.

9 | And I think a quick review of the video shows that.
10 | I've put the details with the time stamps in my response. But
11 | you see what I believe is Mr. McThunel -- from the time he gets
12 | out of the white SUV until right before the white postal truck
13 | pulls up, you see him for three minutes walking around with his
14 | left thumb up to his ear.

15 | The only reason you would have your hand up here is if
16 | you're going to scratch your head -- and that may take you a
17 | couple of seconds -- or if you're brushing your hair. And I
18 | usually do that in front of the mirror in the mornings, not
19 | back there behind the post office.

20 | If you're walking around for three minutes like this
21 | (indicating), you're using your phone. No other explanation
22 | makes sense. And it's certainly valid for case agents to look
23 | at that video and see him with his hand up to his ear for three
24 | minutes and say, "It appears he's possibly using a cellular
25 | device."

1  The one after the video is a little bit -- it's a lot

2  less clear.  I will tell you that when I watched the video it

3  looked to me like at the -- I think it's the 13 -- it was the

4  13:34 mark -- it looks to me like -- you have to look very

5  closely -- that McThunel looks in his pocket real quick and

6  turns his head down like he's checking to see if he has any

7  texts.  But, in fairness, neither one of the agents testified

8  that's what they relied on.  I see it in the video.  They

9  weren't relying on that.

10  What they both testified to is they see the point from

11  the 13:58 to 14:07 mark where he squats down and he sticks his

12  hands out in front of him like this (indicating), and it looks

13  like maybe he's checking a phone, sending a text, or something.

14  It appears.  Again, though, they didn't say he clearly 100

15  percent did it.  They say it appears he did it.  That is

16  truthful, and it is not a lie, and there's no misrepresentation

17  in that affidavit.

18  Let's talk about particularity for a minute.

19  **THE COURT:**  Let me ask you something.

20  **MR. MIMS:**  Yes, ma'am.

21  **THE COURT:**  The no misrepresentation in the affidavit

22  really speaks to the good faith exception more than it does --

23  in your opinion, is this right? -- more than it does whether or

24  not there was or was not a phone there because a phone is not

25  even necessary?

1              **MR. MIMS:**  That's correct.

2              **THE COURT:**  Okay.

3              **MR. MIMS:**  That's correct.

4              **THE COURT:**  So we're really talking good faith

5    exception when you stress that it wasn't a misrepresentation?

6              **MR. MIMS:**  That is correct.

7              And I do want to point out too that the phone

8    records -- admittedly, those were obtained later after we got

9    the identities of people, but the phone records do confirm

10   Mr. McThunel was on the phone for five minutes right about the

11   time he stepped out of that SUV.

12             **THE COURT:**  Right.

13             **MR. MIMS:**  On the issue of particularity, first of

14   all, I believe the warrant was particular.  And I've got --

15   I've got to find where I outlined it earlier.

16             But the phone -- I'm sorry -- the warrant -- or,

17   rather, the affidavit, I should say, says this is an

18   application for a search warrant for information maintained on

19   computer servers controlled by Google, Google location data

20   with particular specified location at a particular time, that

21   being this geofence box between 5:00 and 6:00 p.m.  It's very

22   specific in what we're looking for and what we're asking for.

23             But even on the issue of particularity, there's a

24   case -- a 2023 case that Mr. McGee just found for me out of the

25   District Court -- I'm sorry -- the D.C. Circuit.  This is a

1   January '24 (sic) case.  It is cited at 2023 WL 372044.  So it
2   just came out.

3          And at the end, if I can find the important part here,
4   it says, "Having found the geofence warrant to be
5   constitutionally valid, the Court notes the alleged lack of
6   particularized probable cause would not have been grounds for
7   suppression anyway, because under the good faith exception,
8   'evidence obtained in objectively reasonable reliance on a
9   subsequently invalidated search warrant' need not be
10  suppressed."  So I say it was -- we satisfy particularity.
11  Even if we didn't, the good faith exception would still apply.

12         Your Honor, just in brief, these -- this is addressed
13  in my response.  I know the Court has read them, but the *Google*
14  *III* and the *Google V* cases were both magistrate judge decisions
15  that granted the request for the geofence warrant, found them
16  to be constitutionally valid.  Both have a very good
17  explanation of how these work and why they should be valid.

18         I would also point out, too, the *Chatrie* case,
19  although denying the motion to suppress -- I'm sorry --
20  although finding the warrant to be invalid, denied the motion
21  to suppress because of the good faith exception.

22         Your Honor, let's turn to the issue of further legal
23  process.  In the -- in his argument a minute ago, Mr. Lewis, I
24  thought, said he does not understand my argument.  Maybe I've
25  not made it very clear.

1    My argument is that the further legal process is set
2  forth in the attachment to the affidavit.  This G-2, as we
3  talked about earlier, was part of Attachment A to the
4  affidavit.  It just was inadvertently left off of the initial
5  one submitted in support of their motion to suppress.  But
6  that's part of the affidavit.  That's part of what the judge
7  reviewed when he signed the search warrant.

8    You've heard both agents testify their understanding
9  of this means the further legal process as set forth here.
10  Here is the process -- Step 1, Step 2, Step 3.  I would say,
11  even if the Court finds that, well, what that really meant was
12  you got to go back and get another search warrant, in good
13  faith, you can read this and believe that's not what it means.
14  The further legal process is laid out right here.

15    That, on demand, we can get Step 2 information.  On
16  demand, providers shall give us Step 3 information.  They acted
17  in good faith on what they believed to be the instructions of
18  the Court.  The judge had this information.  He signed off on
19  it.  Here's Step 2 -- here's Step 1; here's Step 2; here's
20  Step 3.

21    If further legal process meant you do Step 1 and then
22  you have to come back and get another search warrant, I would
23  suggest the best thing to have happened would be for Judge
24  Percy to have stricken Steps 2 and Steps 3 and said, "I'm not
25  going to sign this until you take that out.  Do Step 1, and

1    then come back and see me again." That's not what he did.

2          But further legal process is set forth right here.

3    And that's what agents understand it to be because they all

4    talk about Google having this legal portal, going through --

5    I've heard it ever since we've done these. You've got to

6    submit stuff through the Google legal portal. So in my mind,

7    I'm thinking legal process means we're following Google's legal

8    process going through the legal portal.

9          And I believe Mr. McInvaille agreed with me when I

10    asked him about, you know, Google wouldn't hesitate -- if

11    you're not following the steps properly, Google will not

12    hesitate to reject your warrant. They are not law enforcement

13    friendly. You have to dot your I's and cross your T's or they

14    will not comply.

15          And so if Google looked at this -- because they get --

16    you heard one of the agents testify that they get not only the

17    search warrant but the attachments, which is the page 1 and the

18    page 2 here. And if Google looks at that and thinks, no,

19    you've not checked all of the right boxes, they're going to

20    reject it and say, "Huh-uh. We're not giving you anything else

21    without the further warrant."

22          I would also point out too, if I'm not mistaken, the

23    information here in Step 3 could actually be obtained with just

24    a grand jury subpoena. Now, obviously, it's all part of the

25    search warrant process, but, technically, the subscriber name,

1    e-mail address, and all of that good stuff, you can get that

2    from Google with a subpoena.  You don't even need a warrant for

3    Step 3.

4        Moving on to the next point, Mr. Lewis talked about

5    this being an improper general warrant.  First of all, if he's

6    making that argument for 592 million people, he has no standing

7    to do so.  I believe I've addressed that in my brief so I'm not

8    going to belabor the point.

9        He mentioned that people should have an expectation of

10   privacy in their location history.  That privacy was not

11   violated.  I know I gave kind of a little silly example in my

12   cross-examination of Mr. McInvaille, but the point here is,

13   apparently, back in February of 2018 or, rather, after that, as

14   the case may be, Google looked to see -- they looked in their

15   Sensorvault to see who was in this box.

16       That would have included any information they had as

17   to where I was on February 5th of 2018, but my privacy has not

18   been violated because nobody knows where I was at 5:00 to

19   6:00 p.m. on February 5th, 2018.  The only people that know it

20   is the people at Google, and it's because I voluntarily let

21   them know where I was.  So no privacy interest has been

22   violated here.

23       I also point out, Mr. Lewis says, "Well, they're not

24   searching any particular account."  We're simply searching

25   Google.  He makes a statement, "They searched 592 million

1  devices."  I will readily admit I am not the smartest person at
2  all when it comes to this technology.  I'm doing my best to
3  learn and catch up.  But I don't believe that statement is
4  true.

5       First of all, the warrant doesn't say we're seeking a
6  search warrant for 592 million devices.  It says we're seeking
7  a search warrant for Google for information maintained at
8  Google's headquarters.  And their own expert admitted Google
9  maintains all of this information in a Sensorvault, which is
10 basically an electronic file cabinet.

11      They're merely looking through their own information
12 that they store to see what information do we have that's
13 responsive.  They're not searching my phone, your phone, their
14 phone.  They're searching the information that we've given them
15 to store in their own file cabinet.  They're not searching 592
16 million devices.  They're searching Google's file cabinet.

17      Just briefly on *Ybarra.*  I know the Court's already
18 picked up on it.  It's a different situation.  In *Ybarra,* they
19 were searching individual people.  That's a completely
20 different type of search.  I did notice the Court made a
21 comment a minute ago, "592 million people didn't know they were
22 searched."  And I would simply argue 592 million people weren't
23 searched.  Google was searched.

24      Mr. Lewis did talk about the fact that *Chatrie* relied
25 heavily on *Ybarra* in invalidating the warrant.  I would point

1  out that, regardless of that, *Chatrie* still found the good

2  faith exception would apply.

3  Now, Mr. Lewis makes the comment that the Government

4  determined one account wasn't involved and, therefore, didn't

5  pursue.  Let's talk about that for just a minute.  First of

6  all, law enforcement investigating a crime -- they make

7  decisions all of the time about what leads to pursue and who to

8  interview and then look at a situation and determine what's

9  relevant and what's not.  That's all part of an investigation.

10  I think Mr. Lewis has the facts a little bit wrong

11  based on the testimony of the agents.  And, frankly, Your

12  Honor, to be clear, I've messed it up a little bit in my

13  response because I think -- in my response, I think I said they

14  narrowed it down from three to two before they got to Step 3.

15  I was wrong.  I got that wrong.

16  **THE COURT:**  You confused me.

17  **MR. MIMS:**  And I apologize for that.  I got confused.

18  In fact, they didn't narrow it down to two until after the

19  geofence warrant.  And then they narrowed it down to two and

20  said, "We want a second warrant for location information on

21  McThunel and Smith only from January to April."

22  But, in fact, what Inspector Mathews testified to was

23  we did get the information on this third individual.  That

24  third individual didn't appear to be involved, but we're going

25  to follow up and see who it is anyway because maybe they were a

1 witness.  We'll see.

2 And they tried to track it down, and they couldn't
3 figure out, based on the information Google gave them, exactly
4 who that was.  And so they gave up on it.  But it did not
5 appear to be anybody that was relevant because, from the video,
6 you've got a drop-off person, you've got an assailant, you've
7 got a lookout, and they're all gone by about 5:30 or so.  So
8 somebody hitting at 5:58 doesn't appear to be involved anyway.

9 Last thing, Your Honor, I think.  In regards to good
10 faith exception, I think we've really already addressed that
11 issue.  I would point out that, when Mr. Lewis says, "Well,
12 Judge Percy was not told 592 million accounts were searched,"
13 again, as I said, I don't believe we're searching 592 million
14 accounts.  It's our opinion we're only searching Google's file.

15 I would point out one thing that I've highlighted from
16 the defendants' memorandum, just some things that they admit.
17 They admit that location history is maintained by Google.  They
18 admit that Google collects this data and that one purpose in
19 collecting it is to allow Google to better tailor searches but
20 also for -- collecting is for advertising revenue.

21 So Google uses this to enhance its business and to
22 have advertising revenue.  To me, it's kind of unfair to say,
23 well, they're allowed to get it for this but law enforcement
24 can't use it.

25 And, finally, again, they admit Google collects this

1   information associated with each account in a Sensorvault to be

2   used for advertisement, marketing, and many other purposes.  So

3   I don't think there's any real dispute that this is information

4   that Google collects and stores and we're simply searching

5   Google.

6          Your Honor, I'd be happy to answer any other questions

7   the Court may have, including if the Court has any more

8   questions about the length of time it took to bring this case,

9   as you raised earlier with one of the witnesses, but,

10  otherwise, Your Honor, I have nothing further.

11         I would ask the Court to find that the warrant is

12  valid, but in the alternative, if you should find there's any

13  defects in the warrant, I would certainly assert the good faith

14  exception applies.

15         I would point out, Your Honor, this warrant was

16  obtained in 2018.  Even today, there's not much out there

17  legally as far as guidance and direction on geofence warrants.

18  Certainly, in 2018, there was not.  These agents are doing the

19  best they can.  As long as they didn't misrepresent the facts

20  in the affidavit, I don't see how the good faith exception

21  cannot apply.

22         That's all I have, Your Honor.

23         **THE COURT:**  Thank you.

24         Any rebuttal?

25         **MR. LEWIS:**  Well, Your Honor, I'm inclined to spare us

1 from any more talking about this issue.

2 But, you know, if I want to enable location history in
3 order to, you know, get ads and restaurant recommendations when
4 I'm in Memphis, I've not consented to the Government searching
5 my location history. Okay? I'm going to jump around a little
6 bit.

7 The argument about, you know, we're just searching
8 Google's vault and, therefore, it's particular, I mean, that
9 argument was directly rejected in *Chatrie*. And, again, *Chatrie*
10 is the only case of the six that had the record -- the similar
11 record that the Court has before it today. The other five,
12 *Google I, II, III, IV, and V*, three of which invalidated the
13 warrant, two permitted it to go, those were magistrate
14 decisions that were not on a complete record. And so I just
15 tell the Court that.

16 We've put into evidence today that Google searched 592
17 million accounts in order to comply with this warrant. I
18 appreciate that the Government doesn't believe it or rejects
19 that, but they have not presented any evidence to dispute that,
20 Your Honor. And I would submit to the Court that the Court
21 should accept that as true and undisputed.

22 *Chatrie*, as we heard on several occasions, that the --
23 the evidence was not suppressed because the Court found the
24 good faith exception. There were no facts similar to that that
25 the Court has today about the -- in *Chatrie* about what -- what

1   was actually in the warrant.  And, therefore, the Court has a

2   fuller record or more information to find that the good faith

3   exception is inapplicable.

4          Again, I mean, I'm -- I almost think that the

5   Government has made my argument for me by putting out ideas and

6   suggestions about, Well, the Court could conclude that further

7   legal process was already in the warrant.  Alternatively, the

8   Court could conclude that further legal process meant that you

9   were going to get on the LERS, which has the word "legal" in

10  it -- that's the further legal process -- we're going to get on

11  the LERS to get the other information.

12         Again, Your Honor, the Court is required to read the

13  warrant as written, and legal process can only have one meaning

14  in this particular context.  So, Your Honor, we would ask the

15  warrant be invalidated and the evidence from it be suppressed.

16         Thank you, Your Honor.

17         **THE COURT:**  Thank you.

18         Just two or three things to leave you with.  I --

19  Counselors, you both -- I'm just going to say -- you speak for

20  the defendants, Mr. Lewis.  We are at this point all in

21  agreement that it does not take the allegation of the presence

22  of a cell phone in a search warrant to make that valid?

23         Agree, Mr. Mims?

24         **MR. MIMS:**  Yes, ma'am.

25         **THE COURT:**  Agree?

1      **MR. LEWIS:**  I think so, Your Honor.

2      **THE COURT:**  Okay.

3      **MR. LEWIS:**  Wait.  Hang on a minute.

4      **THE COURT:**  Anybody differ from that?

5      **MR. CHINICHE:**  Can you state that again, Your Honor?

6      **THE COURT:**  Well, I speculate --

7      **MR. CHINICHE:**  Right.

8      **THE COURT:**  -- that perhaps the affiant in this case

9  thought it necessary at the time to say that there was possibly

10  a cell phone.  I speculate.  Okay?  It doesn't take a cell

11  phone to do a Section 2703 production, does it, Mr. Mims?

12      **MR. MIMS:**  I agree with what you're saying.

13      **THE COURT:**  Mr. Chiniche --

14      **MR. CHINICHE:**  I don't --

15      **THE COURT:**  -- do you believe it takes a cell phone?

16      **MR. CHINICHE:**  I believe -- I believe it does.

17      **THE COURT:**  Okay.  I thought before we left we'd agree

18  on one thing.

19      **MR. CHINICHE:**  Right.

20      **THE COURT:**  Okay.  I hear you.  I hear you.  But

21  that's where I've got to make a determination there.

22      Do you -- and, Mr. Mims, you've had, apparently, some

23  experience with this and I have not.  Mr. Goodloe, I don't know

24  if this is your first argument in a geofence warrant case or

25  not, or for any of the other defense counsel, but is it fair to

1   say that not all search warrants -- or affidavits, I should

2   say -- not all affidavits has the -- has the language further

3   legal process?

4         **MR. MIMS**:  I think that's true.  I'd have to go back

5   and look at it to be certain.  I know mine will not in the

6   future, but I don't know -- I can't speak to -- I can't speak

7   absolutely certainly regarding the past.

8         **THE COURT**:  Okay.

9         **MR. MIMS**:  Your Honor, may I have one second?

10         **THE COURT**:  Okay.

11         **MR. MIMS**:  Your Honor, I'm going to let Mr. McGee --

12   he knows a lot -- he does a lot more of these than I do.

13         **THE COURT**:  He sat here all day long just to get to

14   say a few words at the end.

15         **MR. McGEE**:  Exactly.

16         So, Your Honor, the Government would submit that

17   this has been ever-evolving since 2000 -- probably -- '17 and

18   the go-bys that I've seen have the vault.  Okay?  And it really

19   is what -- the Department and Google, in my understanding, have

20   negotiated on what we have to do to get the information that we

21   need.

22         So, in other words, like, I was told recently on a

23   geofence that now for Step 3 you have to submit another search

24   warrant.  So that's changed.  And, in fact, you'll see, I

25   think -- in this brand new case that came out a couple of days

1   ago, I think that's what they did because it was all in the

2   January 6th investigation, my understanding.

3          **THE COURT:**  Okay.

4          **MR. McGEE:**  So this happened in 2018.  And, Your

5   Honor, I mean, I think he even insinuated in some of the expert

6   in his direct that, upon demand from the Government, an e-mail

7   through the portal -- or not an e-mail -- but through the

8   portal, Google would send you back that data.

9          And so to answer your question, I think -- I think the

10  go-bys have changed, I want to say, at least twice but maybe

11  three times that I've seen.  I've used different ones and --

12  sent out different ones and seen different ones.

13         **THE COURT:**  Okay.

14         **MR. CHINICHE:**  But -- but, of course, you're the final

15  arbiter of this.

16         **THE COURT:**  Yes, sir.

17         **MR. CHINICHE:**  And what the Government has gotten away

18  with in the past is not -- is not indicative or binding on the

19  Court.  And let's keep in mind what Google -- what -- the data

20  that Google's giving over.  It's not everybody with a cell

21  phone.  It's not everybody with just a Google account.  It's

22  everybody that has location services or history turned on.

23         And none of that information is relayed to the

24  magistrate judge.  And it wasn't in 2018.  And this -- the face

25  of this search warrant indicates further legal process.  It's

1   a -- it's a sentence long, and I don't know how it could be any
2   more clear.

3           Thank you.

4           **THE COURT**:  Okay.  Mr. Mims.

5           **MR. MIMS**:  May I address that just briefly?

6           **THE COURT**:  Yes.

7           **MR. MIMS**:  I think the good faith analysis applies not
8   just to probable cause in the affidavit, but I would argue it
9   applies to the entire process, and that if the agents were
10  acting in good faith on what they believed the process was, as
11  set forth in the affidavit, signed off by the judge -- I
12  actually realize I think I make this argument earlier -- but I
13  think the good faith analysis would apply to that as well.

14          So even if you look at this and say, well, I don't
15  think that's really the best interpretation of these words, if
16  they're acting in good faith on that, I think the good faith
17  analysis still applies.

18          **THE COURT**:  In going to that point, do both of you --
19  do you all agree that there was no case law in 2000 -- no
20  published case in November of 2018?

21          **MR. CHINICHE**:  I believe -- I believe we could -- I
22  believe that's what our information -- our research has shown.

23          **MR. MIMS**:  Your Honor, just for the record, I'm
24  looking at the cases that I've found, and I've got 2020, 2020,
25  2021, 2020, 2021, and the *Chatrie* case in 2022.  There wasn't

1  any case law in 2018.

2  **THE COURT:**  I'm equating this a little bit like one

3  does in looking at a qualified immunity defense, you know,

4  objective reasonableness and what did you know at the time of

5  the commission of the offense.  We don't find any cases that

6  would have assisted the agent in knowing how to draft the

7  search warrant, which I think logically is why everybody was

8  borrowing everybody's -- copying everybody's work, good or bad,

9  picking up language like further legal process and not knowing

10  what it meant.

11  Why did it take from 2018 to 2023 to get this case to

12  this place?

13  **MR. MIMS:**  Well, Your Honor, for one thing, it was a

14  lengthy investigation to begin with.  As you know, from the

15  crime occurring in 2000 -- in February 2018, the geofence

16  warrant was not even sought until November of 2018.  I'd have

17  to get some clarification from the agents, but I speculate the

18  reason for that is, this was so new, agents at that time

19  weren't thinking in terms of geofence warrants.

20  It was months later, when talking with other agents

21  how do we figure this out who was there, Stephen Mathews hears

22  from somebody else, "Hey, try geofence warrant."  "Oh, what's

23  that?  Let's look into that."  These days we're a lot quicker

24  on "Let's get a geofence warrant."  But it took time.

25  And once you get the geofence warrant and identify

1    these individuals, now you've got to get corroborating

2    evidence.  You have to get more search warrants to see where

3    their movements are.  Let's chart these on a map and let's get

4    other information to try to corroborate.

5         And, frankly, there were other folks they interviewed

6    that they thought were potential suspects.  They're

7    interviewing and looking at and said, "Okay.  They weren't

8    involved."  But it's a broad investigation.

9         Now, I don't remember the exact time frame when I

10   first drafted an indictment in this case, but it's been quite a

11   while back.  For one thing, as a prosecutor, we're always

12   looking to see, hey, do we have enough evidence?  What else do

13   we need?

14        And, frankly, I also handle a big caseload.  And so

15   sometimes things sit on my desk a little while.  But I got

16   it -- I want to say -- I want to say it would have probably

17   been sometime in 2020.  I may be off.  It's been two or three

18   years ago when I thought, I'm ready to go.  Let's prosecute

19   this case.

20        And, frankly, I drafted an indictment that included a

21   fourth person we've not talked about today.  That is Chevella

22   Hines.  Chevella Hines had a relationship with Jamarr Smith.

23   She worked at the post office right up the road, I think

24   Robinsonville, which was stop three out of five stops.  Lake

25   Cormorant was the fourth stop.

 1          What you'll hear, if we'd gotten into it today, from

 2   the postal inspectors is these are always an inside job.

 3   Always.  Because the assailant didn't grab all of the mail.  He

 4   grabbed the registered mailbags because that's where the money

 5   is.  Somebody tells them that's where -- what to do.

 6          I wanted to indict Chevella Hines.  When I prepared

 7   the indictment for that and my supervisors looked over it and

 8   reviewed it, they said, "We're not going to let you do this

 9   right now because we don't think you have enough evidence to

10   charge her."  And they were -- they were right.  I know in my

11   heart she was involved.  I don't have proof I can put in front

12   of this jury.

13          So I had to step back and say, "Hey, let's keep

14   looking.  Let's keep digging.  What can we do?"  Frankly, I

15   worked to try to do some other things with Chevella Hines.  It

16   didn't work out.  But at that -- at this point now, I'm slowing

17   down the process.  And then, of course, COVID hit, and that

18   slowed down everything a lot.

19          And so here we are finally getting to the point where,

20   hey, we've got all of the evidence we're going to get.  It's

21   not going to get any better.  We're either going to charge it

22   or don't.  And at this point, I narrow my indictment down to

23   three individuals that I believe I have proof on, re-presented

24   it to my bosses, and they approved it.  But that's the

25   explanation -- lengthy explanation of why it took so long.

1      **THE COURT:**  And it truly is none of my business, and

2  so I apologize for asking it.  You've given me a good

3  explanation, and I appreciate it.  I wanted to satisfy myself

4  that it did not have anything to do with the search warrants.

5      **MR. MIMS:**  No, ma'am.

6      **THE COURT:**  That it did not get complicated down the

7  road somewhere that --

8      **MR. MIMS:**  (Shakes head from side to side.)

9      **THE COURT:**  Okay.  Good enough.

10      Very insignificant point, but just really trying to

11  look at it in the good faith light.

12      The argument that 592 million accounts have been

13  searched -- and I understand that that's something that you

14  learn at some point in the process, and I don't know where or

15  even if it was based upon some declarations that Google has

16  filed in some of these other cases, but it's really not

17  reasonable to believe -- is it reasonable to believe that the

18  affiant would have known that it took searching 592 million

19  cases when he made application for the warrant in November of

20  2018?

21      **MR. LEWIS:**  Well, I don't know what the affiant knew

22  or didn't know.

23      **THE COURT:**  How did we ever come up with 592 million?

24      **MR. LEWIS:**  Well, that's what Google stated.

25      **THE COURT:**  In some affidavit or declaration?

1      **MR. LEWIS:**  Right.  I believe it's attached to
2   Mr. McInvaille's report.  But the point is the warrant --
3   that's the point.  The agent didn't know how many were getting
4   searched because it was not particular.

5      **THE COURT:**  Right.

6      **MR. LEWIS:**  It didn't identify any accounts.  I mean,
7   there are people in the world who knew, like Mr. McInvaille.  I
8   mean, it was -- it was this inverted probable cause, as we
9   discussed, Your Honor.  We're just going to search all of the
10  accounts, see who falls into the thing.  They didn't know how
11  many accounts.  Shouldn't they know?  Wouldn't you think they
12  would know?

13     **THE COURT:**  I hear your point.  Well-taken.

14     Mr. Mims.

15     **MR. MIMS:**  Your Honor, you can't identify a particular
16  account.  The whole point is we're trying to figure out who was
17  there.  You can't possibly identify a particular account to
18  search.  You do that -- you know, you do that later on.

19     There's another thought I had, and it's just escaped
20  me.  Maybe it will come back to me at some point.

21     **THE COURT:**  I was thinking of it in light of
22  Mr. Goodloe's argument too, that the affiant should have
23  disclosed in the affidavit that 592 million accounts would be
24  searched so that Judge Percy, in all fairness, would know that.
25  And, you know, because I don't really understand what took

1  place in 2018, I don't know if that was even a known fact.

2  **MR. MIMS**:  Your Honor, I would -- I would argue it's

3  not a fact.  That's their position.  Again, you're not

4  searching 592 million cell phones or devices.  You're searching

5  Google's Sensorvault.  Now, maybe it's information that 592

6  million people have provided to Google, but you're searching

7  one file at Google, not 592 million phones.

8  And I know the other thought I had, Your Honor.  If --

9  if the whole idea that these search warrants are just per se

10  invalid because it's a reverse whatever Mr. Lewis referred to a

11  minute ago, I mean, the fact is you'll never in these be able

12  to say I want to search one particular person's account.

13  You're searching Google's records.

14  If that's just per se wrong, this issue would have

15  been decided, clearly, a few years ago.  And as *Google V* talks

16  about, Google responds to tens of thousands of these every

17  year.  This wouldn't be an issue.  We -- if that was the

18  case --

19  **THE COURT**:  Well, Mr. Mims, to your point earlier, if

20  you knew the device and the identity, then you wouldn't be

21  using a geofence warrant anyway.  You would be doing what they

22  did in Search Warrant Number 2.

23  **MR. MIMS**:  That's correct.  Yes, ma'am.

24  **THE COURT**:  So I get it.  Okay.

25  Counselors, I want to tell you you've done an

1  excellent job.  I started from scratch with this thing.  I'd
2  never heard of a geofence warrant.  So thank you for the
3  extensive research and help that you've given me in this case.
4  We'll take it under advisement, and I'll give you an opinion as
5  soon as I can.

6          **MR. MIMS**:  Your Honor, may I ask a question?
7  Obviously, it's not my place to really even ask the Court what
8  the --

9          **THE COURT**:  How soon I'm going to do it?

10         **MR. MIMS**:  -- timeline is.  Well, we do have trial
11 coming up three weeks from today.  Obviously, the ruling can
12 affect both parties as to what we may do or how much time we
13 spend preparing.  Do you have any just ballpark idea on a
14 timeline, if you're willing to share?

15         **THE COURT**:  Well, let's say by Tuesday of next week
16 we'll try to have something.  Tuesday or Wednesday.  Okay?
17 Natalie Lowry has this case.  She's the one that's done my
18 research for me.  So, Natalie, can you do that?  Okay.  I'm
19 counting on you.

20         **MR. MIMS**:  Thank you, Your Honor.

21         **THE COURT**:  Thank you.

22     (CONCLUDED AT 5:20 P.M.)

23

24

25

1                              CERTIFICATE

2

3       I, Phyllis K. McLarty, Federal Official Realtime Court

4 Reporter, in and for the United States District Court for the

5 Northern District of Mississippi, do hereby certify that

6 pursuant to Section 753, Title 28, United States Code, that the

7 foregoing 243 pages are a true and correct transcript of the

8 stenographically reported proceedings held in the

9 above-entitled matter and that the transcript page format is in

10 conformance with the regulations of the Judicial Conference of

11 the United States.

12       Witness my hand, this 28th day of August, 2023.

13

14                     /s/ Phyllis K. McLarty
                    PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
                    Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25